## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BRIAN D. JACKSON,** | ) | |
| **Individually, and as Personal Representative** | ) | |
| **of the Estate of Doris Jackson, Deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No: 1:15-cv-01066 (TFH)** |
| **v.** | ) | |
| | ) | |
| **COLGATE-PALMOLIVE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

### COLGATE-PALMOLIVE COMPANY'S MOTION *IN LIMINE* TO PRECLUDE ALL TESTIMONY AND EVIDENCE REGARDING PURPORTED TESTING OF TALC BY PLAINTIFF'S TESTING EXPERTS BECAUSE OF LACK OF AUTHENTICITY AND RELEVANCE OF TALC TESTED

Defendant Colgate-Palmolive Company ("Colgate") hereby moves *in limine* to preclude all testimony and evidence regarding purported testing of talc by Plaintiff's testing experts Mr. Sean Fitzgerald and Dr. Ronald Gordon because of lack of authenticity and relevance of talc tested.[1]  In support thereof, Colgate states the following:

## I.       INTRODUCTION

Plaintiff claims that his mother, Doris Jackson, developed mesothelioma from using Cashmere Bouquet talcum powder, a product that Colgate sold without any allegation of contamination or harm for over 100 years.  In support of his claims, Plaintiff relies ***not*** on any Cashmere Bouquet talcum powder Ms. Jackson claims to have ever used, but instead, on Plaintiff's experts' testing of talcum powder of unknown origin: (1) drawn from vintage Cashmere Bouquet containers purchased by plaintiffs' law firms on the internet or at antique shops, beginning in 2008; (2) taken from Cashmere Bouquet containers, also decades old, that

---

[1] Although this Motion *in Limine* is not technically a *Daubert* motion or dispositive of Plaintiff's claims, the Court's decision on this Motion is critical to the issues raised in the various *Daubert* and dispositive Motions Colgate filed in this case.  Accordingly, in an abundance of caution, Colgate files this Motion now.

had been maintained as "memorabilia" at Colgate facilities; and (3) taken from vintage Cashmere Bouquet containers, and a container of "AGI 1615" talc, which was kept in the 1970s at the Mount Sinai School of Medicine.

The multiple courts that have considered the admissibility of the nearly four dozen samples tested by Plaintiff's experts here have precluded the samples because of the decades-long gaps in chain of custody that prevent Plaintiff from establishing that any of the talc tested is Cashmere Bouquet talcum powder at all, much less talc in the same condition as when it left Colgate's manufacturing plants.  (Ex. 1 (Order in *Winkel v. Calaveras Asbestos, et al.*, LASC No. BC549253 Cal. Super. Ct. Apr. 13, 2015) (Rhodes, J.), hereinafter "CA Preclusion Order"); Ex. 2 (Trial Hr'g Tr. (May 17, 2016) in *Alfaro v. American Talc, et. al*, LASC No. BC583520 (Kralick, J.) at 118:12119:23, hereinafter "CA Preclusion Order II"); Ex. 3 (Trial Hr'g Tr. in *Nosse v. ArvinMeritor, Inc. et al.*, LASC No. BC603354 (Simpson, J.), at 32:7-41:24, hereinafter "CA Preclusion Order III"); Ex. 4 (Order and Memorandum Opinion, *Barlow v. Colgate-Palmolive Co., et. al*., Consolidated No. 24X11000783 (Cir. Ct. Balt. City Nov. 13, 2015) (Panos, J.), hereinafter "MD Preclusion Order"); Ex. 5 (Ruling on Chain of Custody and 104 Hearing, *Fishbain v. Colgate-Palmolive Co., et al.*, Docket No. MID-L-5633-13 AS (N.J. Super. Ct. Aug. 6, 2015) (Viscomi, J.S.C.), hereinafter, "NJ Preclusion Ruling"); Ex. 6 (Oct. 15, 2013 Hearing Tr., *Kaenzig v. Charles B. Chrystal Company, Inc.*, No. MID-L-4873-12 (N.J. Super Ct.)) at 230-34, 239-40, hereinafter, ("NJ Preclusion Ruling II").)

These courts correctly concluded that "the specimen[s] tested . . . by plaintiffs' expert(s) lacks a trustworthy/reliable s[o]urce of production," (Ex. 1 (CA Preclusion Order)), and that the plaintiffs' "inability to account for . . . multiple consecutive decades" of the whereabouts of the containers from which the talc samples were drawn renders the samples inadmissible, (Ex. 4

(MD Preclusion Order) at 4).   Additionally, because Plaintiff cannot authenticate the samples, any testimony or exhibits based upon those samples is irrelevant.  If Plaintiff cannot demonstrate the talc tested actually is Cashmere Bouquet talcum powder in its original state, the samples cannot support an inference that the talc to which the decedent was exposed was contaminated with asbestos.  As a result, this Court, too, should preclude the talc samples tested by Plaintiff's experts and, therefore, also any testimony or exhibits regarding the testing of those samples.

II.     **STATEMENT OF FACTS**

A.     **The Talc Samples Tested by Plaintiff's Experts**

Plaintiff's proffered experts Sean Fitzgerald and Dr. Ronald Gordon purport to have found asbestos contamination during testing of talc samples conducted for this and other litigations against Colgate.

Between 2012 and 2014, Mr. Fitzgerald tested samples of talc drawn from four vintage Cashmere Bouquet containers dating from the 1960s and 1970s.  (Ex. 7 (Chart of Product and Talc Supplier Samples ("Samples Chart")) ¶¶ 3, 36, 45, and 46.)[2]  Mr. Fitzgerald tested a sixth talc sample, drawn from a container identified by Plaintiff as "AGI 1615" talc, a talc purportedly sold in the 1970s by Whittaker, Clark and Daniels ("WCD"), a one-time talc distributor,[3] though never a supplier to Colgate for the talc used in Cashmere Bouquet.[4]  In April 2016, counsel for the plaintiff in another action purchased three more containers with Cashmere Bouquet labeling from eBay and provided them to Mr. Fitzgerald for testing.  (Ex. 10 (July 8, 2016 Mlekush Dep.) at 119:11-13.)  Dr. Gordon tested a total of 44 samples of talc, which included all but three of the

---

[2] The Samples Chart, which lists all of the samples at issue in this Motion, is annexed hereto as Exhibit 7. The sources for the information in the Chart are identified in the Chart itself.

