**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **BRIAN D. JACKSON,** | ) | |
| **Individually and as Personal Representative** | ) | |
| **of the Estate of Doris Jackson, Deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No: 1:15-cv-01066 (TFH)** |
| **v.** | ) | |
| | ) | |
| **COLGATE-PALMOLIVE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**COLGATE-PALMOLIVE COMPANY'S *DAUBERT* MOTION TO EXCLUDE**
**TESTIMONY OF PLAINTIFF'S EXPERT DR. RONALD GORDON**

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 4

    A.    Cashmere Bouquet Was Not Formulated to Contain Asbestos ............................... 4

    B.    Cashmere Bouquet Talcum Powder and Colgate's Source Mines Have
Repeatedly Been Shown to Be Free of Asbestos ..................................................... 5

    C.    Analyzing Talcum Powder for the Presence of Asbestos Presents a Risk of
False Positives Unless Appropriate Measure Are Taken ........................................ 7

    D.    The Only Generally Accepted Method for Analyzing Talc for the Presence
of Asbestos Has Criteria for Reliably Distinguishing Interferences From
Asbestos ................................................................................................................. 11

    E.    Dr. Gordon's Experience and Proffered Expertise ................................................ 13

    F.    Dr. Gordon's Product Testing Opinions ................................................................ 13

    G.    Dr. Gordon's "Modified" Yamate Method Does Not Account for the Risk
of False Positives When Analyzing Talc for Asbestos .......................................... 15

    H.    Dr. Gordon's Tissue Analysis Opinion ................................................................. 18

    I.    One Court Ordered an Evidentiary Hearing on Dr. Gordon's Product
Testing and Another Limited Dr. Gordon's Tissue Analysis Opinions ................ 19

    J.    Dr. Gordon Has Placed His Credibility At Issue .................................................. 20

LEGAL STANDARD ............................................................................................................ 21

ARGUMENT ......................................................................................................................... 22

I.    Dr. Gordon's Product Contamination Opinions Are Scientifically Unreliable and
Should Be Precluded ....................................................................................................... 22

    A.    The Product Samples Cannot Be Authenticated ................................................... 23

    B.    Dr. Gordon Failed to Follow the Only Generally Accepted Method for
Detecting Asbestos in Talcum Powder .................................................................. 23

    C.    Dr. Gordon's Failure to Use the Only Generally Accepted Method for
Analyzing Talcum Powder Renders His Analysis Unreliable ............................... 25

    D.    Dr. Gordon Failed to Follow His Selected Protocol .............................................. 26

II.    Dr. Gordon's Exposure and Specific Causation Opinions Based Upon His Tissue
Analysis Should Be Precluded ........................................................................................ 34

    A.    Dr. Gordon's Control Group Is Untested and Unreliable ..................................... 35

    B.    Dr. Gordon Found No Fibers in Ms. Jackson's Lung Tissue, Negating Any
Basis for Attributing Ms. Jackson's Mesothelioma to Asbestos Exposure
Under the "Helsinki Criteria" ................................................................................ 38

     C.      Dr. Gordon's Finding of a Single Tremolite Fiber in Ms. Jackson's Lymph
Node Tissue Is Insufficient to Attribute Ms. Jackson's Mesothelioma to
Asbestos Exposure ...................................................................................................... 39

     D.      Dr. Gordon's Finding of Three Undocumented "Asbestos Bodies" Is
Insufficient to Attribute Ms. Jackson's Mesothelioma to Asbestos
Exposure ...................................................................................................................... 41

III.    By Failing to Document His Findings, Dr. Gordon Has Placed His Own
Credibility at Issue ............................................................................................................... 42

CONCLUSION ................................................................................................................................. 43

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ambrosini v. Labarraque,*
101 F.3d 129 (D.C. Cir. 1996) ............................................................. 23

*Bernard v. Brookfield Props. Corp.,*
984 N.Y.S.2d 633 (Sup. Ct. N.Y. County 2013) ................................... 10, 20, 31, 34

*Black v. Rhone-Poulenc, Inc.,*
19 F. Supp. 2d 592 (S.D.W. Va. 1998) ................................................. 26, 33, 34, 44

*Cade v. Union Pac. R.R.,*
No. CI 12-393 (Neb. Dist. Ct. Feb. 18, 2015) .................................... 21, 38

*Daubert v. Merrell Dow Pharm., Inc.,*
43 F.3d 1311 (9th Cir. 1995) ............................................................. 23, 26

*Daubert v. Merrell Dow Pharm., Inc.,*
509 U.S. 579 (1993) ......................................................................... 22, 23, 25

*DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach,*
576 F.3d 820 (8th Cir. 2009) ............................................................. 26

*Dugas v. 3M Co.,*
2016 WL 3946802 (M.D. Fla. June 21, 2016) ..................................... 27, 28, 29

*Dyson, Inc. v. Euro-Pro Operating LLC,*
No. 14 C 9442, 2015 WL 1120006 (N.D. Ill. Mar. 10, 2015) ................... 26, 28, 36

*Gen. Elec. Co. v. Joiner,*
522 U.S. 136 (1997) ......................................................................... 23

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999) ......................................................................... 23

*McReynolds v. Sodexho Marriott Servs., Inc.,*
349 F. Supp. 2d 30 (D.D.C. 2004) ....................................................... 23

*Meister v. Med. Eng'g Corp.,*
267 F.3d 1123 (D.C. Cir. 2001) ......................................................... 23

*Morales v. Am. Honda Motor Co.,*
151 F.3d 500 (6th Cir. 1998) ............................................................. 33

*Morehouse v. Louisville Ladder Group LLC,*
No. Civ.A 3:03-887-22, 2004 WL 2431796 (D.S.C. 2004) ..................... 33

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.,*
282 F.R.D. 655 (M.D. Fla. 2012) ......................................................... 33

iii

*Sanchez v. Boston Sci. Corp.*,
   No. 2:12-CV-05762, 2014 WL 4851989 (S.D.W. Va. Sept. 29, 2014) ..................... 26, 27, 31

*Smelser v. Norfolk S. Ry. Co.*,
   105 F.3d 299 (6th Cir. 1997) ........................................................................................ 33

*Staple Cotton Co-op. Assoc. v. D.G. & G., Inc.*,
   No. 1:06CV0046 TCM, 2008 WL 2775644 (E.D. Mo. July 14, 2008) ........................... 26, 27

*United States v. Day*,
   524 F.3d 1361 (D.C. Cir. 2008) .................................................................................... 22

*United States v. Hebshie*,
   754 F. Supp. 2d 89 (D. Mass. 2010) ............................................................................. 33

*United States v. Napoli*,
   54 F.3d 63 (2d Cir. 1995) ............................................................................................. 22

*United States v. Tran Trong Cuong*,
   18 F.3d 1132 (4th Cir. 1994) ........................................................................................ 30

## Statutes and Rules

21 C.F.R. § 73.1550(b) ...................................................................................................... 12

29 C.F.R. § 1910.1001 ................................................................................................. 11, 19

30 Fed. Reg. 15,855 ........................................................................................................... 5

30 Fed. Reg. 15,861 ........................................................................................................... 5

57 Fed. Reg. 24,310 ........................................................................................................... 8

57 Fed. Reg. 24,316 ....................................................................................................... 8, 9

Fed. R. Evid. 702 .......................................................................................................... 4, 22

Fed. R. Evid. 703 ............................................................................................................. 30

## INTRODUCTION

Plaintiff alleges that decedent, Doris Jackson, developed pleural mesothelioma from exposure to asbestos—specifically, from her alleged use of Cashmere Bouquet talcum powder, a product that was never formulated to contain asbestos.  Although Plaintiff's claim rests on a theory of asbestos-contaminated talc, there is no direct evidence that any Cashmere Bouquet talcum powder used by Ms. Jackson was contaminated with asbestos.  Plaintiff attempts to bridge this evidentiary gap by proffering two pseudo-scientific opinions from a pathologist, Dr. Ronald Gordon.

Dr. Gordon intends to testify that (1) he detected asbestos in the talcum powder from every Cashmere Bouquet-labeled he tested and (2) Ms. Jackson's lymph node tissue contained the same type of asbestos he found in the talcum powder and that the asbestos caused her mesothelioma.  Dr. Gordon, however, fails to apply generally accepted methods for testing talcum powder for asbestos, admittedly deviates from the testing method he selected in order to identify asbestos where none actually exists, and pays lip service to generally accepted guidelines for attributing mesothelioma to asbestos, but then violates those guidelines in reaching his conclusion.  Under *Daubert*, the Court should exercise its gatekeeping role and exclude Dr. Gordon's proffered opinions as scientifically unreliable or, at a minimum, subject them to a *Daubert* evidentiary hearing.

**Dr. Gordon's product testing is unreliable.**  Dr. Gordon's opinion that his tests show the talcum powder from vintage Cashmere Bouquet-labeled containers was contaminated with asbestos is unfounded and inherently unreliable for several reasons.  *First*, none of the material in the containers Dr. Gordon tested can be authenticated as Cashmere Bouquet talcum powder in its original condition.  Many of the containers were obtained online, via eBay, with no evidence as to how they were stored or whether the talcum powder they contained was genuine.  Virtually

every court that has ruled upon a motion to preclude testing of these product samples based on failure to authenticate them has granted it.  For the reasons detailed in Colgate's Motion *in Limine* to Preclude All Testimony and Evidence Regarding Purported Testing of Talc by Plaintiff's Testing Experts Because of Lack of Authenticity and Relevance of Talc Tested, the Court should reach the same conclusion here.

*Second*, the USP method for talc is the only generally accepted method for testing talcum powder for asbestos, and Dr. Gordon admits he did not use it.  His failure to use the USP method renders Dr. Gordon's results unreliable because Dr. Gordon's protocol, called the Yamate method, lacks criteria for distinguishing between non-asbestos particles that resemble asbestos and true asbestos.  Without employing criteria that reliably differentiates asbestos fibers from other non-asbestos particles, which are far more common than asbestos, Dr. Gordon cannot reliably conclude that what he found was actually asbestos.

*Third*, not only did Dr. Gordon fail to follow the generally accepted method for talc, but he also failed to follow the Yamate method that he ultimately selected for his analysis.  In fact, Dr. Gordon admitted that if he had actually followed the Yamate method he would have have to report, in his own words, "zero asbestos"—an admission that directly contradicts what he intends to tell the jury at trial.  Dr. Gordon admitted to violating several of its specific requirements, including failing to perform the requisite level of analysis under his testing protocol in order to differentiate between talc and asbestos; failing to maintain records sufficient for another lab to verify his results; and extrapolating from finding single fibers to thousands of fibers per gram without performing any statistical calculations.

Faced with the same proffered opinions and record, a New York court ordered a *Frye* hearing on Dr. Gordon's opinions because it was "troubled" by his admitted failure to follow a

generally accepted protocol.  Dr. Gordon was withdrawn as an expert rather than having his opinions face scrutiny at the hearing.  This is exactly the type of case where *Daubert* must apply—an expert claims to find asbestos using complex scientific methods but then admits that if he had actually followed the protocol's requirements he would have reported "zero asbestos."

**Dr. Gordon's tissue analysis is unreliable.**  Dr. Gordon's proffered opinion that Ms. Jackson's mesothelioma was caused by her use of Cashmere Bouquet talcum powder based upon his analysis of tissue from Ms. Jackson's lungs and lymph nodes is flawed for all the same reasons as his product testing, and then some.  *First*, Dr. Gordon bases his causation opinion on the purported finding of a single tremolite fiber in Ms. Jackson's lymph node tissue, which he claims is an "above background" level of exposure.  When Dr. Gordon compares the results of his testing of Ms. Jackson's tissue to "background," he is comparing his findings to his own "control group"—a handwritten, unpublished, non-public 35 pages of notes from anonymous autopsies that he did not perform and where nothing was recorded regarding the subjects' exposure or work histories.  Another court recently rejected his control group as unreliable and unscientific under *Daubert* and the Court here should do the same.

*Second*, Dr. Gordon appears to rely on his finding of a single fiber in Ms. Jackson's lymph node tissue to attribute Ms. Jackson's mesothelioma to asbestos exposure under what is known as the "Helsinki criteria."  But the Helsinki criteria discusses finding fibers in the *lung* tissue, not the lymph node, and Dr. Gordon found no asbestos fibers in Ms. Jackson's lung tissue.  Dr. Gordon admitted in deposition that his findings do not meet the Helsinki criteria.

