UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Brian D. Jackson, Individually and as
Personal Representative of the Estate of  :
Doris Jackson, Deceased

CIVIL ACTION NO. 1:15-cv-01066-TFH

Plaintiff,

vs.

COLGATE-PALMOLIVE COMPANY,

Defendant.

**PLAINTIFF'S OPPOSITION TO DEFENDANT COLGATE-PALMOLIVE COMPANY'S
MOTION *IN LIMINE* TO PRECLUDE ALL TESTIMONY AND EVIDENCE REGARDING
PURPORTED TESTING OF TALC BY PLAINTIFF'S TESTING EXPERTS BECAUSE OF
LACK OF AUTHENTICITY AND RELEVANCE OF TALC TESTED**

Plaintiff Brian D. Jackson, Individually and as Personal Representative of the Estate of Doris

Jackson, Deceased ("Plaintiff"), files this opposition to Defendant Colgate-Palmolive Company's

Motion *In Limine* to Preclude All Testimony and Evidence Regarding Purported Testing of Talc by

Plaintiff's Testing Experts Because of Lack of Authenticity and Relevance of Talc Tested. In support

thereof, Plaintiff states the following:

**INTRODUCTION**

In this products liability action, Doris Jackson was injured by the transient contents of

"consumable products," i.e., goods designed to be consumed.  Her "product" was containers of

Cashmere Bouquet talcum powder ("Cashmere Bouquet") which Colgate-Palmolive Company

("Colgate") offered for sale, and which Colgate intended to be consumed and replaced.  Plaintiff did

exactly what Colgate intended her to do: she bought Cashmere Bouquet, and she consumed it.  She

1

did that beginning in 1958 all the way up to 1990.  Not surprisingly, the product she last used 26 years ago no longer exists.

Another confounding characteristic of Colgate's Cashmere Bouquet product is that its defect—asbestos—doesn't immediately cause injury but, instead, causes an insidious cancer that manifests long after the product is consumed and the container discarded.  Further, no woman would reasonably expect a product marketed as "admirably suited for use on both infants and adults" to be carcinogenic. Mrs. Jackson could not have appreciated that the product could cause latent injury, and therefore did not preserve it for posterity. As such, *through no fault of his own*, Plaintiff must prove that Cashmere Bouquet contained asbestos without direct evidence of the actual empty talc tins used by his mother over a 32-year period. But federal law unquestionably permits Plaintiff to rely with equal force on indirect evidence:   "[J]uries are routinely instructed that '[t]he law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003). Indeed, "'[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" *Id*. (quoting *Rogers v. Mo. Pac. R.R. Co*., 352 U.S. 500, 508 n.17 (1957)).

In this case, Plaintiff has substantial evidence of the asbestos content of Cashmere Bouquet, and the cornerstone is the uniformly-positive results of asbestos content and releasability testing on *more than 50 historical containers of Cashmere Bouquet.*  Given the overwhelmingly probative value of these results, Colgate not surprisingly seeks to preclude Plaintiff's reliance on historical containers of Cashmere Bouquet for testing of asbestos content and releasability, as well as all testimony and evidence concerning those historical talc samples.  Colgate's Motion claims the containers are inauthentic and not a reliable basis for expert testing or opinions, suggesting that trial courts considering the issue have without exception precluded the evidence.[1]

---

[1] Motion at 2.

In contrast to the picture Colgate paints, however, several courts have refused to exclude testimony concerning the precise talc samples at issue here, or similar samples. The trial court to decide the issue most recently is Judge Randy Rhodes, who entered his ruling on October 25, 2016 in *Blount v. Colgate-Palmolive Co*., No. BC617806 (Cal. Super. Ct.).[2] Colgate, in fact, relies on Judge Rhodes' Order in an earlier case, *Winkel v. Calaveras Asbestos*.[3] When reaching his decision in *Blount*, Judge Rhodes divided the vintage Cashmere Bouquet talc samples into four categories: first, the samples acquired by various plaintiffs' counsel on eBay or elsewhere; second, the samples retained by Colgate in its corporate collection and produced in discovery; third, the ore samples sent to Mt. Sinai for testing; and fourth, the sample found by a Maryland plaintiff in her basement.[4] Judge Rhodes refused to exclude evidence of the samples coming from Colgate itself – the vintage samples maintained by Colgate and those sent to Mt. Sinai for testing.[5] As Judge Rhodes explained regarding the Colgate samples: "Colgate had these things. Wherever you got them, you had them. And you produced them in discovery. Now it is up to you to explain to the jury why they weren't critical."[6] The court also was persuaded that the plaintiffs had made a sufficient showing of authenticity for the ore samples sent to Mt. Sinai for testing.[7]

In a New York talc case against another manufacturer, Judge Martin Shulman refused to exclude not only the samples of ore sent to Mt. Sinai in 1977, but also samples of the talc product purchased on eBay.[8] After listening to lengthy arguments on the subject, Judge Shulman ruled that the talc samples would be admitted and that any weakness in the chain of custody could be explored with the jury during trial: "Again, as I see it, this is all a weight issue, and you are right to fully

---

[2] **Ex. 1** ("Blount Order").
[3] Motion at 2, Ex. 1.
[4] Blount Order at 2-4.
[5] *Id.* at 36.
[6] *Id.* at 27.
[7] *Id.* at 36.
[8] **Ex. 2**, Transcript in *DiScala v. Charles D. Chrystal Co., Inc.*, No. 13/190143 (NYCAL) ("*DiScala* Order"), at 52.

reserve to address any weaknesses. I am satisfied that there is nothing meaningful that would warrant preclusion."[9]

In a New Jersey state talc case against Colgate, Judge Ana Viscomi also refused to exclude samples of the ore sent in 1977 to Mt. Sinai for testing, ruling that the chain of custody is clear and that the plaintiffs had met their burden of authentication.[10] The same was true in a July 2016 New Jersey trial in which Judge Viscomi permitted Mr. Fitzgerald to testify concerning his testing of the ore samples originally sent to Mt. Sinai for testing in 1977 that had been taken from two mines which supplied Colgate with talc used in Cashmere Bouquet.[11]

Colgate asserts that Plaintiff's testing results are admissible only if Plaintiff can prove the authenticity of the contents of the containers, and that Plaintiff can prove authenticity only by establishing an unbroken "chain of custody" for the containers from the time they left Colgate's manufacturing facility.[12] This claim is not supported by the law, the facts or simple common sense and human experience.

First, Colgate has publicly **admitted** to authenticity. Defendant has conceded the authenticity of the talc from vintage containers via the recent publication of a self-funded article which concludes that the contents of the very same historical containers of Cashmere Bouquet at issue here did not create an increased risk of developing asbestos disease. The article announces to the world that the samples are believed to be vintage Cashmere Bouquet. The vintage samples are sufficiently authentic to call Cashmere Bouquet when they help prove Colgate's defense. In fact, Colgate's experts went so far as to rely on Plaintiff's experts to authenticate the Colgate samples in a manner customarily employed by scientists: "[t]hese samples were previously tested by Dr. Ronald Gordon and are relied upon by Plaintiff as representative of the products they used." As Colgate's expert materials analyst,

---

[9] *DiScala* Order at 52.
[10] **Ex. 3**, *Fishbain v. Colgate-Palmolive Co.*, No. MID-L-5633-13AS (Super Ct. N.J.), at 14.
[11] **Ex. 4**, *Panzarella v. Charles D. Chrystal Co., Inc.,* No. MID-5418-12-AS (Super Ct. N.J.), Trial Transcript dated July 21, 2016 at 3983-3991.
[12] Motion at 8.

Matthew Sanchez, has recently admitted, "chain of custody" is not a requirement used by his profession. Given Colgate's reliance on its own historical samples for its litigation defense and its public declaration that the samples are believed to be what they appear – vintage Cashmere Bouquet – Defendant is estopped from taking the opposite, hypocritical stance here.