[3] Ex. 7 (Samples Chart) ¶ 44; Ex. 8 (Apr. 28, 2014 Fitzgerald Report) at 9, 13.

[4] Whittaker, Clark & Daniels has previously represented at trial that it never sold talc to Colgate. (Ex. 9 (Sept. 9, 2015 *Fishbain* Trial Tr.) at 239:1-5.)

samples tested by Mr. Fitzgerald (in his 2012-14 testing) and drawn from vintage Cashmere Bouquet containers, dating from the 1930s to the 1990s.  (Ex. 7 (Samples Chart) at ¶¶ 1-42, 45, 46.)

Based on disclosures provided to Colgate in this and other actions, the 46 containers from which Plaintiff's experts drew samples and performed testing were obtained in three primary ways.  *First*, 19 containers were vintage Cashmere Bouquet containers purchased by various plaintiffs' counsel either from the internet or from antique stores, not earlier than the year 2008.[5] *Second*, 23 containers were vintage Cashmere Bouquet containers produced by Colgate in discovery from display cases of "memorabilia" maintained in some of Colgate's currently operating facilities or from current and former Colgate employees' personal collections.[6] *Third,* three of the containers—a small glass bottle labeled "AGI 1615" and two vintage Cashmere Bouquet containers dating from the 1970s—were received by the Mount Sinai School of Medicine, in New York City, in the 1970s, and were recovered four decades later from a commercial storage space.[7]  The last container was purportedly a vintage container of Cashmere Bouquet talcum powder from the 1970s and purportedly discovered by Kristi Lescalleet, a plaintiff in a case brought in the Circuit Court for Baltimore City, in Maryland.[8]

### B.      The Gaps in the Histories of the Talc Containers

Each of the plaintiffs' law firms who collected the 19 vintage Cashmere Bouquet containers from the internet—and in one instance from an antique store in New York— undisputedly did not obtain the containers until 2008, at the earliest.  (Ex. 7 (Samples Chart) ¶¶

---

[5] Ex. 7 (Samples Chart) ¶¶ 1, 3-15, 35, 36, 39, 45, 46.

[6] *Id.* at ¶¶ 16-34, 40-43; Ex. 11 (Oct. 5, 2010 Dr. Capdevielle Dep.) at 736:21, 742:8, 748:57-67:4.

[7] Ex. 7 (Samples Chart) ¶¶ 37, 38, 44; Ex. 12 (Sept. 26, 2013 Nolan Cert.) ¶¶ 6-7.

[8] Ex. 7 (Samples Chart) ¶ 2; Ex. 13 (Feb. 7, 2012 K. Lescalleet Dep.) at 61:1-5; *see also* Ex. 14 (Dec. 13, 2012 K. Lescalleet Dep.) at 39:18-41:4.

1, 3-15, 35, 36, 39, 45, 46.)  The Levy Konigsberg firm admitted, in response to discovery served by Colgate in New York litigation, that they were not the original recipient or buyer of the vintage samples purchased on eBay (specifically by the Levy Konigsberg firm), they did not know the original recipient or buyer of the samples, and they did not know how the samples were stored or maintained in the time between the time they were originally purchased or obtained and when they came into the law firm's control in 2008 and later. (Ex. 15 (Aug. 20, 2010 NY Pls.' RFA Resps.) at Nos. 3-5.)  They likewise admitted that all of the vintage Cashmere Bouquet containers that they had collected on the internet and at the antique store could be opened in two places: a shoulder seam and/or by simply removing the cap or top.  (*Id.* at ¶ 9; *see also* Ex. 7 (Samples Chart) ¶¶ 11-15, 35, 36, 39.)  Plaintiff's expert, Mr. Fitzgerald, has acknowledged that the containers collected by law firms from the internet were open when he received them and he knew nothing of the original owners or where the containers had been before the law firms bought them.[9]

Internet sites make clear that there is a community of vintage talc container collectors who refill antique containers with other talc for display purposes.  (Ex. 16 (Collectors Forum Discussion,   http://badgerandblade.com/vb/showthread.php/168906-Vintage-Old-Spice-Bottles-Won-on-eBay-Today (visited Aug. 27, 2013)) at 9 ("The trick to refilling your bottle would be finding a modern talc substitute you like that has a granular size similar to the original . . . ."); *id.* at 1 ("They are both empty but will look outstanding refilled with current product and displayed in my 'den.'"); Ex. 17 (eBay Search Results for Cashmere Bouquet, http://www.ebay.com/sch/i.html?_from=R40&_trksid=p2050601.m570.l1313.TR12.TRC2.A0.H0.Xcashmere+bouquet.TRS0 &_nkw=cashmere+bouquet&_sacat=0) (visited Apr. 3, 2016).)

---

[9] Ex. 18 (July 22, 2015 N.J. Super. Ct. Hr'g. Tr.) at 518:11-23, 519:13-17; Ex. 19 (Mar. 17, 2015 S. Fitzgerald Dep.) at 119:8-120:8.

Colgate's corporate representative has explained at deposition that the 23 containers produced by Colgate were drawn from collections of miscellaneous containers of Colgate's current and former products (not limited to Cashmere Bouquet) maintained by Colgate's Corporate Communications department and often displayed as "memorabilia" in Colgate facilities.[10]   Colgate's collection is drawn in part from containers that "trickled in" from employees or former employees who are hobbyists, and other unknown sources.[11]   Such current and former employees have been deposed.  (*E.g.*, Ex. 20 (June 10, 2013 G. Palmietto Dep.) at 8:1-17, 16:2-9 (testimony of current Colgate employee regarding collection he and his wife maintained).)  Peter Chase, a former Colgate marketing executive, testified that the containers he sent to Colgate in 2011—a number of which contained talc tested by Drs. Gordon and Millette— were collected by his mother beginning in the 1970s, from antique shops.  (Ex. 23 (July 10, 2013 P. Chase Dep.) at 27:17-30:5, 38:6-39:7.)  The containers from which Plaintiff's experts tested talc had all been opened either before or during the time that Colgate maintained them.  (Ex. 21 (June 18, 2013 Dr. Capdevielle Dep.) at 85:11-19, 92:15-20.)