*Third*, Dr. Gordon claimed also to find, but not document, three "asbestos bodies" in Ms. Jackson's lymph node tissue.  What Dr. Gordon claims to have found are more accurately characterized as "ferruginous bodies"—iron-coated particles inside human tissue where the

fiber's mineral type is unknown. Not only did Dr. Gordon provide no evidence whatsoever of his purported finding, he admitted that he failed to analyze the core of the "asbestos body" to determine whether, in fact, it was asbestos.  Even assuming that Dr. Gordon actually detected three ferruginous bodies, and further assuming that all three ferruginous bodies were asbestos bodies, a finding of three asbestos does *not* exceed the background levels of his original control group, so Dr. Gordon has no basis to attribute causation to these three undocumented fibers.

**Dr. Gordon's failure to follow basic scientific principles makes his analysis unreliable.**  Finally, Dr. Gordon's failure to follow basic principles of scientific analysis, including record keeping, requires the Court simply to take his word for it.  The Court should decline the invitation because of his recent indisputably false sworn testimony regarding, among other things, his falsification of documents.  His false testimony should, at a minimum, militate in favor of conducting a pre-trial *Daubert* evidentiary hearing.

Accordingly, under *Daubert* and Federal Rule of Evidence 702, the Court should exclude Dr. Gordon's proffered product contamination and specific causation opinions.  Alternatively, the Court should conduct a *Daubert* hearing to evaluate the reliability of his opinions.

## STATEMENT OF FACTS

### A.    Cashmere Bouquet Was Not Formulated to Contain Asbestos

Colgate sold Cashmere Bouquet, a cosmetic talcum powder, for more than a century, from approximately 1875 to 1995.  The recipe for Cashmere Bouquet consisted of cosmetic-grade talc and small amounts of perfume and anti-caking and anti-bacterial agents. *E.g.*, Ex. 1 (1978, 1985 Formula Cards).  It is undisputed that Colgate never used asbestos as an ingredient in Cashmere Bouquet talcum powder or in any other product it manufactured or sold.

**B.      Cashmere Bouquet Talcum Powder and Colgate's Source Mines Have Repeatedly Been Shown to Be Free of Asbestos**

Since 1965, the "Food and Drug Administration regulates talc in the USA, and states that it is generally recognized as safe for use in colour additives in foods, drugs and cosmetics, and in paper, paper products, cotton and cotton fabrics that come into contact with food." Ex. 2 (World Health Organization IARC Monographs, Volume 93: Carbon Black, Titanium Dioxide and Talc (2010)) ("IARC 93") at 311; *see also* 30 Fed. Reg. 15,855, 15,861 (Dec. 23, 1965).  In the 1970s, in response to a report sounding false alarms of potential asbestos contamination in cosmetic talc,[1] the FDA commissioned a study of 195 cosmetic talcum powder products, including three samples of Cashmere Bouquet talcum powder.[2]  The FDA found no asbestos in any of the Cashmere Bouquet samples.  *Id.*  In 1976, a follow-up FDA study of two of the three samples (and samples from other manufacturers) again found Cashmere Bouquet to be free of asbestos.[3]

In July 1986, in response to a citizen's petition, the FDA rejected a request to add an asbestos warning label to cosmetic talcum powder.  After performing its own risk assessment study in which the FDA assumed a *hypothetical* asbestos contamination level of 0.1%, the FDA concluded that the risk from a worst case exposure was "less than the risk from environmental background levels of exposure to asbestos . . . over a lifetime."  Ex. 3 (1986 FDA Letter) at

---

[1]  The false alarms were later repudiated by the FDA, World Health Organization, and others as based on invalid science and a misunderstanding of how to identify asbestos in talcum powder.  *See, e.g.,* Ex. 3 (Ltr. from H. Swanson, Acting Assoc. Comm'r for Reg. Affairs, FDA, to Phillippe Douillet (July 11, 1986)) ("1986 FDA Letter") at FDA00003601 (citing Ex. 4 (Jerome B. Krause & William H. Ashton, *Misidentification of Asbestos in Talc, National Bureau of Standards, Special Publication 506* (1978)) at 342, 351 (criticizing articles discussing potential contamination of talc)); Ex. 2 (IARC 93) at 304 (criticizing article from 1976 claiming to find asbestos in talc, stating the "methodology did not distinguish between asbestos and non-asbestiform mineral fragments"); Ex. 5 (Jerome B. Krause, Letter to Ed., *Mineralogical Characterization of Cosmetic Talc Products*, 2 J. of Toxicol. & Env'l Health 1223 (1977)) at 1223 (stating paper regarding asbestos in talcum powder "conveys an erroneous impression that it is reasonably common to detect the presence of asbestos in over-the-counter talcum powder" and "the conclusions drawn are without sound scientific basis and are therefore misleading and invalid").

[2]  Ex. 6 (July 31, 1973 Memorandum from Dr. Alfred Weissler, Acting Director, Division of Color Technology, to Dr. Robert M. Schaffner, Director, Office of Technology, FDA).

[3]  Ex. 7 (Jan. 7, 1976 Memorandum from Ronald Yates to Heinz Eiermann).

FDA00003602.  More recently, in 2012, the FDA published a study of 27 samples of cosmetic-grade raw talc and 34 samples  of cosmetic products containing talc, finding no asbestos in any sample.[4]

Colgate also performed its own testing of talcum powder, beginning in the 1970s. Sanchez Decl. ¶¶ 99-102.[5]   In addition to its in-house testing, Colgate retained Walter C. McCrone Associates, Inc. ("McCrone"), a leading asbestos testing laboratory, to analyze Colgate's talc supply and other talc samples for the presence of asbestos.  Sanchez Decl. ¶ 100. The overwhelming majority of the available McCrone documents report the talc tested negative for asbestos.  Ex. 9 (compilation of negative McCrone results); Sanchez Decl. ¶ 100.  Colgate's retained experts for litigation have also tested talcum powder from dozens of Cashmere Bouquet-labeled containers, finding all of them free of asbestos.[6]  Sanchez Decl. ¶¶ 92-93.  Further, the cosmetic-grade talc from Colgate's various source mines has repeatedly been found by the Environmental Protection Agency, the National Institute for Occupational Safety and Health, and other independent experts to be pure and free of asbestos.  Sanchez Decl. ¶¶ 53-78.[7]  Indeed, three epidemiological studies of miners and millers from the Val Chisone region of Italy, one of Colgate's major sources of cosmetic-grade talc, found *no cases of mesothelioma* among over

----

[4]  Ex. 8 (FDA, "Ingredients > Talc", available, online at http://www.fda.gov/cosmetics/productsingredients/ingredients/ucm293184.htm (last visited October 28, 2016).

[5]   *See also* Ex. 44 (representative test results of Colgate's in-house testing by x-ray diffraction); Ex. 45 (representative Raw Material Purchase Specifications).  Colgate's supplier also performed its own testing, which shows no asbestos detected in any talc sent to Colgate.  Ex. 46 (representative certificates of analysis from Cyprus Minerals Industrial Company).

[6]   Although both the Plaintiff's and Colgate's test results of these containers should be precluded due to lack of authenticity, if Plaintiff is permitted to rely upon them, Colgate will rely upon these test results as well.

[7]   *See also* Ex. 24 (EPA, Health Assessment Document for Talc (1992), at 2-7, 3-26, 3-35; Ex. 2 (IARC 93) at 283-84, 306-07, 318; Ex. 47 (NIOSH, *Analysis of Talc by X-Ray Diffraction and Polarized Microscopy* 34 (May 1977)).

3,000 miners and millers who worked in the talc mines from 1921 to 1995.[8]  These Italian talc mines are still in operation to this day.  Sanchez Decl. ¶ 74.

Against this backdrop, Dr. Gordon claims that Cashmere Bouquet talcum powder contained dangerous amounts of asbestos, and that Ms. Jackson's exposure to asbestos caused her mesothelioma.  Other than plaintiffs' experts in litigation against Colgate, no other scientists hold this view, and as discussed above, the vast majority believe the opposite—that Cashmere Bouquet and the relevant source mines were asbestos free.  Dr. Gordon can only reach this result by misunderstanding what asbestos is and how to detect it, by failing to follow established, generally accepted methods for detecting asbestos in talcum powder, and by failing to follow protocols for the attribution of mesothelioma to asbestos exposure.

###    C.    Analyzing Talcum Powder for the Presence of Asbestos Presents a Risk of False Positives Unless Appropriate Measure Are Taken

Talc is not asbestos.[9]  The scientific community has recognized for decades that analyzing talcum powder for the presence of asbestos presents a risk of false positives.[10] "Popular methods of analysis can give the wrong answer—namely that asbestos is present when it certainly is not."  Ex. 4 (Krause, *Misidentification of Asbestos in Talc*) at 339.

---

[8]  Ex. 10 (Giovanni F. Rubino, *et al., Mortality Studies of Talc Miners and Millers,* 18 J. Occup. Med.  186 (1976)); Ex. 11 (Giovanni F. Rubino, et al*., Mortality & Morbidity Among Talc Miners and Millers in Italy, in* Dusts and Disease (1979)); Ex. 12 (Maurizio Coggiola, *et al.*, *An Update of a Mortality Study of Talc Miners and Millers in Italy,* 44 Am. J. Indust. Med. 63 (2003)).

[9]  Occupational Exposure to Asbestos, Tremolite, Anthophyllite and Actinolite, 57 Fed. Reg. 24,310, 24,316 (June 8, 1992) (listing asbestos minerals, which do not include talc).

[10]  Ex. 13 (ASTM Int'l, Draft *Test Method for Transmission Electron Microscopy (TEM) Analysis of Cosmetic and Pharmaceutical Talc for Asbestos* (Aug. 10, 2012)) ("Draft ASTM TEM Method") at 4 (§ 6.1) (stating talc, because it is "very similar to asbestos minerals," "may interfere with the analysis by causing false positives"); Ex. 14 (Thomas Kremer & James Millette, *A Standard TEM Procedure for Identification and Quantitation of Asbestiform Minerals in Talc*, 38 Microscope (1990)) at 459-63 (discussing several "interferences" present in talc); Ex. 2 (IARC 93) at 286 (stating talc has a "complex electron diffraction pattern" that "may resemble" "amphiboles" unless "carefully indexed"); Sanchez Decl. ¶¶ 21-27.

To reliably report asbestos in talcum powder, an analyst must account for and distinguish known "interferences" that can lead to false positives.[11]   In this context, an interference is a substance that resembles asbestos and could be mistaken for asbestos, but in actuality is not asbestos.  Sanchez Decl. ¶ 22.

When Dr. Gordon began testing talcum powder for asbestos, he failed to account for potential interferences for a simple reason:  He was unaware of any.   Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 143:12-17.  In fact, it is well known to material science experts with talc testing experience and expertise, that three general categories of interferences must be accounted for when analyzing talcum powder:  (1) non-asbestos cleavage fragments, (2) talc particles on edge or elongated talc particles; and (3) accessory minerals commonly found in talc (none of which causes asbestos-related disease).  Sanchez Decl. ¶ 23.  These interferences are discussed in more detail below.

### 1.    Non-Asbestos Cleavage Fragments Are Interferences That Must Be Properly Distinguished From Asbestos

"Asbestos" is defined as the asbestiform varieties of six naturally occurring minerals (five "amphibole" minerals and one "serpentine" mineral).[12]  In addition to the asbestiform varieties of these minerals, these same six minerals also occur in non-asbestiform varieties, and the non-asbestiform varieties are not regulated as asbestos because they are neither carcinogenic nor otherwise dangerous.[13]   These non-asbestiform minerals, when crushed, are called "cleavage

---

[11]   Ex. 13 (Draft ASTM TEM Method) at 4 (§ 6.1); Ex. 14 (Kremer & Millette, *A Standard TEM Procedure*) at 459; Sanchez Decl. ¶¶ 22-23.

[12]    The "six minerals are chrysotile, crocidolite, amosite . . . , tremolite asbestos, anthophyllite asbestos, and actinolite asbestos.  Chrysotile belongs to the family of minerals called serpentine minerals. The remaining five minerals belong to the family of minerals called amphiboles."  Occupational Exposure to Asbestos, Tremolite, Anthophyllite and Actinolite, 57 Fed. Reg. at 24,316; Sanchez Decl. ¶ 18.