Second, chain of custody is not required where, as here, Plaintiff seeks admission of expert opinion, not introduction of the physical evidence. Third, even if Plaintiff sought to admit the actual vintage canisters, the law requires only a prima facie showing of authenticity, which may be established by chain-of-custody **or by other means**. Colgate asks the Court, without any evidence, to ignore reasonable indicia of trustworthiness and reliability in favor of illogical theories about how the contents *could have been* tampered with.  Colgate asks the Court to accept that a widespread conspiracy occurred among strangers who colluded to refill every available talcum powder container with a substance that looks, feels, behaves, and **microscopically matches** Cashmere Bouquet, but isn't. And to foul the containers with a substance – amphibole asbestos – that is likely not readily available to antique dealers and flea market vendors on the eBay circuit. This makes no sense.

What is far more reasonable is that the vintage containers were in fact filled with leftover talcum powder that nobody thought to throw out years ago. Indeed, in testing of more than 50 different containers labeled "Cashmere Bouquet" and consistent with the images in Colgate's *Annual Reports*; containing a powder **chemically identical** to the known product; made only by Colgate; from people across the U.S. who are strangers to each other and to this litigation; which testing was done by four laboratories on different occasions: *every container contained some combination of the same asbestos fiber types* found in the talc ore referenced in Colgate's formula sheets and in Doris Jackson's lymph node tissue.  These facts constitute a probability, if not a certainty, that the contents are Cashmere Bouquet and easily satisfy the Federal Rules' requirement for a simple prima facie showing of authenticity and relevancy.

Finally, Plaintiff will be irreparably harmed if the motion is granted, because exclusion of this evidence would so adversely affect his underlying prima facie case as to make it improbable. Under the law of the District of Columbia, expert medical testimony is almost always required to prove causation in personal injury cases. *Bragg v. Owens-Corning Fiberglas Corp.*, 734 A.2d 643, 650 (D.C. 1999).  Preventing Plaintiff from offering proper expert opinion testimony is reversible error unless it is more probable than not that the error did not materially affect the verdict. *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997).  Because Plaintiff cannot prove causation without his experts' testimony, the exclusion Colgate seeks would materially affect the verdict. Conversely, no prejudice will flow to Colgate if the motion is denied, as multiple safeguards are available to it. In particular, Colgate's arguments go to the weight of the evidence, not its admissibility, and fall squarely within the realm of cross-examination.  Colgate can vigorously cross-examine Plaintiff's experts and present its own expert testimony and evidence, as contemplated by Fed. R. Evid. 104(e), concerning evidence that is relevant to the weight or credibility of other evidence.

The jury, not the Court, should decide this question of fact. The motion should be denied.

## STATEMENT OF FACTS

### A. Colgate Has Admitted the Authenticity of the Contents of the Historical Containers.

On July 9, 2016, Colgate's experts published an article titled Assessment of Health Risk from Historical Use of Cosmetic Talcum Powder, by Elizabeth Anderson, et al. ("Exponent Article") in a periodical called Risk Analysis.[13] Anderson and all of her co-authors are "experts-for-hire" employed by defense consultants Exponent, Inc., which has been retained by Colgate to offer expert opinions regarding Cashmere Bouquet's inability to cause mesothelioma.  Both the article, and the study upon

---

[13] **Ex. 5**, E.L. Anderson, P.J. Sheehan, R. M. Kalmes , J.R. Griffin, Assessment of Health Risk from Historical Use of Cosmetic Talcum Powder, Society for Risk Analysis (2016).

which it is based,[14] concede these "experts" were specifically commissioned by Colgate to conduct an exposure simulation using vintage Cashmere Bouquet, and to develop, then publish, data and opinions which support Colgate's defense that use of Cashmere Bouquet did not increase the risk of developing an asbestos disease.[15]

Despite its vehement assertion here and in other courts that the contents of its own vintage containers are inauthentic, Colgate specifically directed its experts to test and use the contents from the same historical containers that Plaintiff's experts used: "This report was prepared on behalf of Colgate-Palmolive Company, the original manufacturer of Cashmere Bouquet Talc."[16]

In the article, Colgate's experts represented to the scientific community that the talc samples they tested were representative of vintage products and accompanied by chain-of-custody documentation:

> The talc samples used were from vintage containers labeled as Cashmere Bouquet (referred to herein as Cashmere Bouquet Talc or Talc Samples).
> ***
> Historical Talc Samples believed to be representative of products sold from the 1960s and 1970s were provided to Exponent for use in the exposure simulations….
> ***
> In order to conduct a representative study, Exponent requested samples representative of the products and time period of the alleged exposures to Cashmere Bouquet Talc. In response, Colgate-Palmolive provided five containers labeled Cashmere Bouquet dating from the 1960s and 1970s obtained from its premises and produced to Plaintiff in the litigation, along with chain-of-custody documentation. [17]

Significantly, Colgate apparently chose not to direct its experts to confirm that the talc samples they tested conformed to the Formula Sheets for vintage Cashmere Bouquet, though this would seem a logical step if authenticity were a genuine concern for Colgate. Instead, Colgate's experts suggest the containers are self-authenticated by the fact that Plaintiff's experts have relied on them.

---

[14] **Ex. 6**, Exponent, "Exposure Simulation for Historical Talcum Powder Products," 2012 "Exponent Exposure Simulation").
[15] Exponent Article at vi.
[16] *Id.* at 1-2.
[17] *Id.* (emphasis added).

Exponent has not attempted to confirm that the talcum powder contained in the samples provided is Cashmere Bouquet as originally manufactured but has accepted this assumption for purposes of this analysis.  These samples were previously tested by Dr. Ronald Gordon and are relied upon by Plaintiff as representative of the products they used.[18]

Five years ago, Colgate directed and paid its experts to test the same historical containers of Cashmere Bouquet tested by Plaintiff's experts because it knows them to be authentic and so its experts could say that they, too, had tested the talc and found no asbestos was released into the breathing zone of the test subjects.  Colgate created this "evidence" for its own defense from the very same contents of the very same containers that it has vigorously (and disingenuously) argued to this Court are so unreliable and inauthentic as to warrant an order excluding the evidence from the consideration of the jury. The decision to pay its experts to test the same containers concedes the merits of Plaintiff's experts' testing, and explains why Colgate commissioned an article to contradict Plaintiff's experts' opinions on asbestos content and the product's ability to cause disease. If the samples were authentic and sufficiently reliable to form the basis of Colgate's experts' conclusion that Cashmere Bouquet doesn't cause disease, then they are sufficiently authentic and reliable to form the basis of Plaintiff's experts' conclusion that it did.

Additionally, Colgate will likely seek the introduction of the Exponent test results pursuant to Fed. R. Evid. 801(b), an effort which completely undermines Defendant's 801(b) objection now to the admissibility of "all testimony and evidence," which would include the test results contained in the peer-reviewed publication of Plaintiff's experts.[19]   Also, the Exponent article supports the conclusion that the Gordon article is a proper basis for expert testimony at trial because Colgate's

---

[18] **Ex. 6**, Exponent Exposure Simulation at 1 (emphasis added).  *See also id.* at vi ("These were the same materials that were tested by plaintiff expert Ronald Gordon"); 2 ("These samples were previously tested by Dr. Ronald Gordon and are relied upon by plaintiffs as representative of the products they used").

[19] Ex. 7, Gordon, Fitzgerald and Millette, *Asbestos in Commercial Cosmetic Talcum Power as a Cause of Mesothelioma in Women.* INTERNATIONAL JOURNAL OF OCCUPATIONAL AND ENVIRONMENTAL HEALTH. Int'l J. Occup. & Envtl. Health 318 (2014) ("Gordon article").

article: (1) specifically recognizes the Gordon article as part of the scientific literature, (2) notes that its own conclusions directly contradict the conclusions reached by Gordon, et al., (3) concedes it employed the same methodologies utilized by Plaintiff's experts (TEM and SAED), and (4) isolates the ways in which Colgate's lawyers will cross-examine Plaintiff's experts' testing and test results.[20] Colgate has created the proverbial "battle of the experts," whose victor can only be decided by a jury.

Given that Colgate waived any authenticity argument when it provided the same historical containers to its experts which it seeks here to exclude, and given that its experts have relied upon the authenticity of those samples in publishing an article outlining the results of such testing, it can fairly and reasonably be said that Colgate has waived any objection to the authenticity of the vintage Cashmere Bouquet containers and their contents.