The two Cashmere Bouquet containers and AGI 1615 talc once maintained at Mount Sinai had been obtained by that institution in the 1970s.  (Ex. 24 (Sept. 2, 2015 Dr. Langer Aff.) ¶¶ 3, 4; Ex. 12 (Sept. 26, 2013 Dr. Nolan Cert.) ¶¶ 2, 3.)  The Cashmere Bouquet containers had been obtained when Dr. Arthur Langer, a scientist there, was conducting research regarding asbestos in occupational settings.[12]   He had begun "looking at talc and talc products" in the

---

[10] Ex. 11 (Oct. 5, 2010 Dr. Capdevielle Dep.) at 735:20-736:9, 736:14-20, 751:15-752:14, 755:1-23, 762:20-763:12; Ex. 21 (June 18, 2013 Dr. Capdevielle Dep.) at 79:13-92:20.

[11] Ex. 11 (Oct. 5, 2010 Dr. Capdevielle Dep.) at 764:6-766:23; Ex. 21 (June 18, 2013 Dr. Capdevielle Dep.) at 90:10-92:9; Ex. 20 (June 10, 2013 G. Palmietto Dep.) at 16:27.; Ex. 22 (Feb. 4, 2013 Ltr. from S. Bresnick to S. Smith at 1 (attaching Mar. 22, 2012 Ltr. from C. Chung to A. Raphael)); Ex. 23 (July 10, 2013 P. Chase Dep.) at 27:17-30:5.

[12] Ex. 7 (Samples Chart) ¶¶ 37-38; Ex. 25 (June 14, 2013 Dr. Langer Dep.) at 36:7-37:19.

1970s to see if there was any association between talc and asbestos.  (Ex. 25 (June 14, 2013 Dr. Langer Dep.) at 46:4-48:15.)[13]  With the container of AGI 1615 talc, the Cashmere Bouquet containers had sat in unlocked drawers in Mount Sinai and Brooklyn College laboratories, where known asbestos-containing products were also being tested and stored, from 1977-1996.[14]  They were then transferred to a commercial storage space in New Jersey, in 2013.  (Ex. 12 (Sept. 26, 2013 Nolan Cert.) ¶¶ 6-7.)

The circumstances in which Plaintiff Kristi Lescalleet discovered the Cashmere Bouquet container in her basement are described *infra*, at p. 20–22.

### C.   The Results of the Experts' Testing

Plaintiff's experts claim that they have found talc they tested to be contaminated with asbestos, although even amongst themselves, their results are not consistent.[15]

Colgate's testing expert, Dr. Matthew Sanchez, will testify that the R.J. Lee Group tested the same talc samples tested by Plaintiff's experts, except for the AGI 1615 and three samples bought on eBay in 2016, and found them to be free of asbestos.  (Ex. 29 (Nov. 4, 2016 Sanchez Decl.) ¶¶ 52, 91-93.)   RJ Lee Group has also tested talc from at least two dozen additional, similar containers—that Plaintiff's experts have not produced reports concerning—and also found no asbestos in any of the samples.   (*Id.*)  Dr. Sanchez will also opine that the testing

---

[13] Dr. Langer testified that he never found asbestos in any sample of Cashmere Bouquet. (Ex. 25 (June 14, 2013 Dr. Langer Dep.) at 246:8-247:5.)

[14] Ex. 26 (Sept. 12, 2013 Dr. Nolan Dep.) at 233:7-234:15; Ex. 12 (Sept. 26, 2013 Dr. Nolan Cert.) ¶¶ 3, 5; Ex. 25 (Jun. 14, 2013 Dr. Langer Dep.) at 55:20-56:9; Ex. 24 (Sept. 2, 2015 Dr. Langer Aff.) ¶¶ 7-11.

[15] *See, e.g.*, Ex. 27 (Feb. 1, 2013 Gordon Report for FA13-04B) at 2 (reporting "a minimum of 11,040 anthophyllite and tremolite fibers per gram of talc"); Ex. 28 (March 3, 2014 Millette Report, "Characterization of Cashmere Bouquet Talc Sample U0656") at 3 (reporting a concentration of anthophyllite asbestos of "167 million fibers per gram.").

methods used by Plaintiff's testing experts are unreliable and not generally accepted. (*See, e.g.,* Ex. 30 (Mar. 29, 2016 Sanchez Dep.) at 132:1-5.)[16]

## III.   ARGUMENT

To be admissible, proffered evidence must be relevant and reliable. Here, Plaintiff's burden under federal evidentiary law is to demonstrate an unbroken chain of custody to show that the talc and talcum powder tested by Plaintiff's experts is, in fact, the very same Cashmere Bouquet talcum powder that was in the same condition as when it left Colgate's facilities decades ago. As shown below, speculation is no substitute for authentication. As to the samples at issue here, Plaintiff is unable to account for significant and numerous gaps in the chain of possession—gaps of 30 to 50 or more years—and thus the samples are unreliable, irrelevant, and inadmissible. The gaps present here far exceed gaps that federal courts, including this one, have found to be "serious enough" to warrant preclusion. Indeed, multiple courts considering the exact same record have found these samples inadmissible. The samples thus should be precluded.

### A.   Plaintiff's Must Demonstrate Complete Chain of Custody or Provide Sufficient Corroborative Evidence to Explain Any Breaks in the Chain of Custody

For a "tangible object" to be admissible, the proponent must produce sufficient proof of the object's "'original acquisition and subsequent custody'" to establish that it is what it purports to be and has not been altered in any material respect. *United States v. Mitchell*, 816 F.3d 865, 871 (D.C. Cir. 2016) (quoting *United States v. Mejia*, 597 F.3d 1329, 1335 (D.C. Cir. 2010)); *see also* Fed. R. Evid. 901(a). In other words, the proponent bears the burden of demonstrating

---

[16] Among the flaws in Plaintiff's experts' testing methods, according to Colgate's expert, are counting as asbestos contamination fibers in counts so low as to be statistically insignificant. (Ex. 29 (Nov. 4, 2016 Sanchez Decl.) ¶¶ 50, 108, 114.) Colgate has filed Motions *in Limine* to exclude the opinions of Plaintiff's experts, Mr. Fitzgerald and Dr. Gordon.