[13]    *See, e.g.,* Ex. 16 (June 14, 2011 Gordon Dep.) at 107:15-19; Ex. 17 (Apr. 18, 2013 Gordon Dep.) at 162:1-3; Occupational Exposure to Asbestos, Tremolite, Anthophyllite and Actinolite, 57 Fed. Reg. at 24,316 (OSHA final rule noting "that substantial evidence is lacking to conclude that non-asbestiform tremolite, anthophyllite and

fragments" and are *far more common* than the rare asbestiform variant.[14]  Ex. 19 (James Millette,

*Asbestos Analysis Methods*, in *Asbestos: Risk Assessment, Epidemiology and Health Effects*

(Ronald Dodson & Samuel Hammar eds., 2d ed. 2011)) at 42; Ex. 20 (Sept. 30, 2016 Gordon

Dep.) at 53:25-54:13; Ex. 5 (Jerome B. Krause, *Mineralogical Characterization of Cosmetic*

*Talc Products*, 2 J. of Tox. & Envt'l Health 1223, 1223 (1977) (asbestiform version "account[s]

for less than 1% . . . of each mineral.").  Because cleavage fragments are not asbestos but can

appear similar to asbestos under a microscope, they are interferences that must be properly

distinguished in order to avoid falsely identifying them as asbestos.[15]

It is well recognized, even by Dr. Gordon, that there is no generally accepted method for

differentiating true asbestos from cleavage fragments on the basis of a *single* fiber.[16]  In other

words, an individual asbestos fiber and an individual non-asbestos cleavage fragment can look

the same under the microscope particularly after the minerals have been crushed and milled.[17]

---

actinolite present the same type or magnitude of health effect as asbestos" and therefore "amend[ing] the revised asbestos standards . . . to remove non-asbestiform tremolite, anthophyllite and actinolite from their scope"); Ex. 18 (Ann G. Wylie, *The Habit of Asbestiform Amphiboles: Implications for the Analysis of Bulk Samples*, in *Advances in Environmental Measurement Methods for Asbestos* 53-56, 58 (Michael E. Beard & Harry L. Rook eds., 2000)).

[14]  Both non-asbestos, common form cleavage fragments and rare asbestiform variants of the same amphibole or serpentine minerals share identical elemental chemistries and identical crystalline structures. Ex. 18 (Wylie, *Habit of Asbestiform Amphiboles*) at 54-56.  But only the rare asbestiform variant crystallizes in the habit of asbestos and is characterized by bundles of long, thin, durable and heat resistant fibers that are separable into fibrils.  *Id.* at 55.

[15]  Ex. 18 (Wylie, *Habit of Asbestiform Amphiboles*) at 54-60.

[16]  Ex. 17 (Apr 18, 2013 Gordon Dep.) at 165:8-16; *Bernard v. Brookfield Props. Corp.*, 984 N.Y.S.2d 633, at *2 (Sup. Ct. N.Y. County 2013) (stating "there is no generally accepted method in the scientific community to differentiate an asbestos amphibole from a non-asbestos amphibole on the basis of a single fiber"); Ex. 21 (U.S. Geological Survey, *Some Facts About Asbestos* (2001)) at 1 ("unless a fiber bundle has splaying ends, it is impossible to determine if a *single* long, thin particle grew that way (as asbestos) or is a cleavage fragment (nonasbestiform)".

[17]  Ex. 22 (Aug. 9, 2013 Gordon Dep.) at 339:18-340:11; Ex. 23 (Feb. 12, 2015 Gordon Dep.) at 217:2-8); Ex. 19 (Millette, *Asbestos Analysis Methods*) at 42 ("It is more difficult to classify *individual* fibers as to asbestiform or cleavage fragments because individual fibers do not exhibit all the characteristics of a *population*."); Occupational Exposure to Asbestos, Tremolite, Anthophyllite and Actinolite, 57 Fed. Reg. at 24,317 (stating particles from non-asbestiform minerals "are generally referred to as cleavage fragments and these fragments may occur in dimensions equal to asbestiform fibers."); Sanchez Decl. ¶ 21.

This is because cleavage fragments can be elongated and look like fibers, with aspect ratios (ratio of length to width) of 3-to-1, 5-to-1, or greater and with substantially parallel sides.[18]

Because *individual* asbestos fibers and individual cleavage fragments can be indistinguishable under a microscope, analysts must look at *populations* of fibers for asbestiform characteristics in order to determine whether the fibers crystallized or grew in the rare asbestiform habit or common non-asbestiform habit.[19]   Ex. 18 (Wylie, *Habit of Asbestiform Amphiboles*) at 60 (stating "these criteria must be applied to populations of particles, not to particles individually"); Ex. 21 (U.S. Geological Survey, *Some Facts About Asbestos*) at 1 (stating that to distinguish between asbestos and cleavage fragments, "the analyst can compared the shapes of *several hundred* amphibole particles in the same"); 29 C.F.R. § 1910.1001, App. J (OSHA regulation stating "[o]bservation of many fibers is often necessary to determine whether a sample consists of 'cleavage fragments' or of asbestos fibers").   Analyzing populations can distinguish between asbestos and cleavage fragments because, while *individual* cleavage fragments and asbestos fibers can have the same length, a *population* of asbestos fibers will, on average, have higher aspect ratios (i.e., the fibers are longer) than a population of cleavage fragments and display additional asbestiform characteristics.[20]

---

[18]   Ex. 23 (Feb. 12, 2015 Gordon Dep.) at 212:2-14; Ex. 18 (Wylie, *Habit of Asbestiform Amphiboles*) at 60 ("Since most habits of amphibole cleave into fragments that when longer than 5 µm are also elongated, a 3:1 aspect ratio is not specific for the asbestiform habit."); Ex. 19 (Millette, *Asbestos Analysis Methods*) at 42); Ex. 21 (U.S. Geological Survey, *Some Facts About Asbestos*) at 1 (stating "[l]ong, then cleavage fragments resemble asbestos fibers").

[19]   The "habit" of a mineral refers to the form, crystal structure and texture in which a mineral is found in nature. Sanchez Decl. ¶ 15.

[20]   Ex. 19 (Millette, *Asbestos Analysis Methods*) at 42 (analyzing tremolite fibers found in talc and stating the "population of tremolite fibers in talc is considered to be *nonasbestiform* because the mean AR [aspect ratio] is less than 20:1") (emphasis added); *see also id.* (stating "[r]esearch has shown that a population of cleavage fragment particles has a smaller mean [aspect ratio] than a population of commercial asbestos fibers").   Populations of amphibole particles are best analyzed by polarized light microscopy ("PLM").   Sanchez Decl. ¶ 30.

## 2. Talc and Accessory Minerals Found in Talc Are Interferences That Must Be Properly Distinguished From Asbestos

In addition to non-asbestos cleavage fragments, *talc itself* is an interference that can be mistaken for asbestos,[21] as can fragments of several other accessory minerals commonly found in talc.[22]   For example, as Dr. Gordon has acknowledged, talc and anthophyllite (one of the minerals that can be asbestos) have the same elemental chemistry and therefore cannot be reliably differentiated on the basis of elemental chemistry alone.[23]   In addition, crushing and milling talc can produce elongated particles, and talc plates on edge can look like fibers in an electron microscope.[24]   Other "accessory minerals" that can be found in talc also have chemical, crystal, or morphological structures that are similar to chrysotile, tremolite asbestos, and actinolite asbestos.[25]

## D. The Only Generally Accepted Method for Analyzing Talc for the Presence of Asbestos Has Criteria for Reliably Distinguishing Interferences From Asbestos

The one generally accepted protocol for analyzing talc for asbestos contamination is the *Monograph for Talc*, published by the United States Pharmacopeia ("USP").   Ex. 25 (USP 37/NF 32, Official Monographs/Talc (2014)) ("USP Method"); Sanchez Decl. at ¶ 48.   This is the method that the FDA has adopted to test talc for the presence of asbestos.   *See* 21 CFR §

---

[21]   Ex. 4 (Krause, *Misidentification of Asbestos in Talc*) at 339; Ex. 13 (Draft ASTM TEM Method) at 4 (§ 6.1); Ex. 14 (Kremer & Millette, *A Standard TEM Procedure*)) at 459-63); Ex. 2 (IARC 93) at 286; Sanchez Decl. ¶¶ 24-27, 47.

[22]   Sanchez Decl. ¶¶ 24-27, 46.

[23]   Ex. 23 (Feb. 12, 2015 Gordon Dep.) at 344:16-19; Ex. 22 (Aug. 9, 2013 Gordon Dep.) at 335:8-12.

[24]   Ex. 14 (Kremer & Millette, *A Standard TEM Procedure*) at 459-63 (identifying enrolled talc, ribbon talc, antigorite, talc fragments, silica, and iron oxide fibers as interferences); Ex. 2 (IARC 93) at 286 (stating talc has a "complex electron diffraction pattern" that "may resemble" "amphiboles" and stating talc must be "carefully indexed"); Sanchez Decl. ¶ 21.

[25]   Sanchez Decl. ¶ 23; Ex. 4 (Krause, *Misidentification of Asbestos in Talc*) at 345 (stating "[c]hlorite is one of the most common accessory minerals found associated with talcs" and are "somewhat analogous to amphiboles;" "clay minerals kaolinite, halloysite, and dickite overlap the positions of the chlorite and serpentine peaks, and will interfere when present").

73.1550(b).  Mr. Sean Fitzgerald, one of Plaintiff's other proffered experts on product testing, concedes that the USP method is the FDA's generally accepted method for testing talc.  Ex. 26 (Mar. 30. 2016 Fitzgerald Dep.) at 148:8-15.

The USP method has criteria for reliably distinguishing between cleavage fragments, talc, or accessory minerals on the one hand, and asbestos on the other.[26]  To report asbestos under the USP method, an analyst does not analyze individual fibers, but instead must detect a *population* of fibers with certain asbestiform characteristics: (1) aspect ratios of 20-to-1 to 100-to-1 or higher, for fibers longer than 5 µm; (2) fibers capable of splitting into very thin fibrils; and (3) two or more of the following characteristics: (i) parallel fibers in bundles; (ii) fiber bundles displaying frayed ends; (iii) fibers in the form of thin needles; and (iv) matted masses of individual fibers or fibers showing curvature.[27]  Ex. 25 (USP Method) at 4827.  These criteria permit analysts to properly distinguish between benign cleavage fragments and dangerous asbestos.  Ex. 18 (Wylie, *Habit of Asbestiform Amphiboles*) at 60; Ex. 19 (Millette, *Asbestos Analysis Methods*) at 42; Sanchez Decl. ¶ 20.

---

[26]  The USP method first requires performing infrared absorption or x-ray diffraction ("XRD").  Ex. 25 (USP Method) at 4826-27.  Infrared absorption and XRD are useful for detecting the mineral content of relatively large samples.  Sanchez Decl. ¶ 48.  If either test is positive, the analyst proceeds to analyze the sample by optical microscopy to determine if any of the minerals are present in the rare asbestiform variety.  Ex. 25 (USP Method) at 4826-27.  The optical microscopy portion of the USP method is performed using what is called a polarized light microscope ("PLM").  Sanchez Decl. ¶ 30.  The PLM allows an analyst to obtain a visual image of the particles within a sample, and uses the "refractive indices" of various minerals to accurately distinguish between asbestos, talc, and other accessory minerals.  Sanchez Decl. ¶¶ 31-32 .  The PLM allows "experienced optical mineralogists . . . to come to a remarkably accurate conclusions" because it allows the analyst to analyze "several specific properties . . ., such as refractive indices, extinction angle, birefringence, and optical orientation."  Ex. 4 (Krause, *Misidentification of Asbestos in Talc*) at 341.  These terms are explained in more detail in the Sanchez Declaration at ¶¶ 31-32.

[27]  Similarly, under the EPA's protocol upon which the USP method was based, asbestos is defined as a *population* of particles with an average aspect ratio of at least 20:1, are longer than 5 micrometers, with two or more specified characteristics.  Those characteristics are (i) "[p]arallel fibers occurring in bundles," (ii) "[f]iber bundles displaying splayed ends," (iii) "[m]atted masses of individual fibers," and/or (iv) "[f]ibers showing curvature."  Ex. 27 (EPA, *Test Method: Method for the Determination of Asbestos in Bulk Building Materials (EPA/600/R-93/116)* (July 1993)) at A-1.