Moreover, the Exponent publication is not the only instance in which Colgate has conceded the authenticity of the vintage Cashmere Bouquet containers and their contents. Although Colgate strategically buries this critical point in a footnote,[21] and tries to recast the facts, long before Colgate admitted publicly to the scientific community that the talc samples from its vintage containers were

---

[20] Though Colgate's Motion does not specifically attack the Gordon article by reference, the Exponent article obviates all the objections Colgate has made to that article in previous litigation, particularly the argument that the Court should exclude the Gordon article because it was authored by experts who have testified for Plaintiff in talc litigation, or because those experts have a vested interest in the article's publication. (Colgate's characterizations, not Plaintiff's.) All four of the Anderson article's authors are employees of the same professional expert mill – Exponent, Inc. – which also supplies experts to Colgate for trial testimony in this and probably every other talc case. This is a key distinction from the 2014 Gordon article. Gordon, Millette, and Fitzgerald are, respectively, an electron microscopist, materials analyst, and geologist who spend the majority of their time in private practice outside of litigation; the Exponent article's authors are employees of a business which exists for the sole purpose of consulting with and for manufacturing defendants to create litigation-driven "scientific" literature. Exponent's three highest-paying clients are the "Big Three" automakers Ford, Daimler-Chrysler, and General Motors, which Exponent has exposed as having paid them literally millions of dollars. *See* **Ex. 8**, Colgate's designation of Suresh Moolgavkar at 2:12-13, and p. 12:30-13:3.

Further, the Exponent article plainly acknowledges it is the result of "paid litigation work," since "[f]unding for the underlying research, simulations, and laboratory analysis was provided by the Colgate-Palmolive Company," and the article notes "Colgate-Palmolive is currently involved in litigation with regard to cosmetic talcum powder products, and one of the authors is a named expert in some of those matters." Exponent Article, at 10.

[21] Motion at 16, n.23.

authentic, Defendant has been stipulating to the authenticity of the Cashmere Bouquet vintage samples – at least as far back as 2010.[22]

Colgate has specifically stipulated to authenticity in on-the-record Court proceedings. In April 2013, Colgate stipulated to the authenticity of 53 samples in cases titled *Bernard*, *Tedrick*, and *Feinberg*, and then in July 2013 its lawyer relied on that stipulation in Court: "There are 53 samples in this case as to which Plaintiff stipulated to authenticity just as we did."[23]  Colgate may not stipulate that the samples are authentic in one case when it suits and then in a later case deny the authenticity of the very same materials. Such "prior inconsistent stances … render their present averments suspect. A party may not freely maintain a position that is inconsistent with one it has previously maintained." *Goodman v. Albany Transp., Inc.*, 103 F. Supp. 2d 112, 118-19 (N.D.N.Y 2000). Indeed, in refusing to preclude evidence concerning Colgate's own vintage Cashmere Bouquet samples that were produced in discovery, Judge Rhodes observed:

> I'm feeling that you're arguing, well, [plaintiff's] evidence is untrustworthy and so is ours. Isn't that convenient that ours is untrustworthy and that means we shouldn't have to talk about it during trial.  . . .  How is it that we're going to keep out evidence that you feel that you've produced is now unreliable?  How trustworthy is that?[24]

Neither should this Court countenance such gamesmanship. Colgate has admitted the authenticity of the vintage Cashmere Bouquet containers and their contents. The Court's inquiry should end here.

### B.  Colgate Manufactured Cashmere Bouquet from 1871 Through 1995.

If the Court is not persuaded that Colgate is estopped from its previous admissions of authenticity to perform an about-face now, the facts presented here establish a prima facie case of

---

[22] **Ex. 9**, Email exchange between Audrey Raphael, of Levy, Phillips & Konigsberg (counsel for plaintiffs in certain NYCAL talc cases) and Christine Chung, of Quinn Emanuel Urquhart & Sullivan (counsel for Colgate in those cases) re: "Cashmere Bouquet Talc Powder," which occurred from September 2 to September 3, 2010. The exchange regards a mutual stipulation regarding Colgate's production of "the samples of Cashmere Bouquet (CB) talc so far located at Colgate, ie the 45 samples of which notice has already been given, in the same form as provided for the first 19 samples," Colgate's production of "all remaining samples of CB talc located at Colgate," its production of "all samples of CB talc acquired from open market, or from any other source, that Colgate may rely upon." Colgate expressly-stated: "[a]greed that any CB samples Plaintiffs already produced may be relied upon by either side."

[23] **Ex. 10**, Relevant pages from the transcript of proceedings in *Bernard v. Brookfield Properties Corp., et al.*, etc., on July 9, 2013, at 29:6-7.

[24] Blount Order, at 30.

authenticity and relevance. To begin, Colgate admits it manufactured, marketed, and/or sold Cashmere Bouquet talcum powder from 1871 to 1995. Colgate sold Cashmere Bouquet throughout the entire country.[25]

### C.  The Packaging and Contents of the Historical Containers Are Consistent with Plaintiff's Percipient Recollection.

The packaging and contents of the historical containers[26] are consistent with Mrs. Jackson's percipient recollection of the containers she used, and Colgate has not disputed the accuracy of her description.  Mrs. Jackson used Cashmere Bouquet from the 1940s until approximately 1990.[27] When she first started using Cashmere Bouquet as a child, the container was metal and pink, printed with the name of the product."[28] The top of the can had holes so you could shake the powder out.[29] According to Mrs. Jackson, the top could be pulled off to reveal the "perforated holes."[30]  Over the years, the container changed to a plastic container, which had the product name printed on it; it was still pink.[31]  The color of the powder "was white."[32] Ms. Jackson never saw any warnings on any container she used.[33]  Colgate admits it never put a warning on the product.[34]

### D.  The Packaging and Contents of the Historical Containers Are Consistent with the Images Published by Colgate in Its *Annual Reports*.

The packaging of the historical containers is consistent with the images of Cashmere Bouquet published in Colgate's *Annual Reports* when Mrs. Jackson used the product.  For example:

---

[25] **Ex. 10**, Colgate's Responses to Standard Interrogatories nos. 5, 13, 15; **Ex. 11**, Colgate's Responses to Requests for Admission nos. 2-4, and 7.

[26] In its "Exhibit 7," Colgate includes images of the 46 historical containers which are the subject of its motion.

[27] **Ex. 12**, D. Jackson Video. Depo., 9/29/15, at 8:1-3, 45:7-46:11, 62:8-19; **Ex. 13**, D. Jackson Depo., 9/28/15, at 179:21-180:4.

[28] **Ex. 12**, D. Jackson Video. Depo., 9/29/16, at 44:10-19, 76:16-77:6.

[29] **Ex. 13**, D. Jackson Depo., 9/28/16, at 92:8-15, 94:2-5.

[30] **Ex. 13**, D. Jackson Depo., 9/28/16, at 95:2-13.

[31] **Ex. 12**, D. Jackson Video. Depo., 9/29/16, at 44:10-19, 63:10-18, 76:16-77:6; **Ex. 13**, D. Jackson Depo., 9/28/16, 95:14-18.

[32] **Ex. 12**, D. Jackson Video. Depo., 9/29/16, at 43:2-3.

[33] *Id.* at 52:9-53:3.

[34] **Ex. 14**, Deposition of Colgate PMK Marie Capdevielle at 247:14-248:21.

11






Colgate-Palmolive Company
1962 Annual Report[35]

Colgate-Palmolive Company
1977 Annual Report

### E. All Cashmere Bouquet Manufactured During the Years of Plaintiff's Use Contained the Same Asbestos Fiber Types Found in the Historical Containers.

One obvious way to establish a prima facie case for the authenticity of the contents of vintage Cashmere Bouquet containers is to test the contents to ensure their conformance with Colgate's specifications. All talc is not chemically identical; Colgate relied on Formula Sheets to manufacture its Cashmere Bouquet milled talc product.[36] Like the rifling comparisons of bullets fired from the same gun, the positive identification as "Cashmere Bouquet" of the samples tested by Plaintiff's experts rests on objectively-verifiable points of comparison. Those points of comparison, and the reasonable conclusions that flow from them, are laid out below and provide all the evidence necessary to establish a prima facie showing of authenticity. These facts constitute overwhelming evidence of positive identification to establish the trustworthiness and reliability of the contents of the historical containers.