"both what the evidence was when gathered and that it has remained unchanged since then."  5 Weinstein's Fed. Evid. § 901.03 (2d ed. 2016); 5 Fed. Rules of Evid. Manual § 901.03 (11th ed. 2016) (chain of custody evidence serves the purpose of "provid[ing] assurances that the item, at the time it is offered into evidence, is in substantially the same condition as it was in when it was seized or made").

Courts are empowered to preclude evidence lacking in a clear chain of custody.  While gaps in the chain of custody can go to the weight of the evidence rather than its admissibility, *see Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009), when a break in the chain of custody is "serious enough," a court can rule as a matter of law that the evidence should not be admitted.  *Mejia*, 597 F.3d at 1336 (citing *Novak v. District of Columbia*, 160 F.2d 588, 588-89 (D.C. Cir. 1947)) (noting that district court may abuse its discretion if it admits evidence with serious chain-of-custody issues); *see also Mitchell*, 816 F.3d at 872; *United States v. Crawford*, No. 6:11-cr-60097-AA, 2015 U.S. Dist. LEXIS 79775, at *19 (D. Or. June 18, 2015) (noting, on the basis of *Mejia*, that "serious breaks in the chain of custody of an item can result in its inadmissibility" (citing *Mejia*, 597 F.3d at 1336))[17]; *United States v. Rosado-Cancel*, No. 13-0731, 2015 U.S. Dist. LEXIS 57747, at *14 (D.P.R. Jan. 14, 2015) (noting that "[a]t least one First Circuit case"—*United States v. Ladd*, 885 F.2d 954, 957 (1st Cir. 1989)—"can be read to support [the] proposition" from *Mejia* "that a gap or other flaw in the chain of custody may be glaring as to render evidence inadmissible"), *adopted by* 2015 U.S. Dist. LEXIS 57767 (D.P.R. May 1, 2015); 2 McCormick on Evid. § 213 (7th ed. 2013) ("If there is some specifically

---

[17] In *Crawford*, the District of Oregon excluded a bottle cap purportedly observed at the scene of an arson and later tested for DNA evidence, citing "insurmountable authentication . . . obstacles," because the bottle cap "was not discovered in a closed case or box taken from defendant's home," the bottle cap "could not be accounted for shortly after the arson, and no record of a bottle cap existed until almost a year afterward," and it was unknown how many times the envelope in which the bottle cap had been stored was opened or by whom.  2015 U.S. Dist. LEXIS 79755, at *18.

identified risk of misidentification or alteration, the proponent of the exhibit should produce evidence to overcome this risk or suffer exclusion.").

A break is deemed "serious enough" to warrant exclusion if there are possibilities of misidentification and adulteration of the evidence. *Mitchell*, 816 F.3d at 872.  If such evidence exists, then the proponent must provide "'ample corroborative evidence as to [the evidence's] acquisition and subsequent custody'" that sufficiently "'demonstrate[s] that, as a matter of reasonable probability, possibilities of misidentification and adulteration have been eliminated.'" *Id.* (quoting *Mejia*, 597 F.3d at 1336); *see also United States v. Lane*, 591 F.2d 961, 962-63 (D.C. Cir. 1979) (the proponent must persuade the court that "as a matter of normal likelihood the evidence has been adequately safeguarded"); 5 Weinstein's Fed. Evid. § 901.03 ("The trial court may admit evidence if it determines, after considering the nature of the evidence and the surrounding circumstances, that the evidence is substantially in the same condition as when it was first gathered.").

As to the talc samples at issue here, Plaintiff is unable to account for what are undoubtedly <u>serious</u> breaks in <u>multiple</u> links in the chain of custody—including gaps of 30 to 50 years or more—and provides little to no evidence to corroborate either the acquisition or the subsequent custody of those samples.  Consequently, Plaintiff cannot establish that each talc sample at issue is, or ever was, what he claims it to be—Cashmere Bouquet talcum powder, in the same condition as when it left Colgate's facilities decades ago.  As a result, he cannot authenticate those samples, and the purported testing of those samples is irrelevant.

**B.      Multiple Courts Have Rejected the Authenticity of the Talc Samples at Issue Here Based on the Same Record**

This precise question, *i.e.*, whether these purported talcum powder samples are authentic and, therefore, relevant and admissible, has come before courts in diverse jurisdictions in multiple cases, and multiple courts excluded all of the samples.

The three times this issue has come before the Los Angeles Superior Court, that court has excluded the samples.  First, in *Winkel v. Calaveras Asbestos, Ltd., et al.*, Judge Randy Rhodes granted a similar motion *in limine* "to preclude all samples of Cashmere Bouquet and purported 1615 talc, and related testing, due to lack of authentication." (Ex. 1 (CA Preclusion Order).)[18] Judge Rhodes ruled that "[m]atters relied upon by experts and other opinion testimony require some foundational basis of reliability and/or trustworthiness," and "[h]ere, the specimen[s] tested by plaintiff's expert(s) lacks a trustworthy/reliable s[o]urce of production." (Ex. 1 (CA Preclusion Order).)  As Judge Rhodes put it during argument, "How do we know they [*i.e.*, the containers] were adequately protected from 1977 through this chain of events to the date of testing by your – Mr. Gordon or anyone else?" (Ex. 31 (Apr. 21, 2015 *Winkel* Trial Tr.) at 1265:24-26).)

Second, in *Alfaro v. American Talc, et. al.* (Los Angeles Superior Court)*,* Judge John Kralick also granted this same motion *in limine* "To Preclude All Testimony And Evidence Regarding Purported Testing Of Talc By Plaintiff's Testing Experts Because Of Lack Of Authenticity And Relevance Of Talc Tested."  Judge Kralick held that, given the failures in the chain of custody, there is simply no way to know whether these talc samples could have survived without being contaminated by asbestos fibers in the ambient environment.  He then

---

[18] Ex. 1 (CA Preclusion Order) (granting motion "to preclude all samples of Cashmere Bouquet and purported 1615 Talc, and related testing, due to lack of authentication and/or chain of custody").)

excluded the samples and prevented Mr. Fitzgerald from discussing or relying upon testing of those samples. (Ex. 2.).

Third, in *Nosse v. Arvinmentor, et al.* (Los Angeles Superior Court), Judge C. Edward Simpson granted the same motion in *limine*. In granting the motion, Judge Simpson stated: "[I]t is unreasonable for an expert to rely on the test that was done in a product that cannot be traced back to the product at issue and draw conclusions from the testimony on those products that what he tested was indeed the product in issue." (Ex. 3 at 41:19-24.)