It is undisputed that Dr. Gordon did not use this method, and instead, as discussed below, used a "modified" Yamate method that fails to account for the substantial risk of false positives when analyzing talc.

### E.      Dr. Gordon's Experience and Proffered Expertise

Dr. Gordon is a pathologist who, before being retained to test material from vintage Cashmere Bouquet-labeled containers, had limited experience with product testing of any type, with 90% of his work involving human tissue analysis. Ex. 16 (June 14, 2011 Gordon Dep.) at 48:13-19.  He also had no experience quantifying the presence of asbestos in talc or in any product.  *Id.* at 101:7-20.  As Dr. Gordon has acknowledged, tissue analysis is his primary area of expertise and is "a whole different ball game" from product testing.  Ex. 28 (July 13, 2016 Gordon Dep.) 86:12-14.  He had never written, and could not even cite, any publications concerning talc and asbestos when he was retained. Ex. 16 (June 14, 2011 Gordon Dep.) at 76:25-77:6.

### F.      Dr. Gordon's Product Testing Opinions

As set forth in his report, Dr. Gordon will opine that "Ms. Jackson had a significant exposure to asbestos above normal background levels" and that the "asbestos fibers were the causative factor in the development of [her] malignant mesothelioma."  Ex. 29 (Gordon Report) at 1.  He further claims that his "finding of tremolite as well as talc in [Ms. Jackson's tissue] is consistent with exposure to cosmetic talcum powder products, including Cashmere Bouquet." *Id.*

In attempting to link Ms. Jackson's mesothelioma to her use of a product that was never formulated to contain asbestos and that was shown *not* to contain asbestos by the FDA and other leading independent laboratories, *supra* Statement of Facts ("SOF") § (B), Plaintiff relies on Dr.

Gordon's testimony that he has tested material from "more than 50" vintage Cashmere Bouquet containers and has "found asbestos fibers in all those containers." *Id.*

In fact, for the material from the first container Dr. Gordon tested, he reported finding 100% talc and no asbestos. Ex. 30 (Dr. Gordon's Testing Reports, Report for FA08-43, dated Aug. 4, 2009); Ex. 40 (June 22, 2011 Gordon Dep.) at 259:24-260:4. After modifying his testing protocol, Dr. Gordon altered his results for that container to claim he had detected asbestos. Ex. 30 (revised report for FA08-43, dated Feb. 2, 2009). Since that time, Dr. Gordon has reported finding trace amounts of asbestos fibers—usually only a single fiber of anthophyllite asbestos—in virtually all the samples he tested. Ex. 30 (Dr. Gordon's Testing Reports, Reports for FA13-06CC, FA13-06DD, FA13-06FF, FA13-06GG, FA13-06HH, all dated Apr. 12, 2013).[28] Dr. Gordon used a transmission electron microscope ("TEM") equipped with energy-dispersive spectroscopy ("EDS") and selected area electron diffraction ("SAED") in his analysis.[29] *See, e.g.*, Ex. 30 (Report for FA13-15, dated Mar. 4, 2014) at 1. In employing his TEM, he claimed to follow what he called a "modified" Yamate Level III protocol. Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 151:3-8; 153:11-13. Dr. Gordon admitted that he did not maintain proper records of his analysis, including "bench sheets" recording the locations of the fibers he claimed to find so that another analyst could recreate his work.[30] Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 131:4-18. Dr. Gordon did not employ either XRD or PLM analysis, as required by the USP Monograph for

---

[28]   The full set of Dr. Gordon's testing reports is attached as Exhibit 30.

[29]   Sanchez Decl. at ¶¶ 33-40 (describing testing methods and terminology).

[30]   Dr. James Webber, another testing expert retained by plaintiffs in asbestos personal injury litigation against Colgate, stated that he could not rely upon Dr. Gordon's findings based on the absence of bench sheets and other records. Ex. 31 (Aug. 7, 2015 Webber Dep.) at 74:9-14 ("Q As you sit here today, you're not able to offer the opinion that Dr. Gordon's reports are scientifically defensible, though, correct?  [Objection.]  A. THE WITNESS: That's correct."); 137:20-139:12 (testifying that Dr. Gordon's report "was not in a format that I'm accustomed to seeing" and Dr. Gordon's failure to identify the grid openings where he identified particles means that "I can't really speak to his report because I don't know all the underlying data").

Talc, because both analytical tools are outside his area of expertise.[31]  Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 41:8-15, 187:1-10.

### G.    Dr. Gordon's "Modified" Yamate Method Does Not Account for the Risk of False Positives When Analyzing Talc for Asbestos

The "modified" Yamate method that Dr. Gordon employed does not account for the well-known risks of false positives.   For example, regarding the danger of reporting cleavage fragments as asbestos, the Yamate method itself recognizes that "[t]he non-asbestos forms of amphiboles have properties *very similar* to their asbestos counterparts, [] they must be distinguished from asbestos on the basis of morphology alone."  Ex. 34 (Yamate Method) at 48 (emphasis added).   The Yamate method, however, does not contain morphological criteria for distinguishing between non-asbestos cleavage fragments and asbestos.   Instead, the Yamate method contains blunt criteria that permit an analyst to count any *individual* particle, regardless of the population, with "substantially parallel sides" and a 3 to 1 aspect ratio (ratio of length to width) as an asbestos structure.[32]  Ex. 34 (Yamate Method) at 34.   But as discussed, individual cleavage fragments can also have aspect ratios of 3-to-1, or 5-to-1, or higher when crushed or milled.  *See, e.g.,* Ex. 18 (Wylie, *Habit of Asbestiform Amphiboles*) at 60.   These counting criteria, therefore, permit an analyst to count as "asbestos" particles that are not, in fact, asbestos.[33]

---

[31]   Dr. Gordon published the results of his analysis in the International Journal of Occupational and Environmental Health.  Ex. 32 (Ronald Gordon, et al., *Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women*, 20 Int'l J. Occup. & Envtl. Health 318 (2014)).   The publication describes exactly the same product testing at issue in this Motion and which Dr. Gordon has performed exclusively for plaintiffs' lawyers in litigation against Colgate.  *See id.* at 331 ("The work done was paid for by attorneys for litigation purposes.").

[32]   The Yamate method Dr. Gordon employed also requires that the particle is either an amphibole or serpentine mineral.  Ex. 34 (Yamate Method) at 44-45.

[33]   Historically speaking, the use of a 3-to-1 aspect ratio is "arbitrary" but is now "well-entrenched" in regulatory protocols, and it may still be appropriate to use regulatory settings "for counting airborne particles in an atmosphere known to contain asbestos, such as during or after an abatement procedure."  Ex. 18 (Wylie, *Habit of Asbestiform Amphiboles*) at 59, 60.

In addition, Dr. Gordon failed to apply the appropriate level of analysis under his chosen method, which caused him to misidentify non-asbestos minerals, like talc and other accessory minerals, as asbestos.  The Yamate method has three levels of increasingly rigorous analysis, Levels I, II, and III.  "If a legal proceeding is anticipated, Level III analysis *will be required* where a chain-of-custody record is kept from collection, transport to the laboratory, preparation, analysis, data reduction, and reporting of results."  Ex. 34 (Yamate Method) at 5 (emphasis added).[34]  Level III analysis confirms (or disconfirms) the presence of asbestos through a methodology called quantitative selected area electron diffraction ("SAED").  *See id.*

Quantitative SAED analysis is an analytical tool under Yamate Level III that definitively identifies and distinguishes different minerals based upon their unique crystal structure.  Ex. 34 (Yamate Method) at 44, 55-58.  A Level III analysis requires a *quantitative* measurement of a "diffraction pattern," which is a pattern of spots that is created by aiming an electron beam at mineral particle.  Ex. 34 (Yamate Method) at 44, 55-58.  As the electrons pass through the particle, they diffract at different angles, creating a pattern of spots that reveals the crystal structure of the particle.  Sanchez Decl. ¶¶ 36-42.  Below is an example of a diffraction pattern for anthophyllite:

---

[34] *See also id.* at 4 ("Level III, the most sophisticated and the costliest of the methods, is intended for confirming asbestos identification, especially in *judicial controversies*") (emphasis added); *id.* at 44 (stating Level III may be necessitated where "fundamental disagreements between parties involved in a *litigation* require further clarification" or "for source samples whether as bulk material or bulk-air type where a *legal judgment* is anticipated") (emphases added).



Sanchez Decl. ¶ 39.

Under Level III, the analyst must actually *measure* (or "index") the distances and angles between specified spots on the diffraction pattern. Ex. 34 (Yamate Method) at 44, 55-58. This analysis must be done on two different diffraction patterns for each fiber, each at a "zone axis" orientation.[35] *Id.* Once the analyst has quantitative measurements from two zone axis diffraction patterns, he compares them to known asbestos standards and looks for a match. *Id.* at 58; *see also* Sanchez Decl. ¶¶ 41-43.

Dr. Gordon did not perform a Level III quantitative SAED analysis. Ex. 20 (Sept. 30, 2016 Gordon Dep.) 92:8-11. Instead he relied on a *visual* comparison alone, which is akin to a Level II analysis under Yamate. *Compare* Ex. 34 (Yamate Method) at 37 *with id.* at 44; *see also id.* at 50 (explaining that "the method of obtaining the *visual* SAED pattern of randomly oriented specimens, as in Level I and II analysis, is modified for *quantitative* SAED pattern analysis" under Level III) (emphases added). Dr. Gordon admitted, with respect to his SAED analysis, that "I don't do measurements" and agreed that he has "never quantitatively measured the distance between the dots or the spots" on the diffraction pattern. Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 64:1-8, 65:19-21. There is no dispute that he failed to meet the requirements of Level

---

[35] *See* Sanchez Decl. ¶¶ 37-47 for an explanation of zone axis.

III, and as discussed in more detail below, this allowed him to mistakenly identify non-asbestos minerals as asbestos because, upon a visual comparison, the diffraction patterns of talc and other non-asbestos minerals can resemble the diffraction patterns for asbestos.[36]

### H.     Dr. Gordon's Tissue Analysis Opinion

In addition to analyzing product samples for the presence of asbestos, Dr. Gordon more recently analyzed Ms. Jackson's lung and lymph node tissue for the presence of asbestos.  Dr. Gordon admittedly found nothing he counts as asbestos fibers or asbestos bodies in Ms. Jackson's lung tissue.[37]  Ex. 29 (Gordon Report) at 22.  Dr. Gordon claimed to find a single tremolite fiber in Ms. Jackson's lymph node tissue.  Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 85:14-23.  Despite documenting only a single fiber, Dr. Gordon claims his findings demonstrate that Ms. Jackson was exposed to above-background levels of asbestos.[38]  *Id.*  He also claimed to find "asbestos bodies" in Ms. Jackson's lymph node tissue, Ex. 29 (Gordon Report) at 22, but admitted in deposition that he had no records of them and had not verified whether the bodies actually contained asbestos as opposed to some other non-asbestos mineral, Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 73:9-24, 74:22-75:5.

---

[36]   Unlike PLM, which is used in the USP method, the Yamate method employs a TEM microscope.  TEM offers higher magnifications and can therefore identify smaller fibers than PLM, but must be used properly in order to distinguish between asbestos and cleavage fragments or other non-asbestos minerals.  29 C.F.R. § 1910.1001, App. J ("Care must be taken when analyzing by electron microscopy because the interferences are different from those in light microscopy and may structurally be very similar to asbestos."); Sanchez Decl. ¶ 34.  The Yamate method can be appropriate for analyzing talcum powder, but only when the analyst applies morphological criteria for distinguishing between asbestos and cleavage fragments and uses a Level III quantitative SAED analysis (defined below).

[37]   Dr. Gordon does not count fibers in a patient's tissue that are less than five micrometers in length because short fibers are viewed as less carcinogenic and, to him, indicates above-background exposures.  Ex. 23 (Feb. 12, 2015 Gordon Dep.) at 186:16-187:12. "Asbestos bodies" are particles found within human tissue that the body has coated with iron, but these bodies are more appropriately called "ferruginous bodies" because, as Dr. Gordon acknowledges, they can form around non-asbestos particles.  Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 70:24-71:21, 75:2-5, 123:15-18.