The primary ingredient in talcum powder is talc, a mineral which geologically grows as "ore" in metamorphic rock formations in different parts of the world.  Colgate's Formula Sheets for Cashmere Bouquet specified certain talc mines in certain time periods. Colgate used talc from the Val

---

[35] Left: Colgate-Palmolive Company 1962 *Annual Report*, Bates No. QE-CPC00001281. Right: Colgate-Palmolive Company 1977 *Annual Report*, Bates No. QE-CPC00001376. **Ex. 15**, Images in *Annual Reports* produced by Colgate in discovery.

[36] *See, e.g.*, **Ex. 16**, Cashmere Bouquet Formula Sheets dated 9/26/68, 7/29/70, 4/6/72; **Ex. 11**, Colgate Responses to Requests for Admissions nos. 35-38, **Ex. 14**, Capdevielle Depo. at 198:11-211:16; *see also* **Ex. 17**, Trial testimony of Marie Capdevielle at 656:14-657:11.

Chisone/Val Germanasca region of Italy ("Italian talc") between 1937 and 1968.  From 1968 to 1970, it used "M-6670 North Carolina Talc" from Regal, North Carolina ("North Carolina talc"). Through 1972, Colgate's Cashmere Bouquet contained a blend of talc from Willow Creek, Montana ("Montana talc"). In the 1970s, it also used a blend of Montana and Italian talc called "Monital 60/40."[37] The significance of the talc ore sources is that the asbestos fiber types they contain are unique to them.  That is, the asbestos fiber types in the ore sources are the same asbestos fiber types in the finished product.  Here, the fiber types in Colgate's ore are the same fiber types found in the historical containers of Cashmere Bouquet.

### F.  The Asbestos Fiber Types Found in the Historical Containers Are the Same Fiber Types Found in Colgate's Ore Sources.

➢  **Italian Talc Ore: Tremolite Asbestos and Anthophyllite Asbestos**

Colgate's first known source of talc for Cashmere Bouquet was mined from the Val Chisone/Val Germanesca region of Italy.[38] A 1966 geological study documents that "amphiboles of the tremolite-actinolite series" were diffused throughout the deposit in "considerable volumes." Inclusion of such accessory minerals was "constant and regular," and was in "every deposit."[39] Tremolite was also in the milled ore: Keith Lehman, who milled the ore for Colgate, sent batch samples of the milled ore to an outside lab for asbestos testing.  Those tests found tremolite asbestos.[40]  Plaintiff's expert geologist, Sean Fitzgerald, P.G., personally analyzed the Italian talc ore used to make Cashmere Bouquet, and found tremolite asbestos and anthophyllite asbestos.[41]

➢  **North Carolina Talc Ore: Tremolite Asbestos and Actinolite Asbestos**

---

[37] **Ex. 16**, Cashmere Bouquet Formula Sheets dated 9/26/68, 7/29/70, 4/6/72; **Ex. 11**, Colgate's Responses to Requests for Admissions nos. 35-38, **Ex. 14**, Capdevielle Depo. at 198:11-211:16; *see also* **Ex. 17**, Capdevielle Testimony at 656:14-657:11.

[38] **Ex. 11**, Colgate's Responses to Requests for Admissions nos. 35-37.

[39] **Ex. 18**, Declaration of plaintiffs' expert geologist Sean Fitzgerald, P.G. ("Fitzgerald Decl.") at ¶¶52-60.

[40] **Ex. 19**, Deposition of Keith Lehman at Vol. 1, 25:9-28:11, 57:4-23, 74:1-16, and 144:4-145:13, and at Vol. 3, 488:16-490:2.

[41] **Ex. 18**, Fitzgerald Decl. at ¶¶61-66.

The asbestos content of the Regal, North Carolina mine is well-documented.  In 1914, a geological survey of the Murphy Marble Belt, of which the Regal mine is a part, documented tremolite asbestos throughout the formation. "Along these contacts, and in the marble, are developed beds or irregular lenses composed of silicates, in large measure tremolite."  Independent researchers also found tremolite and actinolite asbestos in the Murphy Marble Belt in 1948. Fitzgerald personally tested talc ore from the Murphy Marble Belt, and found tremolite asbestos.[42]

> **Montana Talc Ore: Tremolite Asbestos and Chrysotile Asbestos**

The asbestos content of the Willow Creek, Montana mine is also well-documented.  A geological survey conducted by the Montana Bureau of Mines confirmed serpentine and tremolite asbestos. Asbestos was also confirmed during a study of the mine beginning in 1979 to determine its continued viability.  The "Cyprus Study" concluded that fibrous tremolite asbestos existed "along 80 percent of the strike length of the ore body," in quantities up to 20 percent. Fitzgerald found chrysotile and asbestiform tremolite.[43]

### G. The Asbestos Fiber Types Found in the Historical Containers Are the Same Fiber Types Found in Colgate's Internal Testing of Milled Talc.

In 1971, Colgate began conducting its own tests on the talc used to make Cashmere Bouquet to investigate for the presence of asbestos. Colgate's own internal testing, while extremely prone to false negatives, revealed asbestos in its talc and, specifically, the same fiber types found in the historical containers.  Colgate's testing found North Carolina talc "positive for tremolite," Montana talc "positive for anthophyllite & tremolite," and Italian talc "positive for tremolite."[44, 45]

---

[42] *Id.* at ¶¶40-43, 61-66.

[43] *Id.* at ¶¶44-51, 61-66.

[44] **Ex. 14**, Capdevielle Depo. at 70:23-71:22, 102:15-103:25, 104:24-106:2, 177:10-20; **Ex. 20**, Colgate Laboratory Notebook 3-3388, dated 9/20/71; 1/27/76; 3/5 and 3/7/76; 10/27/76; and **Ex. 17**, Capdevielle Testimony at 860:26-861-17, 867:3-875:26, 881:22-884:7, 884:14-886:10, and 1068:13-1069:11.

[45] In 1968, the Johns-Manville Corporation had already tested body powders using x-ray diffraction, and found tremolite in Cashmere Bouquet. **Ex. 18**, Fitzgerald Decl. at ¶¶67-69; **Ex. 21**, Johns-Manville October 1968 Petrographic Examination at pp. 1-2. Johns-Manville again found chrysotile and tremolite in Cashmere Bouquet in testing done in 1973.

**H. The Asbestos Fiber Types Found in the Historical Containers Are the Same Fiber Types Found by Colgate's Independent Testing Laboratory.**

In 1974, Colgate hired McCrone Associates ("McCrone") to test Colgate's talc.  McCrone tested the milled ore and the finished Cashmere Bouquet product, and found chrysotile and tremolite asbestos in both. McCrone continued to test Colgate's talc, including 1615 ore,[46] and continued to find asbestos, including tremolite and chrysotile, through 1984.[47]

**I. The Asbestos Fiber Types Found in the Historical Containers Are the Same Fiber Types Found in Colgate's Internal Testing of a Known Cashmere Bouquet Sample Obtained from the CTFA.**

The Cosmetic Toiletries and Fragrance Association ("CTFA," presently the Personal Care Products Council) is a lobbying group/trade association in Washington, D.C., which represents the hundreds of companies that manufacture personal care products.  The CTFA had a known sample of Cashmere Bouquet, and Colgate's testing of that sample revealed tremolite and anthophyllite.[48, 49]

**J. The Asbestos Fiber Types Found in the Historical Containers Are the Same Fiber Types Found in Testing Performed by Academia.**

➢ **The Lewin Study**: In 1972, Professor Seymour Lewin, a chemist at New York University, tested 102 products for the presence of asbestos, including cosmetic talcs.  Testing of Cashmere Bouquet revealed the presence of chrysotile.  The results were submitted to the FDA.[50]

---

[46] 1615 ore refers to Colgate's Italian ore source.  It is referred to here as AGI 1615 ("American Ground Italian" talc).  This ore is among the products plaintiffs' experts tested, and those results have been allowed by Courts.

[47] **Ex. 14**, Capdevielle Depo. 106:13-117:5, 122:1-124:22, 125:14-138:7, 144:20-149:20, 162:20-167:6, 180:17-183:3, and its Exhibit 6, 7, 9-13; **Ex. 17**, Capdevielle Testimony at 694:15-20, 695:15-697:24, 658:7-20, 698:12-701:5, 867:3-875:26, 911:9-913:8.