On the other side of the United States, a Maryland court precluded the samples. In consolidated cases in the Circuit Court for Baltimore City, captioned *Barlow v. Colgate-Palmolive Co., et al.*, Judge Christopher Panos issued a 28-page opinion precluding all talc samples before the court in that case—consisting of 44 samples offered by Plaintiff in this case.[19] Judge Panos ruled that "all of Plaintiffs' talcum powder samples shall be excluded from trial," because of plaintiffs' "inability to account for the extraordinary attenuation of time, indeed multiple consecutive decades, commencing with the manufacturing of the Cashmere Bouquet and ending with the purported Cashmere Bouquet samples making their way into the hands of Plaintiffs' testing experts." (Ex. 4 (MD Preclusion Order) at 4.) The court found inadmissible each of the categories of containers at issue here: those collected by Plaintiffs' counsel from the internet, those produced by Colgate, the AGI 1615 talc and Cashmere Bouquet containers once kept at Mount Sinai, and the Cashmere Bouquet container allegedly found in Kristi Lescalleet's basement – one of the plaintiffs in the cases before Judge Panos. (*Id.* at 9-11, 13-14, 17-18, 20, 26-28.)

---

[19] The exceptions are the samples drawn from the two containers purchased on the internet by the Simon Greenstone firm, which were not at issue in the Baltimore cases. The Simon Greenstone firm represents Plaintiff in this action.

Finally, the Superior Court of New Jersey has twice excluded all talc samples tested by Mr. Fitzgerald and drawn from vintage Cashmere Bouquet containers.  In *Fishbain v. Colgate, et al.*, Judge Ana Viscomi conducted a four day evidentiary hearing and the parties submitted written summations regarding whether plaintiffs had met their burden to prove chain of custody. (Ex. 5 (NJ Preclusion Ruling) at 2.)  The court issued a 16-page Order precluding talc samples drawn from two vintage Cashmere Bouquet containers purchased from the internet (by the law firms Levy Konigsberg, L.L.P. ("Levy Konisberg") and The Law Offices of Peter G. Angelos ("Angelos")) and the container found by Ms. Lescalleet in her basement. (Ex. 7 (Samples Chart) ¶¶ 2, 3, 36.)  The Order in that case noted that the plaintiffs' expert witnesses at a pre-trial hearing— including Mr. Fitzgerald—themselves had disclaimed knowledge of "how many hands" the talc had passed through over the course of 40 or 50 years or whether "the talc was intact from the time it left, say, the Colgate factory to when it arrives in the laboratory."[20]

In *Kaenzig v. Charles B. Chrystal Company, Inc.*, a New Jersey case in which Colgate was not a party, Judge Vincent Le Blon excluded talc drawn from the AGI 1615 container and from vintage product containers of Shulton Co. Regarding the talc drawn from vintage containers, which "were purchased on the internet," the court found "a real problem with the almost 30 to 40-year gap in the supposed manufacture of the products . . . to the purchase of the materials on eBay in 2012."  (Ex. 4 at 230:15-19.)  Judge LeBlon also found that there was only "hearsay" information about the original source of the AGI 1615 sample—Dr. Nolan's reading of "a label on the box" noting two transfers of the sample before it arrived at Mount Sinai.  (*Id.* at 227:18-25.)  The court found that even assuming the samples were relevant, he would preclude them because "they're just not appropriate for the jury to consider given such a big gap in time . . . ." (*Id.* at 240:16-241:6.)

---

[20] *Id.* at 9, citing Ex. 18 (July 21 and July 22, 2015 N.J. Super. Ct. Hr'g Tr.) at 258:10-14; 518:14-16).

Despite having been proffered in multiple cases, talc drawn from containers at issue here have never been admitted as to Colgate at any trial.

> **C.** **The Samples Tested by the Experts Are Inadmissible Because, Despite "Serious" Breaks in Each Sample's Chain of Custody, Plaintiff Cannot Prove, to Any Degree of Certainty, that the Possibilities of Misidentification and Adulteration Have Been Eliminated**

The prior rulings regarding the talc samples at issue in this case were correct, and this Court should preclude the samples in this case as well.

*First,* Plaintiff cannot demonstrate a reasonable probability that the talc samples drawn from the 19 vintage Cashmere Bouquet containers purchased by plaintiffs' counsel on the internet or at an antique store contain Cashmere Bouquet talcum powder in its original condition. Each of the containers obtained by the Levy Konigsberg, Angelos, and Simon Greenstone firms is decades old, and Plaintiff has no information to corroborate the whereabouts or condition of the containers or talc before lawyers bought them on eBay, beginning in 2008. The containers also easily can be opened—most often in more than one way—and had varying levels of talc in them. (Ex. 7 (Samples Chart) (photographs); Ex. 18 (July 21 and July 22, 2015 N.J. Super. Ct. Hr'g Tr.) at 422:17-19 (testimony of S. Fitzgerald regarding varying levels of powder).)[21] The chain of custody for each of these containers is missing several links that amount, in each case, to a gap of no less than 30 to 50 years (or more)—an undoubtedly "serious" break in the chain—during which time the whereabouts and

---

[21] Plaintiffs in other cases have claimed that several of the containers purchased by counsel on the internet after 2008 but dating from the 1950s and 1960s should be admitted because when obtained from eBay sellers, they were found to be "sealed" with either plastic or paper coverings. (Ex. 7 (Samples Chart) ¶¶ 3, 4, 35.) As Judge Panos in Baltimore noted, however, plaintiffs fail to establish that the containers were "sealed" at manufacturing. (Ex. 4 (MD Preclusion Order) at 17 (finding inadequate plaintiffs' reliance on purported patents obtained by companies other than Colgate and other information).) In addition, these containers, no less than the others, have "extraordinary" gaps in chain of custody, *id.* at 17, which merely beg the question of when the purported "seals," or covers, were placed. Judge Rhodes also considered these samples and precluded them. (Ex. 1 (CA Preclusion Order); Ex. 32 (Mar. 6, 2015 Declaration of Ian Shelton in *Winkel* in Support of Colgate's Authenticity Motion).)

conditions of storage of each container is unknown, and the contents of each container easily could have been either adulterated or even replaced, given what Judge Panos termed the active "secondary talcum powder container market" among collectors. (Ex. 4 (MD Preclusion Order) at 15-16.)[22] As Mr. Fitzgerald himself has admitted, he did not know "how many hands [the samples] had been in, in the course of the 40 or 50 years." (Ex. 18 (July 22, 2015 N.J. Super. Ct. Hr'g Tr.) at 518:3-23.)  These samples could not be admitted without unfairly inviting the jury to speculate that they are authentic Cashmere Bouquet talcum powder.