[38] As discussed below, Dr. Gordon has changed levels of his background control group, the group to which he compared his findings in Ms. Jackson's tissue, over time so that a finding of a single fiber of tremolite would be considered above background.

**I.      One Court Ordered an Evidentiary Hearing on Dr. Gordon's Product Testing and Another Limited Dr. Gordon's Tissue Analysis Opinions**

All the testing of talcum powder that Dr. Gordon relies upon here was performed in other cases, including some testing in cases before Justice Shulman in New York City Asbestos Litigation.  There, Justice Shulman granted Colgate's request for a *Frye* hearing because he was "troubled" by Dr. Gordon's failure to follow established scientific protocols.  Ex. 35 (July 24, 2012 Hr'g Tr.) at 64:25-65:2.   The Judge also expressed concern that Dr. Gordon was inexperienced in testing talc for asbestos, *id.* at 17:25-18:2, and that he did not follow the Yamate Level III protocol:

> Dr. Gordon concededly did not follow the Yamate level 3 protocol the way he should have, that's why he did it over again.  No secret.  He admitted he didn't do it.  He didn't take pictures, he didn't record, he didn't do a preset grid to work off of.  He admitted it.

*Id.* at 64:20-24.  But before the *Frye* hearing occurred, plaintiffs' counsel withdrew Dr. Gordon as an expert, and the hearing went forward as to another product-testing expert, Dr. James Millette.  *Bernard v. Brookfield Props. Corp.*, 984 N.Y.S.2d 633, at *1 n.2 (Sup. Ct. 2013). After a three-day *Frye* hearing, Justice Shulman issued a written opinion precluding Dr. Millette's product-testing opinions based on errors equally present in Dr. Gordon's analysis.  *Id.* at *7.

Dr. Gordon's tissue analysis has also been the subject of judicial gatekeeping.  After performing an extensive analysis under *Daubert*, another court precluded Dr. Gordon from comparing tissue analysis findings to the background levels in his "control group"[39] because, "[g]iven this lack of transparency, peer-review, and general acceptance, Dr. Gordon's control group is not sufficiently reliable under *Daubert*."  Ex. 36  (*Cade v. Union Pac. R.R.*, No. CI 12-

---

[39] Dr. Gordon's control group analysis is explained in more detail below.  *See infra* § (II).

393 (Neb. Dist. Ct. Feb. 18, 2015) (Order on Defendant's Mot. in Limine to Exclude or Limit the Expert Testimony of Drs. Ronald E. Gordon and Vernon Rose) ("*Cade* Opinion") at 6.

### J. Dr. Gordon Has Placed His Credibility At Issue

Dr. Gordon's failure to record where he supposedly found asbestos in product samples and document all his findings in his tissue analysis is particularly problematic because it requires the Court to simply take his word for it. His opinions are particularly problematic in view of Dr. Gordon's refusal to respond to questions concerning perjuring himself about being arrested for passing forged checks.

Dr. Gordon has lied under oath in recent depositions regarding his criminal past. Dr. Gordon was arrested by U.S. Customs Agents in September 1992 for attempting to launder $11.2 million in counterfeit checks to an undercover agent, and he admitted to committing those crimes—including falsifying checks—in the course of testifying as a cooperating witness against a co-defendant. Ex. 37 (Gordon Testimony in *United States v. Reyes* (E.D.N.Y. July 12, 1993)) ("*Reyes*") at 275:1-4; *see also* William C. Rempel, *Alleged Mob Case May Best Illustrate How Not to Play the Game*, L.A. Times, July 4, 1993 (available at http://articles.latimes.com/print/1993-07-04/news/mn-9977_1_money-laundering-schemes). Dr. Gordon agreed to testify against his co-conspirators at trial, and subsequently entered the Witness Protection Program. Ex. 37, at 278:14-279:23. During his sworn testimony at a 1993 federal criminal trial, Dr. Gordon admitted "to criminal activity regarding drugs and drug laundering money" with his wife, mother-in-law, and others. Ex. 38 (July 8, 1993 Gordon Testimony in *Reyes*) at 180:4-7; 175:25-176:5; *see also id.* at 160:3-161:16, 186:13-187:8, 190:15-24, 192:14-195:1, 195:20-199:18, 208:9-212:2, 212:3-215:25; *see also United States v. Napoli*, 54 F.3d 63, 64 (2d Cir. 1995) (describing conspiracy "managed by Caruso and Dr. Ronald Gordon" and Dr. Gordon's criminal conduct and arrest).

When Dr. Gordon was later questioned at subsequent depositions—including a deposition concerning his talcum powder testing—he repeatedly testified falsely about whether he had ever been arrested;[40] whether he had falsified documents;[41] whether he had ever testified in any capacity other than as an expert;[42] and whether his employment at Mount Sinai Hospital was uninterrupted, as he continues to represent in his expert report in this case.[43]

## LEGAL STANDARD

Pursuant to Federal Rule of Evidence 702 and *Daubert*, "'the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Day*, 524 F.3d 1361, 1368 (D.C. Cir. 2008) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)).  An expert's testimony must be "ground[ed] in the methods and procedures of science" and cannot be based on mere "subjective belief and unsupported speculation." *Daubert*, 509 U.S. at 590.  Courts must exclude expert evidence that is not "based on sufficient facts or data," that is not "the product of reliable principles and methods," or that has not "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

The objective of *Daubert*'s gatekeeping requirement "is to ensure the reliability and relevancy of expert testimony," and "to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  In exercising its gatekeeping function, "the trial judge must have considerable leeway in deciding in a particular case how to

---

[40]   Ex. 38 (July 8, 1993 Gordon Testimony in *Reyes*) at 175:3-6, 181:8-9; Ex. 48 (Apr. 23, 2012 Gordon Dep.) at 181:24-182:19; *see also* Rempel, *Alleged Mob Case May Best Illustrate How Not to Play the Game*, L.A. Times, *supra*.)

[41]   Ex. 38 (July 8, 1993 Gordon Testimony in *Reyes*) at 160:3-161:16, 186:13-187:8, 190:15-24, 192:14-195:1, 195:20-199:18, 208:9-215:25; Ex. 17 (Apr. 18, 2013 Gordon Dep.) at 84:11-12.

[42]   Ex. 17 (Apr. 18, 2013 Gordon Dep.) at 19:9-11.

[43]   Ex. 29 (Gordon report) at 2; Ex. 37 (July 12, 1993 Gordon Testimony in *Reyes*) at 285:3-15; Ex. 17 (Apr. 18, 2013 Gordon Dep.) at 56:25-57:16; Ex. 39 (June 14, 2011 R. Gordon C.V.) at 1.

go about determining whether particular expert testimony is reliable." *Id.*; *see also Daubert*, 509 U.S. at 594 (stating the inquiry is "a flexible one").  The *Daubert* court set forth a non-exclusive list of four factors that courts may consider when evaluating whether expert testimony is reliable: "focusing on whether the theory or technique had been tested, whether it had been subjected to peer review and publication, the method's known or potential error rate, and the method's general acceptance in the scientific community." *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 (D.C. Cir. 2001) (citing *Daubert*, 509 U.S. at 593-94).

"[N]one of the factors discussed is necessarily applicable in every case or dispositive; nor are the four factors exhaustive." *Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996). Indeed, as particularly relevant here, the court may also consider whether "the party proffering the evidence [has] explain[ed] the expert's methodology and demonstrate[d] in some objectively verifiable way that the expert has both chosen a reliable scientific method and *followed it faithfully*." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) (emphasis added).  In addition, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"The party offering the expert's testimony must establish by a preponderance of the evidence that the expert testimony is admissible . . . ." *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 35 (D.D.C. 2004).  For the reasons that follow, Plaintiff cannot meet this burden.

## ARGUMENT

### I.    Dr. Gordon's Product Contamination Opinions Are Scientifically Unreliable and Should Be Precluded

All of Dr. Gordon's product testing opinions should be precluded because the product samples cannot be authenticated; Dr. Gordon failed to follow the only generally accepted

protocol for analyzing talcum powder; and he failed to follow the protocol that he ultimately selected. As described below, these failures render Dr. Gordon's analysis unreliable and allowed him to claim asbestos was present when it was not.

**A.      The Product Samples Cannot Be Authenticated**

As a threshold matter, Dr. Gordon's opinions should be precluded because he tested talcum powder drawn from vintage containers that were indisputably never used by Ms. Jackson and are of unknown provenance. Virtually every court—from New Jersey and Maryland to the three judges in California—that has ruled upon Colgate's motion to preclude contamination opinions based upon testing of these product samples that are all previously opened, multiple decades old and for which there is no proof that their contents are in the same condition as when they left Colgate's factory, has granted the motion.[44]

**B.      Dr. Gordon Failed to Follow the Only Generally Accepted Method for Detecting Asbestos in Talcum Powder**

Even if Plaintiff could establish that the talcum powder samples were authentic Cashmere Bouquet, which Plaintiff cannot, Dr. Gordon's product testing opinions should nonetheless be precluded because, presumably due to his lack of experience with testing talcum powder for the presence of asbestos, he used test methods that are not generally accepted and cannot reliably detect asbestos in talcum powder.

As discussed *supra* SOF § (E), Dr. Gordon is a pathologist and, before being retained to test material from vintage Cashmere Bouquet-labeled containers, had limited experience with product testing of any type, with 90% of his work involving human tissue analysis. Ex. 16 (June 14, 2011 Gordon Dep.) at 48:13-19. He also had no experience quantifying the presence of asbestos in talc or in any product. *Id.* at 101:7-20.

---

[44] *See* Colgate's Motion *in Limine* to Preclude All Testimony and Evidence Regarding Purported Testing of Talc by Plaintiff's Testing Experts Because of Lack of Authenticity and Relevance of Talc Tested.

Even assuming Dr. Gordon is qualified to offer an opinion regarding asbestos contamination in talcum powder, his testimony should be precluded due to his failure to follow a generally accepted method.  One of the factors courts consider under *Daubert* is whether the expert employed a generally accepted method.  *Daubert*, 509 U.S. at 594.  There is only one generally accepted method for detecting asbestos in talcum powder, and Dr. Gordon did not follow it.  As discussed above, the USP method is the only generally accepted method for analyzing talc, and is approved by the FDA has adopted to test talc for the presence of asbestos.  *Supra* SOF § (D).

Dr. Gordon admits he did not use the USP method.  Ex. 33 (Sept. 29, 2016 Gordon Dep.) 188:19-25.  This is not surprising given that, at the time he first tested samples of Cashmere Bouquet-labeled talc, he had never written, and could not even cite, any publications concerning talc and asbestos.  Ex. 16 (June 14, 2011 Gordon Dep.) at 76:25-77:6.  Further, despite the USP talc method stating on its face that it is specific for talc, Dr. Gordon testified he was not familiar with the method and "never saw that it was just purely specific for that."  Ex. 20 (Sept. 30, 2016 Gordon Dep.) 50:14-21.

Because he failed to use the only method that experts in the field should rely upon for analyzing talc, Dr. Gordon's opinion should be barred under *Daubert*.  As discussed below, his failure to use the only generally accepted method for analyzing talcum powder makes his analysis fundamentally unreliable because it permitted him to claim that certain fibers, which resemble asbestos in some respects but that are definitively not asbestos, were countable as "asbestos" under his flawed method.