[48] **Ex. 22**, Colgate Laboratory Notebook 3-3388, dated 3/25/76; *see also* **Ex. 17**, Capdevielle Testimony at 867:3-875:26, 872:4-875:26, 886:11-888:22, 866:110-1068:12.

[49] Notably, the Noxell Corporation, which is part owner of a company (Max Factor) that makes talcum products, was unconcerned with using a specific product when it suggested to the CTFA in 1992 that they should conduct a "use study" on talcum products to investigate exposure to talc via inhalation during use.  Noxell didn't want to use its own product, indicating a generic formula could be used, as the only requirement for a reliable outcome of testing the "breathing zone" and "settling rate" of the talcum powder in "a bathroom type environment" is a product "where the particle size is well-characterized." Colgate's notion that the product can only have been Cashmere Bouquet for scientists to draw valid conclusions is a construct of litigation, not science or even industry.

[50] **Ex. 14**, Capdevielle Depo. at 167:7-169:19; **Ex. 23**, 8/3/72 Letter from Lewin to FDA at p. 1, 5, 11; see also, **Ex. 18**, Fitzgerald Decl. at ¶¶67-106.

> **The Langer & Rohl Study**: In 1973, under a grant from the National Institute Environmental Health Services, researchers at Mt. Sinai Hospital's Department of Environmental Medicine began analyzing commercial talcum powder products for asbestos. Arthur Langer, then an Associate Professor of Mineralogy, and his colleague Dr. Arthur Rohl, purchased several talcum powders "off-the-shelf." Using electron microscopy, Langer and Rohl found Cashmere Bouquet contained had one of the highest concentrations (20%) of asbestos.[51] When Langer and Rohl completed their study in 1976, their findings were published in mainstream media, such as *The New York Times*, *The Washington Post*, and *The Ottawa Citizen*. In response to the 1976 Mount Sinai study, Colgate obtained Mt. Sinai's "off-the-shelf" sample of Cashmere Bouquet, and did its own testing on that sample. Once again, Colgate's own testing confirmed anthophyllite, "possible tremolite" and "other amphiboles."[52]

## K. The Asbestos Fiber Types Found in the Historical Containers Are Not Generally Found in Ambient Air.

Colgate suggests that the vintage samples of its product could have been "adulterated" over time or "contaminated by asbestos fibers in the ambient environment." Motion at 2, 15. Contamination would be impossible for many reasons including, for example, the fact that anthophyllite is not found in ambient air.[53] Colgate's own experts have eliminated the likelihood of contamination from ambient air. In *Airborne Asbestos in Buildings*, R.J. Lee and Drew Van Orden, of the RJ Lee Group retained by Colgate as experts in this case,[54] published the results of their testing of ambient air in 752 buildings nationwide. They found no anthophyllite, very little tremolite, and no asbestos fibers over 5 microns long. They concluded the presence of asbestos-containing materials

---

[51] **Ex. 24**, 3/22/76 Memorandum of Meeting between Langer, Rohl, and FDA; *see also* **Ex. 18**, Fitzgerald Decl. at ¶¶69-71; see also **Ex. 14**, Capdevielle Depo. at 87:15-91:16, 99:24-100:17 and its Exhibit 5; *see also* **Ex. 17**, Capdevielle Testimony at 1081:14-1084:23.

[52] **Ex. 14**, Capdevielle Depo. at 170:25-171:10; **Ex. 17**, Capdevielle Testimony at 895:23-896:11, 1082:22-1084:23; *see also* **Ex. 25**, Colgate Laboratory Notebook 6490-2, 3/11/76.

[53] **Ex. 26**, Deposition of Ron Gordon at 41:13-19.

[54] **Ex. 27**, Colgate's Designation of Expert Witnesses.

inside buildings does not result in elevated airborne asbestos in building atmospheres.[55] Indeed, Colgate's own PMK testified that when its internal testing found asbestos in Cashmere Bouquet in the 1970s, Colgate did not ascribe any of those findings to contamination.[56]

**L. The Asbestos Fiber Types Found in the Historical Containers Are the Same Fiber Types Found in Mrs. Jackson's Lymph Node.**

Plaintiff's expert Dr. Ronald Gordon tested lung and lymph node tissue collected from Mrs. Jackson for asbestos. Dr. Gordon found tremolite in the lymph node tissue that drains from the lung.[57] Thus, Mrs. Jackson's lymph nodes contained one of the same fiber types found in the historical containers,[58] which contain the same fiber types found in Colgate's ore and milled talc.

**M. Nearly Half the Historical Containers Were Produced by Colgate in Discovery, and the AGI 1615 Ore Sample Was Produced by Another Talc Defendant.**

Colgate admits that almost half of the historical bottles of Cashmere Bouquet were produced *by Colgate* in response to prior plaintiffs' discovery requesting that it produce *Cashmere Bouquet*. Motion at 15. Colgate's discovery responses are therefore "admissions of a party opponent" since Colgate has, by its words and conduct [producing the bottles labeled 'Cashmere Bouquet' in response to discovery requesting 'Cashmere Bouquet'] manifested its belief in the truth of name on the container.  This evidence is admissible against Colgate to establish any material fact or issue against it. Fed. R. Evid. 801(d)(2). Indeed, "there is no better example of an admission of a party opponent, which is admissible because it is not hearsay, than an answer to an interrogatory." *Walls v. Paulson*, 250 F.R.D. 48, 52 (D.D.C. 2008).

---

[55] **Ex. 28**, Lee, RJ, Van Orden, DR, "Airborne Asbestos in Buildings," Regul. Toxicol. Pharmacol., 50:218-25 (2008).

[56] **Ex. 17**, Capdevielle Testimony at 1074:24-1075:4.

[57] **Ex. 29**, Report of Ronald Gordon, Ph.D.

[58] **Ex. 26**, Deposition of Ron Gordon at 201:9-13.

Further, though Colgate now suggests the containers in its own collection are unreliable,[59] its motion offers no witness affidavits that attest to tampering, much less facts which would permit any inference of tampering. [60] Further, the sample of "AGI (American Ground Italian) 1615" ore (from the Italian mine Colgate used) was produced by attorneys for Whittaker, Clark & Daniels, a defendant talc supplier in talc litigation, as maintained from the 1970s by Dr. Langer, an expert disclosed and relied upon by Colgate in Cashmere Bouquet litigation.[61] There is similarly nothing in the record to support an inference of tampering with that ore.

### N. Plaintiff's Experts Have Percipient Knowledge of the Testing, Are Qualified to Conduct the Testing, Are Qualified to Offer Opinions Regarding the Results, and Their Results Have Been Published in Peer-Reviewed Literature.

The testing of the historical Cashmere Bouquet containers is testing that was personally performed by Plaintiff's own experts. These experts are the same experts who received, inventoried, opened, and tested the containers. As such, *they have percipient knowledge* of the subject of their own opinions. Further, they are qualified to offer opinions about the reliability of the methods, analysis, and results, which are also now part of the medical and scientific literature.

### 1. <u>Ronald Gordon, Ph.D., Electron Microscopist</u>

Dr. Gordon has been an electron microscopist for 45 years. His laboratory is at Mt. Sinai, the same institution where Langer and Rohl conducted their study, and is licensed by the State of New York and certified by the College of American Pathologists (CAP). Dr. Gordon also serves as an inspector for the College of American Pathologists to inspect other labs like his own. He is the Associate Editor for *Microscopy*, and is on the Editorial Advisory Board for the *Journal of Histotechnology*. Dr. Gordon has authored hundreds of original peer-reviewed articles, abstracts, and

---

[59] Motion at 15-16.

[60] "Merely raising the possibility of tampering is not sufficient to render evidence inadmissible." *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991).

[61] **Ex. 30**, Chain of Custody Certification of Leah Kagan in *Fishbain v. Colgate-Palmolive Co.*

book chapters, including papers addressing his analysis of asbestos fibers in human tissue and fiber-counting methods.

Dr. Gordon has tested multiple products for the presence of asbestos. His methodology has been the same for over 30 years. In fact, Dr. Gordon learned this methodology, still used by both Dr. Langer and Dr. Nolan, while training under Dr. Langer in the 1970s. Dr. Langer testified he would not "reject Dr. Gordon's methodology if it followed mine," has vouched for the reliability of Dr. Gordon's work, and has repeatedly acknowledged that Dr. Gordon is a "reputable scientist." Several courts have accepted his methodology and results as reliable, and have allowed his testimony on detection of asbestos fibers by electron microscopy.