*Second,* Plaintiff similarly cannot authenticate the talc drawn from the 23 vintage containers produced by Colgate.  Again, these containers date principally from the 1950s, 1960s, and 1970s.  All but three of the containers produced by Colgate, and from which Plaintiff's experts' drew samples, were upright containers that can be opened in two places. (Ex. 7 (Samples Chart) ¶¶ 18-32, 34, 40-43.)  The other three are flat, cylindrical plastic containers from which the entire top can be lifted. (*Id.* at ¶¶ 16-17, 33.)

As Colgate's corporate representative has testified, these containers were not preserved from Colgate's manufacturing lines.  Instead, they are drawn from a "memorabilia" collection of packaging maintained by Colgate's Communications Department and displayed at Colgate's facilities.  That collection includes vintage containers collected by current and former Colgate employees who collect Colgate packaging as a hobby.  For example, Peter Chase, a former Colgate executive, testified that the containers he sent to Colgate in 2011—a number of which have been tested by Drs. Gordon and Millette—were collected by his mother beginning in the

---

[22] Importantly, Plaintiff's experts themselves maintain that there is asbestos everywhere at background levels. (Ex. 33 (May 7, 2013 Dr. Arnold Brody Dep.) at 140:17-141:5 ("we're all walking around with some asbestos in our lungs from the background [air]").)

1970s, from antique fairs. (Ex. 23 (July 10, 2013 P. Chase Dep.) at 27:17-28:17, 30:10-20.)  Mr. Chase sent the containers to Colgate after his mother passed away. (*Id.* at 30:21-31:4, 45:3-18.)

Thus, "the chain of custody gaps span numerous decades," for the Colgate-produced containers as well as the containers collected by plaintiffs' lawyers. (Ex. 4 (MD Preclusion Order) at 10.)  The origin of any given container is unknown.  As Dr. Capdevielle testified: "we really don't know the history of any of these samples, where they originated from, where they have been" or "even if what is in some of these tins is what was the original Cashmere Bouquet." (Ex. 21 (June 18, 2013 Dr. Capdevielle Dep.) at 80:16-81:1; *see also* Ex. 11 (Oct. 5, 2010 Dr. Capdevielle Dep.) at 736:21742:8 ("[t]here's no way . . . to know" whether the containers produced by Colgate hold original talcum powder product.").)  Speculation or a "leap of faith," as Judge Panos put it, (Ex. 4 (MD Preclusion Order) at 20), cannot be substituted for chains and links.  As such, the talc samples from the vintage containers produced by Colgate, too, should be precluded.[23]

***Third*,** Plaintiff cannot authenticate the containers collected by Mount Sinai researchers—the AGI 1615 container and two additional vintage Cashmere Bouquet containers dating from the 1970s—because the containers have decades-long gaps in their chains of custody and lack the requisite corroborative evidence concerning their acquisition and subsequent custody.  Dr. Langer, who was leading the Mount Sinai research throughout the 1970s, and Dr. Nolan, who joined him in that research in 1979, have each been deposed about

---

[23] Plaintiffs in other litigation have also attempted to assert that Colgate's production of the containers mandates that samples drawn therefrom are admissible, or that Colgate has previously stipulated to the admissibility of talc drawn from the samples. (*E.g.*, Ex. 4 (MD Preclusion Order) at 18-20.)  As to the first claim, a party's compliance with its discovery obligations is not a concession of authenticity. The second claim refers to a stipulation that Colgate made in New York cases, and limited to those cases, at the urging of the trial judge in New York who had already determined to hold a *Frye* hearing regarding the testing methodology and wanted to avoid that his *Frye* ruling would be mooted. As Judge Panos in Baltimore concluded, that stipulation was expressly "without prejudice to either side," does not exist in any other case, and thus fails to establish admissibility of the proffered samples. (Ex. 4 (MD Preclusion Order) at 19-20.)

the history of these containers.[24]  Neither scientist obtained the AGI 1615 container or had

firsthand knowledge about how Mount Sinai acquired that container.[25]  The earliest information

about the AGI 1615 container is a December 1977 note from a Helena Rubinstein employee

forwarding to Dr. Langer "samples" of "old" talc products and a separate document entitled

"Samples from Whittaker, Clark, and Daniels, Inc." also from 1977, which identifies a "1615

AGI Talc BC*" sample dating from three years earlier, in 1974.[26]  There are no additional

identifying numbers, markings, or information that corroborates the conclusion that this note

even correlates to the talc sample produced here and it's conceivable the materials were placed

together sometime during the intervening decades.  Thus, the conditions in which the AGI 1615

container were maintained from 1974 to 1977 are unknown, and the hearsay label, on its face,

records two transfers from Whittaker, Clark & Daniels to Helena Rubinstein to Mount Sinai,

under conditions also no longer known.

 Dr. Langer, the only witness with knowledge of talcs that Mount Sinai collected before

Dr. Nolan's arrival, in 1979, did not remember who purchased the two Cashmere Bouquet

containers that were once stored at his laboratory and did not recall testing talc from the

containers.[27]

---

[24] Ex. 34 (Aug. 11, 2015 Dr. Langer Dep.) at 118:20-121:9; Ex. 25 (June 14, 2013 Dr. Langer Dep.) at 31 :2-32 :3; Ex. 35 (June 21, 2013 Dr. Nolan Dep.) at 362:9-363:5; Ex. 26 (Sept. 12, 2013 Dr. Nolan Dep.) at 88:24-90:10; 254:16-18.  Dr. Langer and Dr. Nolan were not deposed in this case.  They have not been retained as experts by Colgate.  Plaintiff will rely on historical testimony and affidavits from prior cases.

[25] Ex. 24 (Sept. 2, 2015 Langer Aff.) ¶ 5; Ex. 26 (Sept. 12, 2013 Dr. Nolan Dep.) at 220:19-235:8.