### C.     Dr. Gordon's Failure to Use the Only Generally Accepted Method for Analyzing Talcum Powder Renders His Analysis Unreliable

Plaintiff must "demonstrate in some objectively verifiable way that the expert has both chosen a reliable scientific method and *followed it faithfully*." *Daubert*, 43 F.3d at 1319 (emphasis added). "Vigorous adherence to protocols and controls are the hallmarks of 'good science.'" *Sanchez v. Boston Sci. Corp.*, No. 2:12-CV-05762, 2014 WL 4851989, at *7, *28 (S.D.W. Va. Sept. 29, 2014) (quoting *Black v. Rhone–Poulenc, Inc.*, 19 F. Supp. 2d 592, 603 (S.D.W. Va. 1998)) (excluding expert because "haphazard application of these tests, errors, and changes to their report lead to the conclusion that their methodology is unreliable," and excluding another expert's opinion in part because the expert "altered the protocols of peer-reviewed studies without a scientific basis for doing so").[45]

Dr. Gordon's failure to use the generally accepted USP method for talc renders his analysis inherently unreliable. Dr. Gordon's "thumb on the scale" method permits him to count benign cleavage fragments as "asbestos." Under his criteria, any individual particle with "substantially parallel sides" and a 3 to 1 aspect ratio (ratio of length to width) can be counted as "asbestos." Ex. 34 (Yamate Method) at 34. But because non-asbestiform cleavage fragments can also meet these criteria and can appear as "fibers" with 3:1 aspect ratios or greater, Ex. 18 (Wylie, *Habit of Asbestiform Amphiboles*) at 60; Sanchez Decl. at ¶ 105, Dr. Gordon's method actually counts cleavage fragments, which are far more common than asbestos, as "asbestos." The USP method, on the other hand, requires analyzing *populations* of particles to determine whether the population has an aspect ratio of 20:1 to 100:1 or higher, along with several other

---

[45]     *See also Dyson, Inc. v. Euro-Pro Operating LLC*, No. 14 C 9442, 2015 WL 1120006, at *17 (N.D. Ill. Mar. 10, 2015) (precluding expert opinion under *Daubert* because expert "fail[ed] to comply with ASTM [test method's] confidence interval requirement"); *Staple Cotton Co-op. Assoc. v. D.G. & G., Inc.*, No. 1:06CV0046 TCM, 2008 WL 2775644, at *3 (E.D. Mo. July 14, 2008), *aff'd sub nom. DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820 (8th Cir. 2009) (precluding expert testimony in part because "he did not follow the protocol of the test method used").

asbestiform characteristics—criteria that appropriate distinguish cleavage fragments.   Ex. 25 (USP Method) at 4827.

Dr. Gordon's failure to use the USP method fundamentally affected the reliability of his results because every particle he counted could be, and almost certainly is, a non-asbestos particle.   There is no scientific literature or testing protocol that specifies using 3 to 1 aspect ratio criteria for the detection of asbestos in talcum powder.   Sanchez Decl. ¶ 105.

This case is similar to *Dugas v. 3M Co.*, 2016 WL 3946802, at *9 (M.D. Fla. June 21, 2016).   In that case, the court precluded an asbestos analyst's exposure opinion under *Daubert*.   The expert claimed he had found asbestos in certain samples, but had arrived at this result by "fail[ing] to follow any generally accepted . . . methodology." *Id.*   Instead, the expert modified his methodology and only by modifying it was he able to claim he found asbestos.   *Id.* ("Dr. Longo still could not detect asbestos without modifying the only acceptable methods for occupational exposures to make the asbestos detectable.")   Modifying a method to achieve the desired result is not science, and that is exactly what Dr. Gordon has done here by failing to use the only generally accepted method for analyzing talcum powder for the presence of asbestos.   His product testing opinion should be precluded.   *Id.*; *see also Sanchez*, 2014 WL 4851989, at *7, *28; *Staple Cotton Co-op. Assoc.*, 2008 WL 2775644, at *3 (precluding expert testimony in part because "he did not follow the protocol of the test method used").

### D.       Dr. Gordon Failed to Follow His Selected Protocol

Not only did Dr. Gordon fail to use the USP method—which renders his analysis unreliable for the reasons discussed above—but he also failed to follow the Yamate method, the protocol he ultimately selected.   As discussed above, "[v]igorous adherence to protocols and controls are the hallmarks of 'good science.'"   *Sanchez*, 2014 WL 4851989, at *7, *28; *see also Dyson*, 2015 WL 1120006, at *17 (precluding expert opinion under *Daubert* because expert

26

"fail[ed] to comply with ASTM [test method's] confidence interval requirement").   But Dr. Gordon did not vigorously adhere to his protocol and instead admitted to throwing out the aspects of the Yamate method that safeguard against false positives, and only by doing so was Dr. Gordon able to claim he found "asbestos."

Dr. Gordon claims he followed a "modified" Yamate method.  Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 151:3–8.  In other words, Dr. Gordon deviated from the Yamate method in myriad ways.  He even admits that if he had actually followed its requirements he would have concluded that he found "zero asbestos" in the talcum powder he tested:

> You're giving me criteria and I'll tell you, very straightforward, if we use this criteria, there's going to be *zero asbestos in your samples*.

Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 167:20-168:18 (emphasis added); Ex. 20 (Sept. 30, 2016 Gordon Dep.) 85:9-14 ("Q. You've previously testified that if you had followed the requirements of the Yamate method as written, the level 3 full-blown analysis, you would not have reported asbestos in any of the samples you tested, correct?  A. That's probably true.").

This is a devastating admission that reveals Dr. Gordon's product testing opinion for what it is: the epitome of ends-driven pseudo-science.   Dr. Gordon chose his desired conclusion—that talcum powder in Cashmere-Bouquet-labeled containers was contaminated with asbestos—and modified his testing protocol so he could reach that result.[46]

Dr. Gordon's admissions should be the beginning and the end of the inquiry under *Daubert*.  Untestable and unreliable expert testimony, where the risk of misleading the jury with complex technical analysis is extremely high, should be excluded.[47]  *Dugas*, 2016 WL 3946802,

---

[46]   Justice Shulman in New York ordered a *Frye* hearing on Dr. Gordon's analysis for this same reason, stating that Dr. Gordon conceded that he failed to follow his chosen protocol.  Ex. 35 (July 24, 2012 Hr'g Tr.) at 64:20-24 (stating "Dr. Gordon concededly did not follow the Yamate level 3 protocol the way he should have").

[47]  Dr. Gordon admitted that his "modifications" to the Yamate method have not been peer reviewed, published, or adopted.  Ex. 17 (April 18, 2013 R. Gordon Dep.) at 103:24-104:2, 106:8-12.  The article that Dr. Gordon published

at *9 (precluding asbestos-testing expert's opinion because, in part, "Dr. Longo still could not detect asbestos without modifying the only acceptable methods for occupational exposures to make the asbestos detectable").

Although his admitted failure to follow his protocol should be sufficient to preclude his testimony, below are the many specific ways in which he failed to follow key aspects of the Yamate method, which permitted Dr. Gordon to report finding "asbestos" when, in reality, no asbestos was present.

### 1.    Dr. Gordon Failed to Perform the Proper Level of Analysis Under the Yamate Method

The Yamate method has three levels of increasingly rigorous analysis and requires the highest level of analysis, Level III, where results are intended for use in litigation.  Ex. 34 (Yamate Method) at 5; *supra* SOF § (G).  Dr. Gordon has admitted that he failed to perform a Level III analysis and, indeed, does not even know how to do so.  *Supra* SOF § (G).  His failure to use a Level III analysis is an independent basis for preclusion of his product testing opinion.

It is undisputed that Dr. Gordon failed to perform a Level III analysis, which requires the analyst to perform a quantitative SAED analysis.[48]  Ex. 20 (Sept. 30, 2016 Gordon Dep.) 92:8-11.  Instead, he performed a visual estimation, which is a Level II analysis.  *Supra* SOF § (G).

---

in 2014 does not describe or address in any way his modifications to the Yamate method.  *See* Ex. 32 (Gordon, *Asbestos in commercial cosmetic talcum powder*).)  Although Colgate will, if necessary and at the appropriate time, move *in limine* to preclude the article, its publication, of course, does not remedy any of the fundamental errors discussed in this Motion.  Among other reasons, Dr. Gordon should not be permitted to rely upon the article because (1) the talcum powder at issue in the article cannot be authenticated as Cashmere Bouquet talcum powder; (2) it is hearsay; and (3) the article describes paid work performed exclusively for litigation is not the type of information that "experts in the particular field would reasonably rely on . . . ."  Fed. R. Evid. 703; *see also, e.g., United States v. Tran Trong Cuong,* 18 F.3d 1132, 1143 (4th Cir. 1994) ("Reports specifically prepared for purposes of litigation are not, by definition, 'of a type reasonably relied upon by experts in the particular field.'").

[48]  Dr. Gordon admitted, with respect to his SAED analysis, that "I don't do measurements" and agreed that he has "never quantitatively measured the distance between the dots or the spots" on the diffraction pattern.  Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 64:1-8, 65:19-21.

Dr. Gordon's use of a Level II analysis allowed him to mistakenly identify non-asbestos particles as asbestos. A Level II analysis relies on visually estimating the distance between rows of spots on a diffraction pattern and looking for a specified distance (0.53 nanometers) between the rows of spots. Ex. 34 (Yamate Method) at 36; *see also* Sanchez Decl. at ¶ 44. But many other minerals, *including talc and non-asbestos minerals commonly found in talc*, also have a 0.53 nm row spacing. Sanchez Decl. at ¶¶ 45-46. Thus, simply looking for an estimated 0.53 nm row spacing, instead of actually measuring specified spots on the diffraction pattern, would lead an analyst to conclude that talc and other non-asbestos minerals are asbestos. Sanchez Decl. ¶ 47.

The Level III analysis addresses this risk by requiring quantitative measurements of the distance and angles between multiple spots on the diffraction pattern; only by measuring multiple aspects of the diffraction pattern can a mineral be definitively identified by its crystal structure.[49] Ex. 34 (Yamate Method) at 44; *see also* Ex. 4 (Krause, *Misidentification of Asbestos in Talc*) at 350-51 ("Many investigators simply observe the electron diffraction pattern in the microscope and decide on the basis of general pattern geometry whether or not the particle is an amphibole. This can lead to misidentification, since numerous other minerals can give electron diffraction patterns with amphibole pattern geometry. Careful measurement of an electron diffraction pattern is required . . . ."); Ex. 2 (IARC 93) at 286 (stating talc has a "complex electron diffraction pattern" that "may resemble" "amphiboles"); Sanchez Decl. ¶¶ 36-43.

Dr. Gordon took no measures measure his diffraction patterns or otherwise to account for the risk of false positives. When asked to identify how he would account for potential interferences, Dr. Gordon could not identify any interferences present in talc when analyzing it

---

[49] Another judge has also recognized the importance of quantitative SAED: it is "necessary to correctly classify the amphibole as a true asbestiform fiber via . . . *quantitative zone axis* electron diffraction study . . . ." *Bernard*, 984 N.Y.S.2d 633, at *4 (emphasis added).

for asbestos.  When asked to name even a single interference, Dr. Gordon testified, "I know that there is, but I -- that, again, is not my specific area of expertise."  Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 143:12-17.  Indeed, Dr. Gordon did not even know what an "interference" was until Colgate's counsel defined it for him.  *Id.* at 140:23-141:13.  Accordingly, when asked if he "follow[ed] any analytical criteria to avoid interference minerals when identifying asbestos in talc," he answered, "No."  *Id.* at 145:7-10.

Dr. Gordon's purported work cannot be fully reviewed and verified because he failed to create and maintain appropriate documentation for his analysis.  Colgate's experts would have performed their own Yamate Level III analysis on Dr. Gordon's diffraction patterns if Dr. Gordon had actually provided proper records.  Level III requires having two different "zone axis" diffraction patterns for each particle.  But Dr. Gordon admitted he failed to obtain *any* zone axis diffraction patterns.  Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 133:17-135:5.  He further admitted that tilting the fiber to obtain a zone-axis SAED diffraction pattern is "not my area of expertise."  *Id.* at 136:3–7; *see also id.* at 136:3–17.  Further, Dr. Gordon admitted that the copies of certain SAED patterns he provided to Colgate were so poor that Colgate "can't do anything with this, I understand that."  *Id.* at 53:5-6.

Dr. Gordon's failure to perform a Level III analysis is not only a violation of the Yamate method, it is a mistake that negates his conclusion that he found asbestos.[50]  By performing only a visual estimation of the SAED diffraction pattern, he has no reliable basis for concluding that the particles he claimed to find were actually asbestos instead of talc or other common, non-asbestos minerals often found in talc.

---

[50]   The Yamate method can be appropriate for analyzing talcum powder, as long as the analyst follows the protocol, employs a full Level III analysis and also employs criteria for distinguishing between cleavage fragments and asbestos.

### 2. Dr. Gordon Materially Deviated From the Yamate Method by Failing to Follow the Method's Recordkeeping Requirements

The Yamate method also has recordkeeping requirements, which Dr. Gordon failed to follow.