### 2.      Sean Fitzgerald, P.G., Geologist and Mineralogist.

Sean Fitzgerald, P.G. is a Senior Research Scientist at Scientific Analytical Institute. He is a professional geologist, mineralogist, and asbestos expert, with 25 years of experience researching and analyzing asbestos minerals. He has reviewed materials including company records, trade organization documents, government records, and studies relevant to talcum powders, including Cashmere Bouquet and its talc source ores and has personally reviewed talc ore and finished talcum powders including Cashmere Bouquet.[62]

### 3.      Plaintiff's Experts' Testing Results of the Historical Cashmere Bouquet Containers Are Published in Peer-Reviewed Scientific Literature.

The historical Cashmere Bouquet containers were subjected to rigorous testing and analysis by Dr. Gordon, Mr. Fitzgerald, and materials analyst James Millette, Ph.D. Their testing confirmed the presence of significant amounts of the signature types of asbestos found in Colgate's ore sources and the finished product, and releasability tests of the contents have repeatedly demonstrated significant concentrations of airborne asbestos. They therefore co-authored an article titled *Asbestos*

---

[62] **Ex. 18**, Fitzgerald Decl. at ¶¶1-14, 37-60-111.

*in Commercial Cosmetic Talcum Power as a Cause of Mesothelioma in Women*.  In 2014, the article

was accepted for publishing following peer review by members of the scientific community, and is

contained in the INTERNATIONAL JOURNAL OF OCCUPATIONAL AND ENVIRONMENTAL HEALTH at 20

Int'l J. Occup. & Envtl. Health 318 (2014).[63]

### O. Colgate's Own Expert Has Relied on the Same Historical Containers to Analyze the Contents and Form Contrary Opinions.

Colgate designated Matthew Sanchez, to testify about his own testing of the same historical

containers of Cashmere Bouquet.  Sanchez has not only tested the contents, but is prepared to offer

opinions that the contents are sufficiently reliable for him to offer an opinion that Cashmere Bouquet

did not contain asbestos. Sanchez was disclosed as follows:

> to testify about product testing that was performed at RJ Lee Group on material from Cashmere Bouquet labeled containers to determine whether the material was contaminated with asbestos.  In particular, Dr. Sanchez may testify on matters described in test reports from RJ Lee Group dated April 28, 2009; September 14, 2009; October 15, 2009; July 19, 2010; September 15, 2010; November 5, 2010; April 14, 2013; April 25, 2013; July 25, 2013; February 17, 2015; February 20, 2015; and March 9; 2015. As set forth in those reports, none of the talc in those containers was found to be contaminated with asbestos.[64]

Mr. Sanchez has testified he has tested "thousands" of materials for the presence of

asbestos,[65] "pretty much any building material you could name that would have come through the lab

on a routine basis."[66] And yet, obtaining chain of custody documentation for any or all of those

materials is "beyond anything we would do at the laboratory level.  **We would not routinely ever be**

**provided that information**."[67]

In fact, Mr. Sanchez testified that of the thousands of products he has tested for the presence

of asbestos without any chain of custody documentation, he has complete confidence in all of his

---

[63] **Ex. 7**, Gordon, Fitzgerald and Millette, *Asbestos in Commercial Cosmetic Talcum Power as a Cause of Mesothelioma in Women*, Int'l J. Occup. & Envtl. Health 20(4):318 (2014).
[64] **Ex. 27**, Colgate's Designation of Expert Witnesses at 12.
[65] **Ex. 31,** Deposition of Matthew Sanchez,  July 21, 2016 ("Sanchez Depo."), at 31:24-32:1.
[66] *Id.* at 34:19-21.
[67] *Id.* at 36:12-37:16 (emphasis added).

analytical results.[68]  He has never told a client his results might not be accurate because he wasn't provided with documentation of where the product had been between the time it was purchased and the time it arrived at his laboratory, because "[a]gain, **that is well beyond the realm of what the analytical laboratory's role is**.  I receive samples, I analyze those samples, we stand by the results of the analysis.  I can't speak to where the samples came from, where they originated or their whole life history.  **That is not part of the scope of what we do.**"[69]

### P.  Other Courts Have Allowed the Testing Results of Both the Source Talc Ore and the Historical Containers of Cashmere Bouquet.

Throughout its motion, Colgate relies extensively on the rulings from state trial courts as authority or support for this motion.  If the Court is inclined to consider state trial courts' unpublished rulings, Plaintiffs direct the Court's attention to the most recent ruling on the issue, from Judge Rhodes, upon whose earlier, contrary ruling Colgate relies, Motion at 1, Ex. 1, as well as the other rulings discussed and attached herein.

### Q.  Plaintiff Has Chain of Custody Documentation

Chain of custody refers to the movement of evidence *after it has been taken into custody*, as the plain language of the term states, and solely to assure it is not altered prior to expert testing. "[T]he purpose of the chain of custody requirement is to insure that the items offered into evidence are in substantially the same condition <u>as they were at the time the proponent came into possession of the evidence</u>." *United States v. Brown*, 136 F.3d 1176, 1181 (7th Cir. 1998) (emphasis added)(finding no error in the admission of six tapes without chain of custody where the accuracy and trustworthiness of the recordings was shown). Here, a chain of custody has been maintained for samples tested by Plaintiff's experts and is already in Defendant's possession.[70]

---

[68] *Id*. at 37:17-38:18.
[69] *Id*. at 38:19-39:7.
[70] Although the chain of custody documentation is already in Colgate's possession, Plaintiff attaches true and correct copies as **Ex. 32-1** through **32-13.** The change of custody documents for samples FA13-43 to 13-44 (**Ex. 32-10**)

## LEGAL ARGUMENT

**A. This Motion is an Improper Attempt to Challenge the Sufficiency of Plaintiff's Evidence, Which Would Be Governed by Fed. R. Civ. P. 56.**

Colgate's motion is not in actuality a challenge to the *admissibility* of Plaintiff's testing evidence, but its *sufficiency*. Colgate argues that Plaintiff's evidence of Cashmere Bouquet's asbestos content and ability to cause disease is insufficient to prove those elements of Plaintiff's case. The vehicle for challenging the sufficiency of Plaintiff's evidence, however, is not a motion *in limine*. Those challenges are governed by Fed. R. Civ. P. 56, which has strict notice and hearing requirements. The time to make that motion has passed, so a motion *in limine* which effectively seeks summary judgment – but without proper notice – deprives Plaintiff of due process.

**B. To Establish Authenticity, Plaintiff Is Required to Make a Prima Facie Showing that the Historical Samples of Cashmere Bouquet Are What They Purport To Be – Not To Comply with Rigid Chain of Custody Requirements.**

This is not the complicated equation Colgate suggests it to be. The issue before the Court is whether the historical containers of Cashmere Bouquet from which samples were taken are in fact vintage Cashmere Bouquet. Does the fact that women around the country put away their partially-used tins of talcum powder without using them up or throwing them out raise the spectre of product tampering such that a jury could not find that the vintage tins of Cashmere Bouquet are in fact Cashmere Bouquet? The answer is no. There is nothing about the circumstances in which these vintage containers were found – particularly those produced by Defendant and kept in its possession – to suggest that they hold anything other than Cashmere Bouquet.

In *United States v. Rawlins*, 606 F.3d 73 (3d Cir. 2010), the Third Circuit refused to reverse the district court's admission of packages of cocaine seized from the defendant's luggage even though there were unexplained breaks in the chain of custody. In reaching its decision, the Court of

---

refer to the samples bought off the shelf in the 1970s for Dr. Langer's testing; the samples were retained by the Mt. Sinai laboratory. **Ex. 33**, Deposition of Robert Nolan, June 21, 2013, at 38:1-40:14.