[26] Ex. 36 (Package Label from Helena Rubinstein to Mr. Arthur M. Langer); Ex. 37 (Dec. 2, 1977 Ltr. From M. Roark to A. Langer); Ex. 38 (Packing Slip for Helena Rubinstein 1615 Shipment); Ex. 26 (Sept. 12, 2013 Dr. Nolan Dep.) at 221:17-222:22, 223:23-224:5.)

[27] Ex. 25 (Jun. 14, 2013 Dr. Langer Dep.) at 37:16-19; Ex. 39 (Aug. 7, 2014 Dr. Langer Dep.) at 32:17-33:9; Ex. 25 (Jun. 14, 2013 Dr. Langer Dep.) at 15:14-19; 61:6-20; 63:9-19 (none of the sample numbers on the Cashmere Bouquet containers corresponded to the sample numbers of Langer's 1976 study on cosmetic talcs).

Even more fundamentally, the AGI 1615 container and the two Cashmere Bouquet containers also were stored and intermingled with samples of raw asbestos and known asbestos-containing products also being tested at Mount Sinai.  Drs. Langer and Nolan have both testified that any talc in the laboratory would have been stored, until 1989, in an unlocked drawer in the laboratory.[28]  Dr. Langer testified that, in that period, anyone with access to the laboratory had access to the drawer where their talc samples were stored.[29]  At the time, the laboratory was engaged in testing samples of raw asbestos minerals and asbestos-containing products, and those samples were stored in the same drawers and cabinets as the talc samples.[30]

Moreover, the AGI 1615 container and the two Cashmere Bouquet containers were transferred three times over the next three decades.  The transfers were carried out each time by unknown person or persons, while remaining commingled with known asbestos and asbestos-containing products.  The "drawer" full of samples was first moved to another building at Mount Sinai.[31]  In 1989, the samples were moved again, after Dr. Langer took a position at Brooklyn College.[32]  The talc samples were again stored in an unlocked drawer at Brooklyn College, during which time anyone with access to the laboratory had access to them and asbestos and non-asbestos samples were intermingled.[33]

---

[28] Ex. 25 (Jun. 14, 2013 Dr. Langer Dep.) at 50:15-52:10); Ex. 26 (Sept. 12, 2013 Dr. Nolan Dep.) at 233:7-234:15; Ex. 24 (Sept. 2, 2015 Dr. Langer Aff.) ¶¶ 7-8, 11.

[29] Ex. 25 (Jun. 14, 2013 Dr. Langer Dep.) at 58:13-59:7; Ex. 24 (Sept. 2, 2015 Dr. Langer Aff.) ¶ 8, 11.

[30] Ex. 25 (Jun. 14, 2013 Dr. Langer Dep.) at 55:20-56:16; Ex. 24 (Sept. 2, 2015 Dr. Langer Aff.) ¶¶ 3, 9, 11.

[31] Ex. 25 (Jun. 14, 2013 Dr. Langer Dep.) at 51:3-52:12; *id.* at 53:8-11 (no knowledge of who moved the samples).

[32] *Id.* at 51:3-52:12; Ex. 24 (Sept. 2, 2015 Dr. Langer Aff.)¶ 10; Ex. 12 (Sept. 26, 2013 Dr. Nolan Cert.) at ¶ 5; Ex. 35 (Jun. 21, 2013 Dr. Nolan Dep.) at 44:17-45:14.); Ex. 25 (Jun 14, 2013 Dr. Langer Dep.) at 53:12-16; Ex. 35 (Jun. 21, 2013 Dr. Nolan Dep.) at 42:9-16 (testimony of Drs. Langer and Nolan that they did not know who moved the samples).

[33] Ex. 24 (Sept. 2, 2015 Dr. Langer Aff.) ¶ 11) ; (Ex. 25 (Jun. 14, 2013 Dr. Langer Dep.) at 58:13-59:7.

Then, in 1996, Dr. Nolan moved the containers from the college to a commercial storage space called "Storage Mart," in Secaucus, New Jersey. (Ex. 12 (Sept. 26, 2013 Dr. Nolan Cert.) ¶ 6.)  "[T]he movers" also moved at that time "many, many different samples" that were easy to transport, including "samples of the UICC Standard Asbestos Minerals, the Canadian Chrysotile, the various asbestos samples, some products."[34]  It was from this storage space that Dr. Nolan retrieved the AGI 1615 talc and the two Cashmere Bouquet containers in 2013—some four decades after Mount Sinai acquired them.[35]

Under these circumstances, courts in California, Maryland, and New Jersey have found that there is no reasonable certainty that the talc Plaintiff's experts tested is Cashmere Bouquet or AGI 1615 talc in its original condition.  Judge Rhodes in California ruled after hearing extensive argument, including about the AGI 1615 container, that based on the lack of authenticity, "the various samples as tested by Mr. Fitzgerald or any of the other experts in this case" would be precluded.[36]  Judge Panos in Maryland determined that "it would be beyond reason for the Court to find that there is no possibility of alteration or cross-contamination" of the talc in the AGI 1615 container (Ex. 4 (MD Preclusion Order) at 9), given the storage and transfer conditions, and that there was an "immeasurable gap" regarding the chain of custody of the two Cashmere Bouquet containers," which also could have been cross-contaminated by the "raw asbestos or asbestos containing materials" with which they were stored. (*Id.* at 12, 14.) Judges LeBlon and Panos agreed, in addition, that the lack of any information other than hearsay about the first years of the AGI 1615 container, and the circumstances of purchase of

---

[34] Ex. 25 (Jun. 14, 2013 Dr. Langer Dep.) at 55:20-56:16; Ex. 24 (Sept. 2, 2015 Dr. Langer Aff.) ¶ 12.

[35] Ex. 12 (Sept. 26, 2013 Dr. Nolan Cert.) ¶ 6, 7; Ex. 25 (June 14, 2013 Dr. Langer Dep.) at 55:1 -56:16.

[36] Ex. 31 (Apr. 21, 2015 Winkel Trial Tr.) at 1272:8-11.

the Cashmere Bouquet containers, undermined the foundation for the talc taken from those containers, and tested by Plaintiff's experts after 2013.[37]

The talc tested from the AGI 1615 and Cashmere Bouquet containers maintained, for parts of their histories, at Mount Sinai, should be precluded.