Maintaining proper records is essential to the scientific method. "[G]ood science requires the investigator to keep good documentation so the study can be reconstructed wholly independent of the investigator." *Black v. Rhone-Poulenc, Inc.*, 19 F. Supp. 2d 592, 598 (S.D.W. Va. 1998) (precluding expert opinion in part due to failure to maintain records, which made "independent reconstruction [of results] exceedingly difficult if not impossible"). Courts frequently preclude experts for failing to maintain records of their analysis. *See id.*; *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 304 (6th Cir. 1997) *abrogated on other grounds by Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 514 (6th Cir. 1998) (testimony improperly admitted where expert had "failed to adequately document testing conditions and the rate of error so the test could be repeated and its results verified and critiqued"); *Morehouse v. Louisville Ladder Group LLC*, No. Civ.A 3:03–887–22, 2004 WL 2431796, at *7 (D.S.C. 2004) (excluding expert testimony in part because the expert "failed to record his hypothesis testing or include relevant details in his report"); *United States v. Hebshie*, 754 F. Supp. 2d 89, 125 (D. Mass. 2010) ("Documentation is necessary to test a hypothesis; in fact, reproducibility is the sine qua non of science."); *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 282 F.R.D. 655, 667 (M.D. Fla. 2012), *aff'd,* 725 F.3d 1377 (Fed. Cir. 2013) (excluding expert's results because "[h]is testing procedures are undocumented and do not conform to the governing scientific standards").

At deposition, Dr. Gordon was asked, very simply, "Do you see a paragraph that is entitled, Data Reduction?  A. Yes. Q. Did you follow these data reduction protocols?  A. No."

Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 166:19-23; Ex. 34 (Yamate Method) at 39-41.  Not only

is this a violation of the Yamate method, but it makes it impossible for another scientist to verify

or replicate his results.  For example, Dr. Gordon *never* recorded the location of any fibers he

found on the "grids" he used in his electron microscope, and Dr. Gordon admitted that without

those records, another lab would not be able to find his fibers or verify his conclusions.  Ex. 15

(Mar. 20, 2015 Gordon Dep.) at 131:4-18.  As summarized by Justice Shulman: "He didn't take

pictures, he didn't record . . . .  He admitted it."  Ex. 35 (July 24, 2012 Hr'g Tr.) at 64:20-24.

Without any way to verify his findings of "asbestos," Colgate, the Court, and the jury

must accept his claims without proof.  Dr. Gordon's failure to comply with the Yamate method's

recordkeeping requirements is yet another digression from generally accepted methods and

another basis for preclusion of his product testing opinion under *Daubert.  See, e.g., Black*, 19 F.

Supp. 2d at 598 (precluding expert opinion in part due to failure to maintain records).

### 3. Dr. Gordon Materially Deviated From the Yamate Method by Reporting Asbestos and Extrapolating to a Concentration Based Upon Statistically Insignificant Results

"[I]t is the consensus of the scientific community that a reported 4 or less fiber count in a

tested sample is below the detection limit and must be deemed insignificant statistically . . . ."

*Bernard*, 984 N.Y.S.2d 633, at *4.  The Yamate method specifically states that a finding of less

than 5 fibers cannot be distinguished from background levels of asbestos, or the possibility of lab

contamination.  Ex. 34 (Yamate Method) at 70 (stating "the minimal detectable difference

between test and control samples is 5 fibers in the test sample and 0 fibers in the blanks").

Another court has precluded an asbestos product testing expert, in part, for failing to find a

statistically significant population of fibers.  *Bernard*, 984 N.Y.S.2d 633, at *5-7.

Dr. Gordon's testing suffers from the same defect.  Indeed, Dr. Gordon admitted that he

failed to meet the five fiber threshold necessary to report a confirmed finding of asbestos

contamination: "Q. For each of your grids where you didn't find five fibers, did you satisfy this minimal detectable difference in Yamate Level 3?  A. In actuality, no." Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 167:20–24.  In his testing reports, Dr. Gordon claimed to find at least five fibers in *only 4 individual samples*.[51]  Ex. 30 (Gordon Reports, Reports for FA13-43, dated Jan. 15, 2014; FA13-44, dated Jan. 15, 2014; FA13-18, dated Mar. 4, 2014; and FA14-21, dated Dec. 11, 2014).  Dr. Gordon's analysis on every other sample he tested cannot be distinguished from background contamination and, under his chosen protocol, should have been reported as no asbestos detected.

Dr. Gordon seeks to offer the jury his opinions concerning his statistical analysis despite having candidly conceded that "statistics is not my thing."  Ex. 17 (Apr. 18, 2013 Gordon Dep.) at 131:3–14; *see also id.* at 112:5-15 ("I don't do statistics.").  Further, he admitted he made no statistical calculations when extrapolating from the individual fibers he found to tens or hundreds of thousands of fibers per gram.  Ex. 40 (June 22, 2011 Gordon Dep.) at 306:22-307:1.  In the majority of his individual samples, Dr. Gordon's fibers-per-gram figures are based on a *single* purported fiber of asbestos.  For instance, in sample FA12-21, Dr. Gordon reported "1 anthophyllite fiber" in each sample and then claimed there were a minimum of "11,040 anthophyllite fibers per gram of talc."  Ex. 30 (Report for FA12-21, dated June 22, 2012) at 1-2.  Dr. Gordon acknowledged, however, that these calculations were not based on any reliable statistical method, Ex. 17 (Apr. 18, 2013 Gordon Dep.) at 109:6-8, and that he had not performed any statistical calculations to support his findings, Ex. 40 (June 22, 2011 Gordon Dep.) at 306:22-307:1.  His testimony should be precluded.  *Dyson*, 2015 WL 1120006, at *17

---

[51]   His contamination opinions for these four samples should nevertheless be precluded for the same reasons discussed above.

(precluding expert opinion under *Daubert* because expert "fail[ed] to comply with ASTM [test method's] confidence interval requirement").

*      *      *

In sum, Dr. Gordon failed to use the generally accepted method for analyzing talcum powder, which caused him to identify non-asbestos interferences as "asbestos."  He also failed to follow his chosen protocol, the Yamate method, in myriad ways that caused him to claim asbestos was present when it was not and admitted that, if he had followed his method, he would have reported finding no asbestos.  His product-testing opinions are unfounded and unreliable and should be precluded.

## II.    Dr. Gordon's Exposure and Specific Causation Opinions Based Upon His Tissue Analysis Should Be Precluded

For the vast majority of women with mesothelioma, their disease cannot be attributed to asbestos exposure.  Ex. 41 (Robert Spirtas, *et al.*, *Malignant mesothelioma: attributable risk of asbestos exposure*, 51 Occup. Environ. Med. 804 (1994) (stating that only 23% of mesothelioma cases in women could be attributed to asbestos exposure).  In attempting to claim that Ms. Jackson's particular mesothelioma was caused by asbestos exposure, Dr. Gordon must, therefore, prove that Ms. Jackson is in the very small minority of women that can attribute their mesothelioma to exposure to asbestos.  Remarkably, Dr. Gordon testified that for *every patient* he has examined, he has always opined that an individual's mesothelioma was caused by asbestos exposure.  Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 78:1-5.

Dr. Gordon supports his claim that Ms. Jackson's mesothelioma was caused by asbestos exposure based on finding a single tremolite "asbestos" fiber and three undocumented "asbestos

bodies" in Ms. Jackson's lymph node tissue.[52]  Ex. 29 (Gordon Report) at 22.  As an initial matter, all the errors discussed above apply to Dr. Gordon's fiber burden analysis in which he attempted to identify asbestos fibers using the same flawed techniques.[53]  His fiber burden analysis, however, suffers from additional flaws that further support preclusion.

### A.      Dr. Gordon's Control Group Is Untested and Unreliable

Finding fibers in an individual's tissue, by itself, is unremarkable given that all individuals, even those without mesothelioma, have asbestos fibers in their lungs and lymph nodes.  Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 196:16-197:2.  The finding of fibers only becomes relevant if the quantity of fibers in the patient's tissue exceeds the tissues found in a control group of individuals without mesothelioma and without known exposures to asbestos.  Ex. 42 (*Consensus Report: Asbestos, asbestosis, and cancer: the Helsinki criteria for diagnosis and attribution*, Scand. J. Work Env'l Health 23(4), 311 (1997)) ("Helsinki Criteria") at 313.  Unlike many other labs, Dr. Gordon uses his own unique control group that has never been tested, validated, or published in the peer-reviewed literature.  For these reasons, another court has precluded under *Daubert* his attempt to compare his findings to his control group.

In *Cade v. Union Pacific Railroad*, the court, applying *Daubert*, precluded Dr. Gordon from providing any opinions based on his control group.  Ex. 36 (*Cade v. Union Pac. R.R.*, No. CI 12-393 (Neb. Dist. Ct. Feb. 18, 2015) (Order on Defendant's Mot. in Limine to Exclude or Limit the Expert Testimony of Drs. Ronald E. Gordon and Vernon Rose) ("*Cade* Opinion").  The *Cade* court went through each of the relevant factors under *Daubert* and held that "[n]one of the *Daubert* factors support inclusion of information about Dr. Gordon's control group."

---

[52]  Dr. Gordon calls this analysis of Ms. Jackson's lung and lymph node tissue his "fiber burden" analysis.  Ex. 29 (Gordon Report) at 21-23.

[53]  Although Dr. Gordon fails to identify any testing protocol in his report, he claims to have used TEM with SAED and EDS, the same tools as his product-testing analysis and has not disclosed any different fiber identification protocol he used for his tissue analysis.  Ex. 29 (Gordon Report) at 21-23.

First, as the *Cade* court recognized, Dr. Gordon admitted in deposition that his control group has never been published or peer-reviewed. *Id.* at 6; Ex. 15 (Mar. 20, 2015 Dep.) at 114:9-13. This factor weighs against admissibility.

Second, "Dr. Gordon's control group results have not attained general acceptance in the scientific community." Ex. 36 (*Cade* Opinion) at 6. Dr. Gordon had testified in that case that most scientists use a lung tissue control group created by Dr. Victor Roggli, which "finds far higher levels of asbestos fibers in non-exposed individuals than did Dr. Gordon's group." Ex. 36 (*Cade* Opinion) at 6.

Third, "Dr. Gordon's methodology for designating a person as a non-exposed individual and including that person in the control group cannot be tested and does not have a known error rate." Ex. 36 (*Cade* Opinion) at 6. Dr. Gordon has no records of the exposure histories for each individual in his control group—nothing beyond their age and gender is known—and the only records he has of them are 35 pages of handwritten notes from anonymous autopsies and surgeries; it is, therefore, impossible to verify the fiber counts in his control group. *Id.* at 6; Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 118:11-122:24. In other words, his "methodology for designating a person as a non-exposed individual and including that person in the control group cannot be tested . . . ." Ex. 36 (*Cade*) at 6.

Fourth, "the size of Dr. Gordon's control group has changed from approximately 200 individuals, to 175, to 35." Ex. 36 (*Cade* Opinion) at 6); Ex. 28 (July 13, 2016 Gordon Dep.) at 130:4-132:8. "At least some of this decrease in size appears to be due to Dr. Gordon electively removing part of the sample because their higher levels of fiber burden made him question whether they were truly non-exposed." Ex. 36 (*Cade* Opinion) at 6. In essence, he selectively removed from his control group the individuals with the highest fiber counts, manipulating

downward the fibers levels in his control group.  *Id.* at 6.  By lowering the fiber levels in his control group, it makes it easier for Dr. Gordon to opine that the fiber levels in the patient at issue are "higher than" his control group.

The court in *Cade* summarized its reasoning as follows: "Given this lack of transparency, peer-review, and general acceptance, Dr. Gordon's control group is not sufficiently reliable under *Daubert*."  Ex. 36 (*Cade* Opinion) at 6.  The *Cade* court therefore precluded "Dr. Gordon . . . from discussing his control group or discussing analytical results derived directly from his control group at trial."  *Id.* at 7.

All of the flaws identified in *Cade* are equally present in the control group Dr. Gordon used in this case.  Indeed, Dr. Gordon uses the same dubious control group as his benchmark for comparing the fibers in Ms. Jackson's tissue.  The Court here should preclude Dr. Gordon from opining that a single tremolite fiber he detected in Ms. Jackson's lymph node tissue exceeds the "normal background" levels of his control group.