Appeals explained that "physical evidence must be authenticated before it is admitted." 606 F.3d at 82. Under Fed. R. Evid. 901(a), authentication merely requires "evidence sufficient to support a finding that the matter in question is what its proponent claims." "The burden is not a heavy one." *Rawlins*, 606 F.3d at 82, quoting 5 Christopher B. Muller & Laird C. Kirkpatrick, Federal Evidence § 9:1 (3d ed. 2007). "[T]he proponent 'need only prove a rational basis from which to conclude' that the evidence is what the party claims it to be," *Id.*, quoting *United States v. Mendel*, 746 F.2d 155, 166, 167 (2d Cir. 1984).

In *Hulmes v. Honda Motor Co.*, 936 F. Supp. 195 (D.N.J. 1996), the district court in a personal injury case refused to exclude physical evidence of a plaintiff's intoxication, rejecting the argument that the defendant auto manufacturer failed to demonstrate a proper chain of custody for the blood sample. In deciding the issue, the court explained that the proponent of evidence need make only a prima facie showing of authenticity:

> The Third Circuit has noted that, under Rule 901:
>
> > "[T]he showing of authenticity is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility. Rather, there need be only a prima facie showing, to the court, of authenticity, not a full argument on admissibility. Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court."

936 F. Supp. at 206-207, quoting *United States v. McGlory*, 968 F.2d 309, 328-29 (3d Cir. 1992). *See also United States v. Jardina*, 747 F.2d 945, 951 (5th Cir. 1984) ("When confronted with evidence of questionable origin, the court should admit the evidence if a prima facie showing of authenticity is made. The sponsor need not present proof beyond a reasonable doubt.")

Establishing a chain of custody is just one way to establish a rational basis for authenticity – to make a prima facie showing. *Rawlins*, 606 F.3d at 82. There is no requirement "that evidence may only be admitted if a 'complete and exclusive' chain of custody is established. *Id*, quoting *United States v. DeLarosa*, 450 F.2d 1057, 1068 (3d Cir. 1971). Instead, "the strength of the chain of

custody can be tested on cross-examination and the jury will ultimately decide the authenticity, as well as the probative value of this evidence." *Hulmes*, *supra*, 936 F. Supp. at 207.

It is uncommon that a break in the chain of custody would warrant the exclusion of evidence, notwithstanding Defendant's allusion to "serious" breaks in the chain: "'[S]erious' gaps may render a chain of custody so deficient that exclusion is required, *Mejia*, 597 F.3d at 1336, **but in the ordinary case gaps in the chain go to the weight of the evidence, not its admissibility**." *Rawlins*, 606 F.3d at 82-83, quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) (emphasis added). In *Meadows v. Anchor Longwall & Rebuild, Inc.*, 455 F. Supp. 2d 391 (W.D. Pa. 2006), for example, the plaintiff was injured on the job when a valve fitting broke loose and struck the plaintiff in the face causing him to lose an eye. 455 F. Supp. at 393. Somehow, the plaintiff's attorney wound up with the allegedly defective valve, though it was unknown who found the valve at the job site or who sent it to the plaintiff's lawyer. *Id*. The valve manufacturer moved for summary judgment, alleging that the break in the chain of custody deprived it of the opportunity of examining the defective valve.  *Id*. at 394. The district court denied the defendant's motion, explaining that "any discrepancies in the chain of custody go to the weight of the evidence and not its admissibility."  455 F. Supp. at 396 (quoting *Bruther v. General Electric Co*., 818 F. Supp. 1238, 1241 (S.D. Ind. 1993).

Finally, despite Colgate's warnings about the threat of reversal for courts who tolerate "serious" gaps in the chain, Motion at 9, "a trial court's ruling about the adequacy of a chain of custody is afforded great deference. It may not be overturned absent a 'clear abuse of discretion.'" *Rawlins*, 606 F.3d at 83, quoting *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir. 1981).

Even setting aside Colgate's admissions as to the authenticity of the vintage samples, the facts set forth herein exhaustively detail the tests showing that the chemical composition of the samples from the vintage tins matches the Formula Sheets for Colgate's Vintage Bouquet product and the composition of the ore from which the talc was milled. These objective, verifiable facts, along with

the attached chain of custody affidavits support the conclusion that the historical Cashmere Bouquet containers and their contents tested by Plaintiff's experts are genuine Cashmere Bouquet talcum powder.   Further, the containers' labeling (brand name and logo) on the product — "Cashmere Bouquet" — is admissible hearsay evidence that the product is what it purports to be.[71]   Businesses regularly use labels to identify products as originating with them, and consumers regularly rely on labels to accurately reflect content.

Colgate makes much of the "serious" gap in the time between it sold the vintage talc and the time the talc samples came into the possession of Plaintiff's experts (and Defendants) who have analyzed those samples. But Colgate does not explain what is significant about that time lapse for this issue. Anyone who has ever cleaned out the home of an elderly relative knows that people inexplicably hang onto meaningless objects. Medicine chests are often filled with expired cold remedies and old shaving brushes. There is nothing about the existence of half-used talcum powder tins that is at all remarkable.

Nor is there any reason that the age of those tins in and of itself would have any bearing on the condition of the contents. An old container of rubber bands or fried chicken would be remarkably altered by the passage of 40 years, but there is no evidence that talcum powder – or the asbestos contaminating it – changes at all in that same time.

The decades do not prevent the product's identification. This is not a run-of-the-mill asbestos case where there is nothing to go on for product identification but the plaintiff's memory. Here, the identical product exists – maybe not the specific containers Mrs. Jackson used, but containers used by someone just like her.

---

[71] Fed. R. Evid. 803(6) (business records exception).

The passage of time does not prevent the experts' analysis of the product. Experts on both sides of the case have analyzed the samples. If the samples contained something unusual, surely one of the esteemed scientists would have identified it.

Colgate's assumption is that the passage of time is a "serious" gap that casts so much suspicion on the vintage samples that Plaintiffs' experts should be precluded from testifying about their reliance on them. But in this case, that assumption makes no sense whatsoever. And it strains credulity to hypothesize that all of the purchasers of the vintage Cashmere Bouquet containers removed the original talc and replaced it with identical cosmetic talc of independent origin. It is even more unlikely that all of them added tremolite asbestos fibers to their talc, or that the amphibole asbestos somehow found its way through the ambient air into Cashmere Bouquet containers dotting sink counters in bathrooms across America.

Plaintiff's burden to show authenticity is not a heavy one – all the law requires is a rational basis for concluding that the vintage containers and their contents are what they appear to be. *Rawlins*, 606 F.3d at 82. Plaintiff has made that showing and the gap in time which serves as the touchstone for Colgate's motion does not change that.

### C. Authentication is Not Required Where Plaintiff Does Not Seek Admission of the Talc Ore or Historical Containers.

Plaintiff does not seek to admit the historical Cashmere Bouquet containers, their actual contents, nor the source talc. Rather, Plaintiff seeks to introduce expert opinion testimony based on the results of testing those materials. Colgate's motion seeks an underlayment of foundational proof for expert opinion testimony which is not required by the Federal Rules of Evidence. Colgate cites *no authority* for its assertion that authenticity must be established through chain of custody evidence for things that are *not* being entered into evidence.

Colgate's proposal would deny Plaintiff of due process, as it would place Plaintiff in the untenable position of having to provide a chain of custody for a product that Colgate chose not to

retain samples of, even knowing of its asbestos contamination. Colgate no longer sells the product and Mrs. Jackson stopped using it 26 years ago. The product's defects only recently became known to Plaintiff when his mother developed mesothelioma. This is a common scenario in asbestos litigation where most plaintiffs were exposed to transient products that were not known to contain asbestos, and did not cause an immediate injury. Further, precisely because of the products' asbestos content, corporate production of nearly all the products at issue in asbestos litigation has been discontinued.  Plaintiff is not required to produce a non-existent product or suffer the exclusion of otherwise reliable circumstantial evidence.

Further, granting Colgate's motion would encourage it and other manufacturers to avoid liability simply by disposing of the product and then insisting that there are no known samples that it deems reliable enough to test for defects.  If this were the rule, any manufacturer would be improperly motivated always to dispute the authenticity of its product even where, as Colgate did here, it produces samples in discovery. This Court should allow the evidence to be fully adduced, permit cross-examination and argument in the normal course of the trial, and let the jury do its job.

### D. Neither Authentication nor "Chain of Custody" Evidence Is Required for Experts to Testify About the Results of Product Testing.