**Finally,** Plaintiff also cannot demonstrate the authenticity of the talc from the vintage talc container purportedly recovered by Baltimore plaintiff Kristi Lescalleet.  A sample that was precluded by the trial judge—on authenticity grounds after an evidentiary hearing—in the case where Ms. Lescalleet was, herself, a party.  After first disclaiming having possession of any Cashmere Bouquet container, at deposition in February 2012, (Ex. 13 (Feb. 7, 2012 K. Lescalleet Dep.) at 61:1-5), Ms. Lescalleet claimed to have discovered a container dating from the 1970s in the basement of the house in which she lived in 2012.[38]  At a second deposition, Ms. Lescalleet testified—inconsistently—that she started looking for the container because her first deposition "got me to thinking" about boxes in her basement (Ex. 14 (Dec. 13, 2012 K. Lescalleet Dep.) at 30:17-31:4), but also that she found the container while looking through her basement because of a water leak. (*Id.* at 35:15-17; 36:9-12.)  Ms. Lescalleet admitted that she had moved twice since last using Cashmere Bouquet talcum powder and had no idea of who had sent the container to her current home or who had brought it there. (*Id.* at 20:21-22:12; 23:18-21, 30:3-16.)  Ms. Lescalleet also conceded that the container "felt like [it was] maybe less than half full," and that she found it in a dusty box along with toothpaste, and "other stuff," including a container of Chantilly talcum powder. (*Id.* at 36:20-37:5; 47:11-13; 57:1558:5.)  Ms. Lescalleet preserved the

---

[37] Ex. 6 (NJ Preclusion Ruling II) at 230:15-19; Ex. 4 (MD Preclusion Order) at 6-11.

[38] Ex. 40 (Oct. 19, 2012 Lescalleet Ans. to Interrogs.) at No. 2; Ex. 14 (Dec. 13, 2012 K. Lescalleet Dep.) at 23:18-21, 46:9-47:5; Ex. 7 (Samples Chart) ¶ 2.

Cashmere Bouquet container but threw away the other contents of the dusty box. (*Id*. at 34:13-37:1.)

At the threshold, even if one accepted Ms. Lescalleet's account as true, there is no proof as to the acquisition or subsequent custody of the container she found, as the container was open, and its condition unknown, for decades.  The sample drawn from the container therefore has the same fatal gap as all of the others, and should be precluded on that basis. (*E.g.,* Ex. 4 (MD Preclusion Order) at 26 ("the 'half full' sample that Ms. Lescalleet found in her basement was stored in an unsealed box for more than four decades prior to its discovery in 2012").)

Notably, and in addition, Judge Panos held a pre-trial hearing in Maryland at which Ms. Lescalleet testified, and found, based on his evaluation of her testimony, additional grounds for preclusion. Judge Panos expressed that Ms. Lescalleet's sworn testimony, taken *in toto*, "seriously call into question the circumstances attendant to the purported discovery of the Lescalleet sample, as well as its authenticity." (Ex. 4 (MD Preclusion Order) at 23.)  The court "struggle[d] to believe" that Ms. Lescalleet would have thrown away the items she purportedly discovered together with the Cashmere Bouquet container, including the Chantilly talc container, given the pending litigation and her claim that she attributed her mesothelioma to using cosmetic talcum powder. (*Id*. at 24.)  Judge Panos also expressed concern regarding Ms. Lescalleet's devastating admission at the hearing that she deliberated over whether to conceal or reveal what she had purportedly found to her attorneys, because she knew that "if he tested it and it didn't have any asbestos in it, then I wouldn't really have a case." (Ex. 41 (Nov. 9, 2015 *Barlow* Hearing Tr.) at 1335:5-9.)  And Judge Panos found that it would be unduly prejudicial to Colgate to admit any sample drawn from the Cashmere Bouquet container Ms. Lescalleet allegedly found, because Ms. Lescalleet had spoliated the other materials in the box that would have

enabled Colgate to determine, through testing, whether the contents of the box bore evidence of common contamination. (Ex. 4 (MD Preclusion Order) at 24-25.)   The Cashmere Bouquet container purportedly found by Ms. Lescalleet cannot be established to contain Cashmere Bouquet talcum powder in its original condition.

As shown above, the Plaintiff has failed to prove that the powders ultimately tested by his experts are, in fact, vintage Cashmere Bouquet talcum powder.  *See Mitchell*, 816 F.3d at 871-72 (noting that proponent of tangible evidence has burden to prove that the evidence is what he claims it to be).  There are decades-long gaps in the chain of custody of each of the samples. Plaintiff has not (and cannot) provide any "corroborative evidence" that eliminates "possibilities of misidentification and adulteration."  *Mejia*, 597 F.3d at 1336.  Moreover, because Plaintiff cannot establish that any of the samples tested are in fact Cashmere Bouquet talcum powder, the testing performed by Plaintiff's experts is irrelevant.   Accordingly, this Court should preclude the admission of these samples.

## IV.    <u>CONCLUSION</u>

Given the decades of gaps in chain of custody, it cannot be established that Plaintiff's experts tested Cashmere Bouquet talcum powder at all, much less in the same condition as when it was manufactured, decades ago.  For the foregoing reasons Colgate respectfully requests that the Court preclude the product samples relied upon by Plaintiff's proffered testing experts because their authenticity cannot be established and, as such, they are also irrelevant.

Respectfully submitted,

*/s/ Matthew T. Wagman*

Michael A. Brown (D.C. Bar No. 434094)
Matthew T. Wagman (D.C. Bar No. 472684)
Matthew R. Schroll (D.C. Bar No. MD29424)
Jonathan J. Huber (D.C. Bar No. 1014590)
Miles & Stockbridge P.C.
100 Light Street
Baltimore, MD  21202-1487
(410) 727-6464 (T)
(410) 385-3700 (F)
mbrown@milesstockbridge.com
mwagman@milesstockbridge.com
mschroll@milesstockbridge.com
jhuber@milesstockbridge.com

**Attorneys for Colgate-Palmolive Company**

## **REQUEST FOR HEARING**

Pursuant to Local Civil Rule 7(f), Defendant, Colgate-Palmolive Company, requests a hearing on its Motion filed herein.

*/s/ **Matthew T. Wagman***
Matthew T. Wagman