Finally, Dr. Gordon's analysis is particularly suspect because in *every case* he has ever offered an opinion, he has always concluded that the plaintiff's fiber counts exceeded his control group and, therefore, that the plaintiff's mesothelioma was caused by asbestos.  Ex. 15 (Mar. 20, 2015 Dep.) at 78:1-5.  This is so despite the fact that the published literature states only 23% of female mesothelioma cases can be attributed to asbestos exposure.  Ex. 41 (Robert Spirtas, *et al.*, *Malignant mesothelioma: attributable risk of asbestos exposure*, 51 Occup. Environ. Med. 804 (1994).  Although Dr. Gordon admitted that people without mesothelioma also have asbestos fibers in their lungs, Ex. 15 (Mar. 20, 2015 Dep.) at 196:16-197:2, somehow none of the individuals in his control group has countable fibers in their tissue.  Put differently, when Dr. Gordon finds *even a single countable fiber* in a plaintiff's tissue, he opines that asbestos exceeded

normal background levels and caused the mesothelioma.  *Id.* at 109:8-110:1.  Yet Dr. Gordon also admitted there is no peer-reviewed literature supporting his opinion that finding a single fiber in lymph node tissue is a basis for concluding that the mesothelioma was caused by asbestos.  *Id.* at 132:4-19.

Dr. Gordon's control group analysis is unreliable, and he should be precluded from using it as a baseline for determining specific causation.

**B.     Dr. Gordon Found No Fibers in Ms. Jackson's Lung Tissue, Negating Any Basis for Attributing Ms. Jackson's Mesothelioma to Asbestos Exposure Under the "Helsinki Criteria"**

Dr. Gordon's report states he followed the Helsinki criteria for attributing Ms. Jackson's mesothelioma to asbestos exposure.  Ex. 29 (Gordon Report) at 3.  In fact, Dr. Gordon deviated sharply from the Helsinki criteria and admitted in deposition that his findings, in fact, do not satisfy the Helsinki criteria.

The Helsinki criteria sets forth several factors that would permit a scientist to attribute mesothelioma to asbestos exposure.  Mesothelioma can be attributed to asbestos exposure in one of the following ways: "[1] A lung fiber count exceeding the background range for the laboratory in question *or* [2] the presence of radiographic or pathological evidence of asbestos-related tissue injury (eg, asbestosis or pleural plaques) *or* [3] histopathologic evidence of abnormal asbestos content (eg, asbestos bodies in histologic sections of lung) . . . .  In the absence of such markers, a history of significant occupational, domestic, or environmental exposure to asbestos will suffice for attribution."  Ex. 42 (Helsinki Criteria) at 313.

There is no evidence of Ms. Jackson having (1) asbestos fibers in her lungs, (2) asbestosis or pleural plaques, or (3) asbestos bodies in her lungs.[54]  Although Dr. Gordon relies upon his finding of a single tremolite fiber in Ms. Jackson's *lymph node* tissue, the Helsinki criteria focuses on finding fibers in *lung* tissue.  Ex. 42 (Helsinki Criteria) at 313.  Dr. Gordon found no asbestos fibers in Ms. Jackson's lung tissue.  Ex. 29 (Gordon Report) at 22.  He therefore agreed in deposition that "Helsinki, as written, does not support [his] conclusion that she was exposed to asbestos above background based upon [his] findings in lung tissue."  Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 210:17-24.

Again, Dr. Gordon ignores his own, chosen methodology to reach an ends-driven opinion.  Dr. Gordon failed to follow the Helsinki criteria and has no basis to opine under those criteria that Ms. Jackson's mesothelioma was caused by asbestos exposure.  *See Sanchez*, 2014 WL 4851989, at *7, *28 (stating "[v]igorous adherence to protocols and controls are the hallmarks of 'good science'").

### C.    Dr. Gordon's Finding of a Single Tremolite Fiber in Ms. Jackson's Lymph Node Tissue Is Insufficient to Attribute Ms. Jackson's Mesothelioma to Asbestos Exposure

In addition to failing to satisfy the Helsinki criteria, Dr. Gordon's finding of a single tremolite fiber in Ms. Jackson's lymph node tissue does not provide a reliable basis for attributing Ms. Jackson's mesothelioma to asbestos exposure.

---

[54]    Regarding the last aspect of Helsinki, whether there is "a history of significant occupational, domestic, or environmental exposure to asbestos will suffice for attribution," Ex. 42 (Helsinki Criteria) at 313, that is, of course, the central dispute in the case, and Dr. Gordon does not have any evidence regarding whether the specific containers Ms. Jackson used may have exposed her to asbestos or whether such exposures would be considered "significant" under Helsinki.  Indeed, the only reliable evidence in the record on this point is from the FDA, which stated in 1986 that the worst case exposure from use of cosmetic talcum powder would be less than background over a lifetime. Ex. 3 (1986 FDA Letter) at FDA00003602.)

*First*, Dr. Gordon agreed that his finding of a single tremolite fiber is not statistically significant.  Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 101:14-24.  This factor alone should end the inquiry.  Ex. 34 (Yamate Method) at 68-73 (discussing statistical significance requirement).

*Second*, a peer-reviewed study has shown that individuals with no known asbestos exposures, and no history of mesothelioma, can have *hundreds of thousands* of asbestos fibers per gram in their lymph node tissue.  Ex. 43 (Ronald Dodson, *et al.*, *Asbestos Content in the Lymph Nodes of Nonoccupationally Exposed Individuals*, 37 Am. J. of Indust. Med. 169 (2000).  The notion that a single fiber of tremolite asbestos (and even this finding is dubious given his failure to comply with testing protocols and maintain appropriate records) is "above background" is contrary to the published literature.

*Third*, Dr. Gordon conceded that he has detected tremolite in people with pleural mesothelioma who had no alleged exposure to cosmetic talcum powder, and that tremolite is a valid marker for past chrysotile exposure.  Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 216:13-16; 66:17-67:1.  He further admitted that he has detected tremolite fibers in his control group.  Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 85:25-86:4.  The finding of a single tremolite fiber in Ms. Jackson's lymph node tissue, therefore, does not even exceed his own control group.

*Fourth*, he admitted that he is "not offering the opinion to a reasonable degree of scientific certainty that the [single tremolite] particle came from Cashmere Bouquet."  Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 124:5-9.  Dr. Gordon admits, therefore, that the single tremolite fiber he found does not provide a basis from him to opine that Ms. Jackson's mesothelioma was caused by exposure to Cashmere Bouquet.  *See id.*

Thus, Dr. Gordon has no reliable basis for attributing Ms. Jackson's mesothelioma to the single tremolite fiber he found in her lymph node tissue, and his exposure and specific causation opinion based upon his tissue analysis should be precluded.

> **D.   Dr. Gordon's Finding of Three Undocumented "Asbestos Bodies" Is Insufficient to Attribute Ms. Jackson's Mesothelioma to Asbestos Exposure**

Dr. Gordon also reportedly detected three "asbestos bodies" in the lymph node tissue. Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 75:20-76:1.   A finding of an excessive number of "asbestos bodies," generally in the lung tissue not the lymph node tissue, is one accepted basis for attribution under the Helsinki criteria.   Ex. 42 (Helsinki Criteria) at 313 (stating "histopathologic evidence of abnormal asbestos content (eg, asbestos bodies in histologic sections of *lung*)" can be used for attribution) (emphasis added).   Even assuming finding "asbestos bodies" in the lymph node tissue would be valid, Dr. Gordon's deposition testimony reveals that the "asbestos bodies" he purportedly detected, but failed to document, do not provide a reliable basis for attribution for multiple reasons.

*First*, "asbestos bodies" are mineral particles that have been coated with iron by the body. Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 123:11-14, 137:4-10.   Unless and until a scientist analyzes the fiber core and identifies it as asbestos, as opposed to some other mineral, these iron-coated bodies are more appropriately called ferruginous bodies, which can also form around non-asbestos minerals, including talc fibers.   *Id.* at 70:24-71:21, 75:2-5, 123:15-18.   Dr. Gordon admitted he did not test the fiber core of the "asbestos bodies" to determine if they were truly asbestos or if, instead, the "asbestos bodies" had formed around a non-asbestos fiber.   *Id.* at 74:22-75:5.   Dr. Gordon is therefore basing his opinion on an assumption, not scientific analysis, despite the fact that scientific analysis was available to him.   Dr. Gordon has no evidentiary basis to conclude that the "asbestos bodies" he claimed to find are, in fact, asbestos.

*Second*, Dr. Gordon provided no corroborating evidence that he actually saw any ferruginous bodies—no images of such particles or any other records, other than this word. Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 73:9-24. The failure to maintain any records whatsoever regarding the supposed "asbestos bodies" renders his analysis untestable and unreliable under *Daubert*. *See, e.g., Black*, 19 F. Supp. 2d at 598.

*Third*, a finding of three "asbestos bodies" is consistent with "background" levels Dr. Gordon had reported in 1996, Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 191:7-11—before Dr. Gordon, as discussed above, selectively removed individuals with higher exposures from his control group.

\*       \*       \*

In sum, Dr. Gordon's exposure and specific causation opinions based upon his finding of a single tremolite fiber and three undocumented "asbestos bodies" detected in Ms. Jackson's lymph node should be precluded. Dr. Gordon's control group is not generally accepted, has no known error rate, and cannot be verified or replicated. His finding of a single tremolite fiber in the lymph node cannot be the basis for a specific causation opinion, and neither can his three undocumented asbestos bodies. His fiber burden analysis should be precluded under *Daubert*.

### III.    By Failing to Document His Findings, Dr. Gordon Has Placed His Own Credibility at Issue

By failing to document his findings, Dr. Gordon has placed his own credibility at issue. As discussed, Dr. Gordon failed to follow the recordkeeping procedures of the Yamate method; failed to provide adequate images of the fibers he found in his product testing; failed to record the locations of the fibers he claimed to find; and failed to provide any records of the "asbestos" bodies he claimed to find.

Relying on Dr. Gordon's uncorroborated claims regarding his analysis are problematic. Dr. Gordon lied under oath while testifying in depositions in talc litigation against Colgate to try to cover up his criminal background.  Specifically, Dr. Gordon testified that he has never falsified a document.  *Supra* SOF § (J).  He has, when he falsified checks as part of a money-laundering scheme.  *Id.*  He lied when he testified that he had never testified in any capacity other than as an expert.  *Id.*  He did, when he testified against his coconspirators in a criminal trial.  *Id.*  He lied when he testified that his employment at Mount Sinai Hospital was uninterrupted.  *Id.*  It was interrupted when Dr. Gordon was arrested, agreed to cooperate and testify against his codefendants, and then entered the witness protection program.  *Id.*  Dr. Gordon lied under oath while serving as an expert in other litigation when he testified that he had never been arrested.  *Id.*  He has, as he admitted before a federal court at the criminal trial concerning the counterfeit check scheme.  *Id.*  Dr. Gordon now refuses to answer questions about any of this.  Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 195:12-197:5.  Dr. Gordon's lies, coupled with his failure to maintain proper records, further undermine the reliability of his opinions and further support preclusion of his testimony.

## CONCLUSION

Dr. Gordon's product testing and his tissue analysis is riddled with errors, failures to follow established protocols, failure to maintain records, and other massive flaws—all of which make his analysis fundamentally unreliable. Colgate respectfully requests that the Court preclude Dr. Ronald Gordon from offering any opinion testimony at trial, or at a minimum conduct a *Daubert* evidentiary hearing.

Respectfully submitted,


**/s/ Matthew T. Wagman**

Michael A. Brown (D.C. Bar No. 434094)
Matthew T. Wagman (D.C. Bar No. 472684)
Matthew R. Schroll (D.C. Bar No. MD29424)
Jonathan J. Huber (D.C. Bar No. 1014590)
Miles & Stockbridge P.C.
100 Light Street
Baltimore, MD  21202-1487
(410) 727-6464 (T)
(410) 385-3700 (F)
mbrown@milesstockbridge.com
mwagman@milesstockbridge.com
mschroll@milesstockbridge.com
jhuber@milesstockbridge.com


and


**/s/ Morgan W. Tovey**

Morgan W. Tovey (*pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600 (T)
(415) 875-6700 (F)
morgantovey@quinnemanuel.com


**Attorneys for Colgate-Palmolive Company**

## **REQUEST FOR HEARING**

Pursuant to Local Civil Rule 7(f), Defendant, Colgate-Palmolive Company, requests a hearing on its Motion filed herein.

*/s/ **Matthew T. Wagman***
Matthew T. Wagman