#### 1. Product Testing Results Are Proper Matter Upon Which Experts May Reasonably Rely Under Federal Rule 703.

It is well-established that an expert witness may rely on otherwise inadmissible evidence to form his or her opinion.  Fed. R. Evid. 703, which governs this matter, provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Colgate cites *no authority* for its assertion that Rule 703 requires a chain of custody to be established for matter to be reliable or to be matter which may reasonably be relied upon. Colgate's attempt to graft a new requirement onto Rule 703 finds no support in the rule, its history, or decisional law and, if applied, would cause reversible error.

Instead, Rule 703 imparts only a "reasonable reliance" requirement. Here, Defendant's own expert, Mr. Sanchez, has admitted that chain of custody evidence is not necessary or relied upon by himself or experts in the field in determining the asbestos content of a vintage product. Sanchez has testified that he has tested "thousands" of materials for the presence of asbestos,[72] "pretty much any building material you could name that would have come through the lab on a routine basis."[73] And yet, obtaining chain of custody documentation for any or all of those materials is "beyond anything we would do at the laboratory level. **We would not routinely ever be provided that information**."[74]

In fact, Mr. Sanchez testified that of the thousands of products he has tested for the presence of asbestos without any chain of custody documentation, he has complete confidence in all of his analytical results.[75]  He has never told a client his results might not be accurate because he wasn't provided with documentation of where the product had been between the time it was purchased and the time it arrived at his laboratory, because "[a]gain, **that is well beyond the realm of what the analytical laboratory's role is**.  I receive samples, I analyze those samples, we stand by the results of the analysis.  I can't speak to where the samples came from, where they originated or their whole life history.  **That is not part of the scope of what we do**."[76]

Plaintiff's reliance on the historical Cashmere Bouquet samples is not only reasonable, it is necessary. The latency of plaintiff's disease caused an intervening passage of time which prevented

---

[72] **Ex. 31**, Sanchez Depo., at 31:24-32:1.
[73] *Id*. at 34:19-21.
[74] *Id*. at 36:12-37:16 (emphasis added).
[75] *Id*. at 37:17-38:18.
[76] *Id*. at 38:19-39:7.

him and his experts from having samples manufactured concurrently with his exposure.   Further, Colgate no longer sells the product, claims it destroyed all of the Cashmere Bouquet it analyzed in the 1970s and 1980s, disavows its own production in discovery, and wants to recant a prior stipulation of authenticity.   And yet, historical bottles of Cashmere Bouquet can be found in private collections and, indeed, in Colgate's own collection maintained at its headquarters.   Plaintiff had nowhere else to source its evidence. Therefore, testing of historical containers of Cashmere Bouquet must necessarily form the basis for Plaintiff's experts' testimony that the product was contaminated with asbestos when it left Colgate's manufacturing facility, and exposed Mrs. Jackson to asbestos in quantities sufficient to contribute to the development of her cancer.

There is no basis, other than complete speculation, to imagine that the samples tested lack trustworthiness. Not one sample has revealed evidence of tampering or incongruity with the original formula. Further, having previously produced the samples as well as publicly admitting and stipulating to their authenticity, Colgate should not be permitted to make an about-face and conveniently claim the samples are now inauthentic.

Plaintiff's experts will testify the testing and analysis of consumer products for asbestos content and safety has been a significant aspect of the work they have performed, and that it is not unusual to test safety of historical products that are out-of-production to identify whether and how they can cause injury or disease.   They will testify that the historical containers of Cashmere Bouquet they tested are precisely the types of materials they and other scientists in their respective fields rely upon in formulating opinions.

Further, Plaintiff's experts will testify that the contents of the historical Cashmere Bouquet containers they tested are genuine Cashmere Bouquet.   Plaintiff's experts' testing results revealed all of the mineral constituents they would have anticipated finding based on the historical testing of both Colgate's source ore and its finished Cashmere Bouquet talcum powders. They will testify that every

sample of Cashmere Bouquet analyzed has demonstrated the presence of substantial quantities of talc, as well as asbestiform tremolite, asbestiform anthophyllite, and/or asbestiform chrysotile, the characteristic mineral assemblage repeatedly identified in analyses of Cashmere Bouquet. They will testify the results are consistent with the makeup and formula of Cashmere Bouquet, the ore, the geology, and asbestos in Colgate's ore sources.

Colgate will have an opportunity to cross-examine them on those facts and to argue the testing evidence is insufficient to prove the samples were Cashmere Bouquet.  This is a question of fact for the jury to resolve, not an evidentiary question to be weighed and determined *in limine*.

Further, pursuant to Federal Rule of Evidence 803(18), Dr. Gordon and Mr. Fitzgerald can testify to the results of their findings based on their peer-reviewed scientific article *Asbestos in Commercial Cosmetic Talcum Power as a Cause of Mesothelioma in Women,* 20 Int'l J. Occup. & Envtl. Health 318 (2014). Indeed, the rule on direct examination is that an expert witness can refer to, summarize, and even quote an article he relied on in forming an opinion, and it may then be admitted as substantive evidence. *Tart v. McGunn*, 697 F.2d 75, 78 (2d Cir. 1982) ("the Rule explicitly permits the admission of medical literature as substantive evidence 'to the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination . . .,' as long as it is established that such literature is authoritative"). *See also Caruolo v. AC&S, Inc*., 93 Civ. 3752 (RWS), 1999 U.S. Dist. LEXIS 3022, at *42 (S.D.N.Y. Mar. 11, 1999), *aff'd in part and rev'd in part on other grounds*, *Caruolo v. John Crane, Inc*., 226 F.3d 46 (2d Cir. 2000) (finding peer-reviewed article by Gordon and Fitzgerald's co-author James Millette was properly before the jury pursuant to Fed. R. Evid. 803(18)).

### 2.     Chain of Custody Evidence Only Applies to the Movement of Evidence Once It Is Taken into the Proponent's Custody.

Finally, Colgate has grossly distorted the concept of "chain of custody" as it is typically applied in the criminal context. Chain of custody refers to the movement of evidence *after it has been*

*taken into **custody*** — as the plain language of the term states.  The chain of custody does not extend back in time before the point at which the evidence was acquired by its proponent. "[T]he purpose of the chain of custody requirement is to insure that the items offered into evidence are in substantially the same condition <u>as they were at the time the proponent came into possession of the evidence</u>." *United States v. Brown*, 136 F.3d 1176, 1181 (7th Cir. 1998)(emphasis added)(finding no error in the admission of six tapes without chain of custody where the accuracy and trustworthiness of the recordings was shown). That requirement has been satisfied here. A complete chain of custody has been maintained for every sample tested by Plaintiff's experts.[77]

## CONCLUSION

Colgate's motion raises issues of fact for the jury to decide; challenges the weight of the evidence, and not its admissibility; and identifies objections it can fully address through effective cross-examination. For each and all of these reasons, the motion should be denied in its entirety.

---

[77] *See* FN 70.

This 5th day of December, 2016.

    Respectfully submitted,

**SIMON GREENSTONE
PANATIER BARTLETT**

*/s/Kevin W. Paul*

Kevin W. Paul *(pro hac vice)*
MSBA #43730
Attorney for Plaintiff
3232 McKinney Ave, Ste 610
Dallas, TX 75204
214-276-7680
kpaul@sgpblaw.com

**BROWN & GOULD, LLP**

*/s/ Daniel A. Brown*

Daniel A. Brown (Bar No. 444772)
Eileen M. O'Brien (Bar No. 483451)
7316 Wisconsin Avenue, Suite 200
Bethesda, MD  20814
Tel: 301-718-4548
dbrown@brownandgould.com
eobrien@brownandgould.com

**ATTORNEYS FOR THE PLAINTIFF**

**CERTIFICATE OF SERVICE**

    The undersigned hereby certifies that on December 5, 2016 I electronically filed the foregoing true and correct copy of Plaintiff's Response in Opposition to Defendant Colgate-Palmolive Company's Motion *In Limine* to Preclude All Testimony and Evidence Regarding Purported Testing of Talc by Plaintiff's Testing Experts Because of Lack of Authenticity and Relevance of Talc Tested with the Clerk of Court using the CM/ECF System which will send notification of such filing to all counsel of record in the above-referenced matter.

    */s/ Kevin W. Paul*

    Kevin W. Paul