UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Brian D. Jackson, Individually and as Personal Representative of the Estate of Doris Jackson, Deceased | : : : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. 1:15-cv-01066-TFH |
| vs. | : | |
| | : | |
| COLGATE-PALMOLIVE COMPANY, | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT COLGATE-PALMOLIVE COMPANY'S *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT DR. RONALD GORDON**

Plaintiff Brian D. Jackson, Individually and as Personal Representative of the Estate of Doris Jackson, Deceased, opposes the *Daubert* motion to exclude the testimony of Plaintiff's expert Dr. Ronald Gordon filed by Defendant Colgate-Palmolive Company ("Colgate") and would respectfully show the Court that the motion should be denied.

## INTRODUCTION

Defendant Colgate-Palmolive Company has moved to preclude plaintiffs' expert Dr. Ronald Gordon from testifying about the product testing he performed on historical containers of Cashmere Bouquet talcum powder, as well as tissue analysis he performed on Ms. Jackson's lymph node tissues. Colgate also seeks to preclude Dr. Gordon from offering specific causation opinions in this case. As will be explained, there is no merit to any of Colgate's criticisms of Dr. Gordon's testing or expert opinions, and its motion should be denied.

Dr. Ronald Gordon of the Mt. Sinai School of Medicine, Department of Pathology, tested more than fifty containers of Cashmere Bouquet manufactured by Colgate over a fifty-year span. Of those, twenty-three containers were produced by Colgate itself. He found asbestos fibers in every one of them. He then tested human tissue samples taken from individuals, including Ms. Jackson, in order to determine if asbestos fibers were present, and confirmed they were. Colgate now moves to exclude Dr. Gordon's testimony based on a variety of objections to the product and tissue analysis he completed and his specific causation testimony based on that work. None of Colgate's objections have merit, and Colgate fails to show that Dr. Gordon's opinions are inadmissible under the *Daubert* standard for expert testimony.

Moreover, Colgate ignores that Dr. Gordon's work—both his actual testing of Cashmere Bouquet talc and analysis of human tissue for asbestos fibers—has been subject to peer-review and published in the medical literature. No matter how Colgate criticizes Dr. Gordon's opinions, it cannot validly state that they do not rest on a reliable foundation established by the medical and scientific community because Dr. Gordon's peers have reviewed and accepted Dr. Gordon's work.  All of Colgate's criticisms go to the weight of Dr. Gordon's testimony, not its admissibility, and is properly addressed on cross-examination.  Plaintiff therefore respectfully requests that Defendant's motion to exclude Dr. Gordon's testimony be denied. Plaintiff's discussion of the relevant facts are incorporated into the argument below.

## LEGAL STANDARD

The prerequisites for an expert witness to give opinion testimony are that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579

(1993), the U.S. Supreme Court held that expert testimony need be based only on a reliable and scientifically valid methodology that fits with the facts of a case. *See Heller v. Shaw Indus.*, 167 F.3d 146, 152 (3d Cir. 1999) (citing *Daubert*, 509 U.S. at 592-93). The Supreme Court "listed four factors to guide a district court in its preliminary assessment of these requirements,[1] but cautioned that these were guideposts and not required factors in each case." *Id.* Rather, "these factors should not obscure the fact that the district court's gatekeeper role is a flexible one, and that the factors are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted." *Id.* (citing *Daubert*, 509 U.S. at 593-94 & n.12).

The Court must "be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence." *See Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). In fact, "exclusion is the least favored means of rendering questionable scientific evidence ineffective," as *Daubert* recognizes that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Cavallo v. Star Enter.*, 100 F.3d 1150, 1158 (4th Cir. 1996). The trial court's gatekeeper role is not intended to replace the adversary system. *See Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001).

Trial courts may not exercise their gatekeeping responsibility by excluding expert testimony that falls within the range of matters on which reasonable experts can disagree. *See Milward v. Acuity Specialty Prods. Group*, 639 F.3d 11, 22 (1st Cir. 2011). Trial courts are not "empowered 'to determine which of several competing scientific theories has the best provenance.'" *Id.* at 15 (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85

---

[1] The *Daubert* factors include: (1) whether an expert's theory can be tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether there is a known potential rate of error; and (4) whether there is widespread acceptance of the theory or technique in the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

(1st Cir. 1998)).  While the trial court may look at the reliability of the expert's methodology, it is for the jury to determine the soundness of the facts underlying the expert's opinion and the correctness of his or her conclusions. *See id.* at 22. The entire body of evidence relied on by the expert should be taken into consideration in evaluating the reliability of the opinion, and the court should refrain from an "atomistic" approach that determines that each piece of evidence is insufficient, on its own, to support the expert's conclusion. *Id.* The mere fact that an expert's methodology requires the application of scientific judgment does not render it unreliable. *See id.* at 18.

## ARGUMENT AND AUTHORITIES

**I.     Dr. Gordon Has the Experience and Expertise to Offer the Challenged Opinions.**

Dr. Gordon has been an electron microscopist since 1971—some 45 years.[2] His lab at Mt. Sinai is licensed by the State of New York and is certified by the College of American Pathologists (CAP).[3] The CAP investigates and recertifies the Mt. Sinai laboratory every two years.  It has never failed a certification inspection since Dr. Gordon has been there.[4]

> "The College of American Pathologists (CAP's) Laboratory Accreditation Program accredits the entire spectrum of laboratory test disciplines with the most scientifically rigorous customized checklist requirements."[5]

Dr. Gordon's qualifications in the area of electron microscopy extend beyond his own practical lab experience. He serves as an inspector for the College of American Pathologists and

---

[2] **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 187; **Ex. 2**, Report of Dr. Robert Gordon, June 13, 2016, at Exhibit 1 thereto (Dr. Gordon's Curriculum Vitae).

[3] **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 188.

[4] *Id.*

[5] **Ex. 3**, College of American Pathologists Laboratory Accreditation Program summary at p.1, Exhibit E.

inspects other pathology labs like his own.[6] He is the Associate Editor for Microscopy on the Editorial Advisory Board for the Journal of Histotechnology.[7]

Dr. Gordon has authored *hundreds* of original peer-reviewed articles, abstracts and book chapters. His peer-reviewed articles include papers specifically addressing Dr. Gordon's analysis of asbestos fibers in human tissue and his standard fiber-counting method by TEM Microscopy, Energy Dispersive Spectroscopy (EDS), and Selected Area Electron Diffraction SAED, including the review of hundreds or more TEM grid openings (the medium upon which samples are transmitted for review under the electron microscope) have been repeatedly published in the peer reviewed literature.[8]  In fact, relying on already published scientific literature, Dr. Gordon and his co-authors stated in their 1996 article *Asbestos Exposure and Ovarian Asbestos Fiber Burden*: "the fact that cosmetic talc was often contaminated with asbestos in the past, particularly before 1976."[9]

Dr. Gordon has tested both human tissue and products for the presence of asbestos. He has analyzed floor tiles, typewriter brakes, gaskets, batteries, fan belts, transmission belts, powders, bulk insulation, exterior shingles, and roof tiles.[10]  He has been admitted to testify at

---

[6] **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 190-91

[7] *Id.* at 191; **Ex. 4**, Journal of Histotechnology Editorial Board.

[8] **Ex. 5**, M. Wu, R.E. Gordon, et al., *Case Report: Lung Disease in World Trade Center Responders Exposed to Dust and Smoke: Carbon Nanotubes Found in the Lungs of World Trade Center Patients and Dust Samples*, 118 ENV. H. PERSPECTIVES 499-504 (2010); D.S. Heller, R.E. Gordon, et al., *Presence of Asbestos in Peritoneal Mesotheliomas in Women*, 9 INT'L. J. GYN. CANC. 452-55 (1999); D.S. Heller, C. Westhoff, R.E. Gordon & N. Katz, *The Relationship Between Perineal Cosmetic Talc Usage and Ovarian Caner Particle Burden*, 174 AMER. J. OBSTET. & GYN. 1507-10 (1996); D.S. Heller, R.E. Gordon, et al., *Asbestos Exposure and Ovarian Asbestos Fiber Burden*, 29 AMER. J. IND. MED. 435-39 (1996).

[9] **Ex. 6**, D.S. Heller, R.E. Gordon, et al., *Asbestos Exposure and Ovarian Asbestos Fiber Burden*, 29 AMER. J. IND. MED. 435-437 (1996).

[10] **Ex. 7**, Deposition of Dr. Gordon, April 18, 2013, at 13; **Ex. 8**, Deposition of Dr. Gordon, June 14, 2011, at 91-92.

least four times in the State of California and as recently as April of 2015 on his detection of asbestos fibers by electron microscopy.[11]

Dr. Gordon also testified that his transmission electron microscope is "taken down," (rebuilt) and calibrated by the manufacturer, Hitachi, on an annual basis.[12] The Energy-Dispersive Spectroscopy (EDS) for compositional analysis is maintained one to two times per year by the president of the company that manufactured it, Evex.[13] That system is calibrated against a known sample of asbestos in order to ensure its accuracy on a monthly basis.[14]

Dr. Gordon also testified it is the only lab he is aware of, accredited by CAP, to conduct human tissue fiber digestion studies.[15]

> "The CAP accredits laboratories performing testing on specimens from human beings or animals, using methodologies and clinical application with the expertise of the program. Laboratories must be appropriately licensed to perform testing when required by law."[16]

Dr. Gordon's laboratory at Mt. Sinai is the central electron microscopy lab utilized by approximately 10 other hospital systems, including Beth Israel, St. Luke's, Roosevelt, New York Eye & Ear, and Miami and Lincoln Hospital.[17]  Dr. Gordon personally reviews most of the nasal, bronchial and tracheal samples under electron microscopy for the Northeast United States.[18]  He

---

[11] *See* **Ex. 2**, Report of Dr. Ronald Gordon, June 13, 2016, at Exhibit 4 thereto (Curriculum Vitae of Dr. Gordon), p. 34-37; *see also* **Ex. 9**, Testimony of Dr. Ronald Gordon in *Winkel v. Colgate*, April 22 and 23, 2015.

[12] **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 189-90.

[13] *Id.* at 190.

[14] *Id.* at 191.

[15] *Id.* at 189.

[16] **Ex. 3**, College of American Pathologists Laboratory Accreditation Program Summary, p. 2.

[17] **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 193.

[18] *Id.* at 193-94.

runs a widely respected electron microscopy lab that is relied upon for the real-world analysis of human tissue.

Dr. Gordon's methodology has been the same for more than 30 years.[19]   In fact, Dr. Arthur Langer, a retained expert of Colgate in the Cashmere Bouquet litigation, testified that Dr. Gordon follows the same methodology that Dr. Langer developed at Mt. Sinai.[20]   Dr. Gordon learned this methodology while training under Dr. Langer in the 1970s at Mt. Sinai, which is still used by both Dr. Langer and Dr. Robert Nolan, another individual hired as an expert by Colgate in the Cashmere Bouquet litigation.[21] Dr. Langer testified that he would not "reject Dr. Gordon's methodology if it followed mine."[22]   Moreover, Dr. Langer has vouched for the reliability of Dr. Gordon's work. He has repeatedly acknowledged that Dr. Gordon is a "reputable scientist," has worked with him for years and regularly uses Dr. Gordon's laboratory at Mt. Sinai.[23] Dr. Langer testified that he had no reason to consider Dr. Gordon's work flawed when they "both did assays on the same tissues and came up with similar if not identical results" in research they conducted together.[24]

Dr. Gordon testified that there is no difference in his analysis of asbestos fibers in human tissue versus products, as "the procedures are basically the same" and one is no more difficult

---

[19] **Ex. 7**, Deposition of Dr. Gordon, April 18, 2013, at 249.

[20] **Ex. 10**, Deposition of Dr. Langer, June 14, 2013, at 290.

[21] *Id.* at 40, 285; *see also* **Ex. 7**, Deposition of Dr. Gordon, April 18, 2013, at 249.

[22] **Ex. 10**, Deposition of Dr. Langer, June 14, 2013, at 285-86.

[23] Dr. Langer's statement is important to consider in light of Colgate's repeated attempts here and across the country to continue to interject inadmissible allegations of prior criminal conduct (addressed in a separate Motion in Limine).  Attempts to introduce this evidence against Dr. Gordon have been rejected now by a number of courts, including **Ex. 11**, *Stokes v. Gen. Elec. Co.*, No. 11-CI-0804, Jefferson Cir. Ct., Ky., May 11, 2012, at 1-2.

[24] **Ex. 10**, Depositions of Dr. Arthur Langer, June 14, 2013, at 40-41, 288-89; *see also* **Ex. 12**, Deposition of Dr. Arthur Langer, April 8, 2013, at 53.

than the other.[25] Dr. Langer confirmed that the protocol for both analyses is "essentially the same."[26]

## II.   Dr. Gordon's Product Testing Opinions Are Reliable and Should Be Admitted.

### A.   Dr. Gordon's Testing Methodology and Results Have Been Peer Reviewed and Accepted in the Scientific Literature.

Colgate admits that Dr. Gordon has reported finding asbestos in every sample of Cashmere Bouquet he has tested, whether those samples are produced by Colgate, provided by consumers who retained samples from their own use, or obtained as vintage samples in the marketplace. Dr. Gordon's methodology and results were published in the October-December 2014 issue of the INTERNATIONAL JOURNAL OF OCCUPATIONAL AND ENVIRONMENTAL HEALTH.[27] Colgate is therefore asking this Court to step in and exclude the very work that the scientific community has already accepted.[28]

Dr. Gordon examined more than 50 historical samples of Cashmere Bouquet talcum powder products obtained both by Plaintiffs and from Colgate.[29] He detected tremolite, anthophyllite and chrysotile asbestos within every single one of those samples and his results were the subject of peer review.[30] In at least 36 of those samples, looking at only a very small

---

[25] **Ex. 7**, Deposition of Dr. Gordon, April 18, 2013, at 246.

[26] **Ex. 10**, Deposition of Dr. Langer, June 14, 2013, at 273.

[27] **Ex. 13**, Gordon, Fitzgerald, Millette; *Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women*, INT. J. OCC. ENV. H. 20(4):318-332 (2014) ("Gordon, 2014").

[28] Plaintiffs' experts, Dr. Gordon and Mr. Fitzgerald, are the only witnesses in the case whose methods and results pertaining to cosmetic talc have been published in the peer-reviewed literature but for Dr. Arthur Langer, who in 1976 found Cashmere Bouquet to contain a substantial amount of anthophyllite and tremolite asbestos, just as Dr. Gordon did. *See* **Ex. 14**, Rohl, Langer, et al.; *Consumer Talcums and Powders: Mineral and Chemical Characterization*, J. TOX. ENV. H.; 2:255-284, 1976, Table 4.

[29] **Ex. 13**, Gordon, Fitzgerald, Millette; *Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women*, INT. J. OCC. ENV. H., Vol. 20 No. 4, 2014, p. 319.Gordon, 2014, at 319.

[30] *Id.*; **Ex. 15**, Deposition of Ronald Gordon, Ph.D., September 29, 2016, at 89:18-90:14; **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 159:16-160:1.

portion of the powder (.01 gram), Dr. Gordon directly counted four fibers.[31] In one sealed sample of Cashmere Bouquet, Dr. Gordon documented 14 individual fibers that equated to a minimum concentration of 276,000 asbestos fibers per gram of powder.[32] Based on this broad survey of Cashmere Bouquet talc, Dr. Gordon has testified that, more likely than not, every single container of Cashmere Bouquet contained some level of asbestos.[33] To the extent that other testers have not found asbestos fibers in particular containers of Cashmere Bouquet, Dr. Gordon has testified that he "would have to look at their protocol to see what their sensitivity was to determine if it was adequate."[34]

In the 2014 paper, all three participating laboratories "confirmed in multiple tests the presence of asbestiform anthophyllite and asbestiform tremolite in the talcum powder products, just as had been found and described by Rohl and Langer over three decades ago."[35] The laboratories had been working independently for several years before the scientists guiding this work collected their results and collaborated in the 2014 paper.[36] Thus, the peer-reviewed published literature, reflecting the work of multiple laboratories, demonstrates asbestos contamination in Cashmere Bouquet talcum powder and reinforce the results of Rohl's and Langer's earlier work.

    **B.**    **The Samples of Cashmere Bouquet that Dr. Gordon Tested Are a Proper Basis for Scientific Study, and a Significant Percentage of the Samples Were Produced by Colgate.**

---

[31] **Ex. 16**, Dr. Gordon's Product Testing Count Sheets, Exhibit P.

[32] **Ex. 17**, Sample FA 12-25.

[33] **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 159:16-160:13, 202:7-15.

[34] **Ex. 15**, Deposition of Ronald Gordon, Ph.D., September 29, 2016, at 91:19-92:3.

[35] **Ex. 13**, Gordon, Fitzgerald, Millette; *Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women*, INT. J. OCC. ENV. H., Vol. 20 No. 4, 2014, at 322.

[36] **Ex. 13**, Gordon, Fitzgerald, Millette; *Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women*, INT. J. OCC. ENV. H., Vol. 20 No. 4, 2014, at 326.

Colgate's complaints about the authenticity of the samples Dr. Gordon tested is a red herring—not least because almost half the samples were provided by Colgate itself in litigation.[37] Plaintiff incorporated by reference his response to Colgate-Palmolive Company's Motion *in Limine* to Preclude All Testimony and Evidence Regarding Purported Testing of Talc by Plaintiff's Testing Experts Because of Lack of Authenticity and Relevance of Talc Tested.

    **C.**    **Dr. Gordon's Decision to Follow the Level II Yamate Protocol and to Exceed the Minimum Level of Analysis Allowed by the Protocol Was an Appropriate Choice Designed to Make His Results More Accurate and Reliable.**

        **1.**    **Dr. Gordon's Decision to Use the Yamate Method, Rather than the USP Method Championed by Colgate, Does Not Render His Results Unreliable.**

Dr. Gordon utilized the following three-step methodology for the identification of fibers, authored by George Yamate: (1) fiber morphology (size and shape) with transmission electron microscopy (TEM); (2) fiber elemental composition using energy dispersive spectroscopy (EDS); and (3) crystal structures using selected area electron diffraction (SAED).[38] Because Yamate was developed as an "air and water" protocol, Dr. Gordon modified the protocol such that he could determine a minimum quantification for what he was finding.[39] Dr. Gordon explained that microscopists find it necessary to make modifications to different protocols on a regular basis in order to adjust for the materials that are being tested.[40]

---

[37] *Id.* at 318.

[38] **Ex. 7**, Deposition of Dr. Gordon, April 18, 2013, at 100, 155; *see also* **Ex. 18**, Yamate Draft Protocol, at 48-50.

[39] **Ex. 7**, Deposition of Dr. Gordon, April 18, 2013, at 101-102; **Ex. 8**, Deposition of Dr. Gordon, June 14, 2011, at 172.

[40] **Ex. 8**, Deposition of Dr. Gordon, June 14, 2011, at 172.

There is no government or regulatory protocol set for the simple task of determining the objective presence of asbestos in cosmetic talc. There are a variety of protocols mentioned by Colgate that are designed to test bulk materials, asbestos in buildings, asbestos in air, etc. These protocols are not designed to determine the presence of asbestos at all, but to determine if asbestos is present *at a certain level*.  This distinction is important.

Colgate's own expert Drew Van Orden used the same protocol as Dr. Gordon. Van Orden used what he called the "EPA Level II protocol (Methodology for the Measurement of Airborne Asbestos by Electron Microscopy).[41] Mr. Van Orden explained that the EPA Level II protocol was "a draft protocol written by George Yamate and a couple of other people that used the basis for all the existing asbestos methodology that are in place now."[42] In fact, Mr. Van Orden testified that he chose the Yamate Level II protocol for its "fiber identification protocol[, s]o that you would know that you've got to get chemistry and a diffraction pattern to identify all the particles [a]nd in terms of counting whether it was a fiber bundle or cluster, those kinds of things."[43]

Colgate's former expert, Dr. Richard Lee, acknowledged "there are a variety of published methodologies that one could use and still come to a scientifically valid conclusion, assuming you do the rest of the science properly."[44]  Dr. Lee, in fact, deviated from both Yamate and ASTM D5756[45] in the course of his testing, "the modifications we did are things that wouldn't

---

[41] **Ex. 19**, Deposition of Drew Van Orden, September 22, 2016, at 18:19-19:8 and Exhibit 3 thereto, p. 1.

[42] *Id.* at 19:7-16.

[43] *Id.* at 20:25-21:7.

[44] **Ex. 20**, Deposition of Dr. Lee, May 2, 2012, p. 116-17.

[45] The ASTM method is titled "Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Mass Surface Loading."

have necessarily been called for…" [46] Dr. Lee's modifications included the use of x-ray diffraction (XRD) and scanning electron microscopy (SEM), methodologies that lack reliable sensitivity for the detection of asbestos in a sample (XRD) *or for which there is no written protocol at all* (SEM). [47]

Colgate complains that Dr. Gordon did not conduct "Yamate Level III" analysis because the samples were tested in the context of litigation. He was under no requirement to do so by any authority, including this particular draft protocol. [48] In fact, Colgate's witness Mr. Saldivar has never used Yamate III even under circumstances when Colgate would argue it was required. In fact the Yamate method states "Level I…should not be used in legal proceedings. If 'positives' or 'false positives' are found, especially in areas where asbestos is known to be absent…**Level II analysis**, and *possibly* Level III analysis, should be performed." [49] Dr. Gordon utilized level II. Level III would not have been required as asbestos had already been found on repeated occasions. As discussed above, Dr. Gordon utilized Yamate's three-prong methodology for the identification of asbestos and no witness has suggested that Level III is mandatory, quite to the contrary.

Colgate's former expert microscopist, Andreas Saldivar, testified Yamate III is not necessary to produce sound results on asbestos samples even when a finding of asbestos was unexpected. [50] Saldivar testified that he has conducted thousands of analyses on asbestos containing materials and dozens to a hundred samples where asbestos was found but not

---

[46] **Ex. 21**, Deposition of Dr. Lee, May 31, 2013, p 235, Exhibit T.

[47] **Ex. 22**, Deposition of Mark Floyd, June 5, 2013, p. 201-215, Exhibit U; **Ex. 21**, Deposition of Dr. Lee, May 31, 2013, at 105; **Ex. 20**, Deposition of Dr. Lee, May 2, 2012, at 48.

[48] **Ex. 18**, Yamate Draft Protocol at p. 5.

[49] *Id.* (emphasis added).

[50] **Ex. 23**, Deposition of Andreas Saldivar taken March 13, 2015, at 53-54.

expected.[51] He has NEVER, in more than 25 years, utilized the Yamate III protocol, but nevertheless testified that his analyses are reliable and sound.[52]

> Q.    Right. And for none of the times that you found asbestos in an unexpected place did you move to Yamate 3 and do that analysis, correct?
>
> A.    Correct.
>
> Q.    Was your, was the fact that you didn't conduct Yamate 3, did that in any way, from a methodological perspective, destroy the validity of your analysis?
>
> A.    No.[53]

### 2. Dr. Gordon Appropriately Exceeded the Minimum Level of Analysis Required under the Yamate Method so that He Could Detect Lower Levels of Asbestos Contamination.

Colgate alleges that Dr. Gordon must adhere to all facets of a specific analytical methodology, where their own experts acknowledge no such requirement—especially when those methodologies lack the requisite sensitivity to detect extremely low levels of asbestos. The question at the heart of this case is "Was there asbestos in Cashmere Bouquet?" Plaintiffs' experts have looked at Cashmere Bouquet with a level of analytical sensitivity to answer the question conclusively in the affirmative while Colgate's experts have repeatedly stopped short.

None of the microscopist witnesses in this case, Plaintiffs or Defense, has strictly followed any one protocol because they each recognize that modifications must be made in order to, for instance, get a readable sample or increase analytical sensitivity.[54]   Colgate's own

---

[51] *Id.* at 49, 52.

[52] *Id.* at 49, 51.

[53] *Id.* at 53-54.

[54] In the past, Colgate's experts have also testified to utilizing different methodologies with various modifications. Exponent, the employer of Colgate Expert Dr. Elizabeth Anderson, requested that the microscopist conducting the analysis for their study modify the prescribed protocol (NIOSH 7402) to increase sensitivity. **Ex. 24,**

witnesses acknowledge that various protocols will only determine if asbestos is present at a certain level rather than answering the more simple question as to *whether or not asbestos is present at all.*

Colgate claims that Dr. Gordon's statement that strict adherence to the Yamate Draft Protocol would result in a finding of zero asbestos is "devastating."  To the contrary, it is honest and demonstrates that following protocol only to a minimum level of sensitivity is a fool's errand—"did not find" does not mean "not present."  Yamate makes this precise point: "although the electron microscopist may report a zero count, the notation 'Below Detectable Level' is more appropriate."[55]

Yamate was only designed to answer the question as to whether the asbestos was present at a certain level in air samples where asbestos was expected to be, not if it was present at all.[56] As proof of this point, Yamate requires a minimum sensitivity of 10 counted grid openings per sample. Below is an example of a grid that a microscopist would look at. It contains 100 openings.

---

Deposition of Mark Floyd, December 4, 2012, at 54-55.  Additionally, Dr. Anderson's testing utilized a type of dust collection device (cyclone) not included in any accepted methodology for the analysis of asbestos fibers in air.  **Ex. 22**, Deposition of Mark Floyd, June 5, 2013, at 135-36, 247; *see also* **Ex. 24**, Deposition of Mark Floyd, December 12, 2012, at 135.  Defense expert Andreas Saldivar has modified his protocol (ELAP 198.4 and 198.6) dilute the sample and get a more even distribution of particulate across his filtration media. **Ex. 23**, Deposition of Andreas Saldivar, March 13, 2015, at 9-10.

[55] **Ex. 18**, Yamate Draft Protocol at p. 5.

[56] *Id.*



Yamate requires only a minimum of 10 grid openings be analyzed.[57] Thus, under Yamate, one only need count 10% of the entire grid, shown below:

**YAMATE MINIMUM**:



**DR. GORDON**:

---

[57] **Ex. 18**, Yamate Draft Protocol at p. 5.



Dr. Gordon counts five full grids minimum, or 490 grid openings *more* than under the Yamate minimum, thus increasing the sensitivity of his analysis 50-fold.[58] Yamate condones increasing the number of grids counted as the overall concentration of asbestos decreases to increase sensitivity, but only suggests counting 20 total openings.[59] Dr. Gordon testified that "statistically, you're more likely to find [asbestos] in the 500. I mean, that's why I expanded it, because my initial charge with doing all of this was to determine if there was asbestos in the samples, not to determine if there was asbestos at a certain level in those samples….The more you look at, the better results you get."[60]

Colgate understands that increasing the area analyzed (number of grid openings) means a much lower (better) level of detection can be achieved. Colgate's own experts have modified their protocols to do just this. Mark Floyd, the microscopist who conducted the analysis of air samples taken in furtherance of the study conducted by Colgate expert Dr. Anderson was

---

[58] **Ex. 1**, Deposition of Dr. Gordon taken March 20, 2015, at 163. Dr. Gordon counts 500 grid openings at a minimum and up to 3,000 maximum to achieve an exceptionally high level of sensitivity. Defense expert Drew Van Order has testified that his laboratory will also increase the number of grid openings counted in order to "achieve a target analytical sensitivity." **Ex. 25**, Deposition of Drew Van Orden, May 4, 2012, at 78-83.

[59] **Ex. 18**, Yamate Draft Protocol at p. 5.

[60] **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 204-205.

instructed to count substantially more grid openings (265 of them) than specified by the method he was asked to follow (NIOSH 7402).[61] This study was recently published in the peer-reviewed literature.[62]

### 3. Dr. Gordon's Results Are Reproducible, and He Maintained the Necessary Documentation.

Dr. Gordon diligently "designed a protocol that was reproducible."[63] Colgate's own expert, Dr. Lee even acknowledged that "if Dr. Gordon found four or more fibers…you can argue that the *finding meets the test of reproducibility*."[64] Dr. Gordon's protocol for testing of Cashmere Bouquet powder:

1.  Suspending $1/100^{th}$ of a gram of powder in water

2.  Removing 10 (microliter) μl samples from the suspension

3.  Drying down the sample on an electron microscope grid.

4.  Count at least 500 grid openings (5 grids).

5.  Scan with TEM at low magnification to identify "fiber forms."

6.  If a fiber form is identified, increase magnification.

7.  Conduct EDS on fiber form to determine elemental composition and fiber type.

8.  Conduct SAED to differentiate talc from anthophyllite, conduct zone-axis tilt as needed.[65]

---

[61] **Ex. 24**, Deposition of Mark Floyd, December 4, 2012, at 55-57, 66; **Ex. 26**, Deposition of Elizabeth Anderson, June 12, 2012, at 130.

[62] **Ex. 27**, Anderson, et al., *Assessment of Health Risk from Historical Use of Cosmetic Talcum Powder*, RISK ANALYSIS, 2016.

[63] **Ex. 8**, Deposition of Dr. Gordon, June 14, 2011, at 103; *See also* **Ex. 7**, Deposition of Dr. Gordon, April 18, 2013, at 123.

[64] **Ex. 21**, Deposition of Dr. Richard Lee, May 31, 2013, at 298.

[65] **Ex. 8**, Deposition of Dr. Gordon, June 14, 2011, 104, 203-204; **Ex. 7**, Deposition of Dr. Gordon, April, 18, 2013, at 174.  Yamate Level III states that the protocol "is designed to allow greater flexibility and freedom of

Dr. Gordon's results have been repeated not only by him but also by his co-authors. Included in his documentation of fiber counts for the vintage Cashmere Bouquet product he produced are some 18 plus reports for Dr. Gordon's repeat analysis of Cashmere Bouquet samples—in every instance he was able to identify asbestos fibers and verify his initial reports.[66] A re-verification of 10% of analyses is a generally accepted number to establish analytical reliability.[67] Dr. Gordon verified more than 40% of his. More importantly, however, his results come some 30-40 years after Drs. Langer and Nolan published findings of asbestos using precisely the same techniques as Dr. Gordon. Dr. Gordon's results echo Colgate-Palmolive's own internal testing of Cashmere Bouquet in the 1970s.[68]

Colgate asserts that Dr. Gordon failed to preserve the documentation required in order to verify his findings. Dr. Gordon did document his findings with electron photomicrographs (photographs taken through the microscope), EDS printouts and SAED spectra pictures.[69] It is generally accepted that only representative pictures need be generated due to time and cost issues when utilizing TEM. Dr. Gordon retained representative photomicrographs, EDS and SAED documentation for virtually every fiber he identified. In fact, Dr. Lee admitted that he takes only

---

decision for the microscopist in determining the selection criteria since, due to practical constraints (position, orientation, contamination, etc.), all fibrous particulates may not be suitable for detailed SAED work." **Ex. 18**, Yamate Draft Protocol at p. 45.

[66] *See* **Ex. 16**, Dr. Gordon's Fiber Count Sheets, specifically the April 12, 2013 reports for items FA13-04C, FA13-04A, FA13-06A, FA13-06E, FA13-06CC, FA13-06FF, FA13-06GG, FA13-06HH, FA13-16, FA13-16B, FA8-43, FA8-43B, FA11-3I, FA11-3IB, FA11-3N, FA11-3NB, FA11-3NC, FA11-35, FA11-35B, FA11-35C, FA11-03T, FA11-03TB, FA11-03TC, FA11-03U, FA11-03UB, FA11-03UC, FA11-03V, FA11-03VB, FA11-03W, FA11-03WB, FA11-03WC, FA11-03WD.

[67] **Ex. 24**, Deposition of Mark Floyd, December 4, 2012, at 92, 94 ("Well, the standard amount specified by most of our accreditations is to do a 10 percent reanalysis of the samples run," and "That's what everyone recommends is 10 percent, yes," for sufficient quality control).

[68] **Ex. 28**, McCrone Testing for Colgate Palmolive finding amphibole asbestos.

[69] **Ex.** 7, Deposition of Dr. Gordon, April 18, 2013, at 82.

representative photographs.[70] Similarly, Drew Van Orden, one of Dr. Lee's senior scientists at RJ Lee Group testified that he does not require a microscopist under his supervision to maintain all EDS readouts.[71] Dr. Sanchez, one of Colgate's witnesses in this case, identified 229 fibrous structures in his test of samples taken from an Italian source mine, but only retained photomicrographs and other documentary evidence for 23 of them.[72]

Colgate complains that Dr. Gordon did not specifically notate in which grid openings he saw asbestos and suggests that this means his results cannot be verified. Firstly, this has already been proven false by Dr. Gordon himself as he has personally re-analyzed at least 40% of the grids containing Cashmere Bouquet particulate and verified his original findings. Secondly, any reviewer of Dr. Gordon's grids would need to do as he did: review each grid opening—the only thing required to review Dr. Gordon's analysis is time. Dr. Gordon testified that he does not mark which grid openings he counted to look for fibers because he counts them all,[73] so that a scientist seeking to reproduce Dr. Gordon's results would likewise count every grid. There are various protocols that require reporting of grids and grid openings where fibers were located, but they are specifically designed for air and water sampling.[74]

Again as before, Colgate's own witnesses' methodologies are not unlike Dr. Gordon's. Dr. Langer acknowledge that, "when analyzing particulate matter under the electron microscope," the grids he utilizes "don't always have the reference numbers for the grid

---

[70] **Ex. 21**, Deposition of Dr. Lee, March 31, 2013, at 145.

[71] **Ex. 25**, Deposition of Drew Van Orden, May, 4, 2012, at 104-105.

[72] **Ex. 29**, Deposition of Dr. Matthew Sanchez, July 21, 2016, at 68-69.

[73] **Ex. 15**, Deposition of Ronald Gordon, Ph.D., September 29, 2016, at 79:2-4.

[74]  **Ex. 7,** Deposition of Dr. Gordon, April 18, 2013, at 150.

openings," making reporting of precise fiber location impossible.[75] Similarly, Dr. Langer's own published, peer-reviewed work, failed to utilize counting sheets in order to document tremolite asbestos fibers found in his analyses.[76] Recording the specific locations of fibers found on a grid is a matter of analyst preference and not of scientific mandate.

### 4. Statistical Significant Is Not Relevant to Reporting the Presence of Asbestos.

Statistical significance refers to the potential range of asbestos fibers actually present in a material based on the finding of a specific number of fibers.[77] It does not refer to the veracity of a finding that asbestos is present at all. Thus, a discussion of statistical significance is only relevant in the context of total fiber count estimation. Both Dr. Lee and Andreas Saldivar have testified that they have used TEM to identify a single fiber of asbestos without reference to additional fibers being present.[78] As noted above, Dr. Gordon has analyzed many of the Cashmere Bouquet samples several times. Every time he utilized the standard TEM, EDS and SAED methodology, he found asbestos fibers. In the Cashmere Bouquet samples he reviewed on more than one occasion, the talcum powder was always from the same container he previously analyzed. As discussed above, Dr. Gordon identified at least 4 fibers in each of 36 separate samples that he

---

[75] **Ex. 10**, Deposition of Dr. Langer, June 14, 2013, at 157.

[76] *Id.* at 266, 273; *See also* **Ex. 30**, A.M. Langer, R.P. Nolan, et al., *Association of Metsovo Lung and Pleural Mesothelioma with Exposure to Tremolite-Containing Whitewash*, THE LANCET i:965-67 (1987). See also S.H. Constantopoulous, A.M. Langer, N. Saratzis & R.P. Nolan, *Regional Findings in Metsovo Lung*, THE LANCET ii:452-53 (1987). These papers also reflect that Dr. Gordon follows the same standard methodology for identifying asbestos fibers in utilizing TEM, EDS, and SAED used by Dr. Langer in his work. In those papers, Langer and Nolan analyzed bulk samples of soil for the presence of asbestos utilizing the same procedure as the Mt. Sinai lab. There, as here, the authors correlated the tremolite asbestos in the bulk samples with the tremolite asbestos in the lungs of the Metsovo residents. Dr. Gordon has completed the identical correlation between Cashmere Bouquet talc and Ms. Jackson's tissue.

[77] **Ex. 18**, Yamate Draft Protocol, at p. 71.

[78] **Ex. 20**, Deposition of Dr. Lee, May 2, 2012, at 135-7; **Ex. 23**, Deposition of Andreas Saldivar, March 13, 2015, at 65.

analyzed. Dr. Lee acknowledged that under both Yamate and ASTM methods, a finding of four fibers means that in 95% of any re-analyses, one to ten fibers will be found.[79] Dr. Langer agrees, "four would push you into some reliability as to quantitation," and four fibers would give you a 95% confidence that one to ten fibers were present in the sample.[80]

The microscopist that Exponent hired to count air samples (Dr. Anderson) stated that even when no significant "population" exists in a sample, his laboratory, Forensic, "would identify the fibers by what the method specifies the fiber is."[81] Indeed, Mr. Floyd testified that under the counting methodology employed by him for the study conducted by Exponent, he identified four anthophyllite asbestos fibers under NIOSH 7402 (protocol for TEM analysis), "there is asbestos reported by this method."[82]

Lastly, Colgate refers this Court to the "EPA's protocol" for the definition of asbestos. In short, the EPA protocol referred to is for analysis of asbestos in bulk building materials, adopted by the talc industry for use on their own products. As Colgate's own witnesses have pointed out, *that protocol requires the presence of substantial amounts of asbestos before one can conclude asbestos is "detected."*[83] Both Mr. Saldivar and Dr. Lee have agreed that one can objectively identify the presence of even single fibers without first having to find a "population" of fibers per the industry protocol.[84] As discussed above, the Yamate method presumes individual fibers can

---

[79] **Ex. 21**, Deposition of Dr. Lee, May 31, 2013, at 200; **Ex. 18**, Yamate Draft Protocol, at p. 71.

[80] **Ex. 10**, Deposition of Dr. Langer, June 14, 2013, at 314.

[81] **Ex. 22**, Deposition of Mark Floyd, June 5, 2013, at 235.

[82] **Ex. 24**, Deposition of Mark Floyd, December 4, 2012, at 243, 244, 285. Later, after Mr. Floyd provided his results to Exponent, they requested he reclassify the fibers he identified as "transitional" and ambiguous. *Id.* at 284-85. Exponent's request for a "final check" of the anthophyllite fibers was not based upon any procedures contained in a quality control manual, as there is no such written protocol. **Ex. 22**, Deposition of Mark Floyd, June 5, 2013, at 64-74; **Ex. 27**, Deposition of Elizabeth Anderson, June 12, 2013, at 184-85.

[83] **Ex. 23**, Deposition of Andreas Saldivar taken March 13, 2015, at 125, 134-35.

[84] *Id.* at 65, 67; **Ex. 20**, Deposition of Dr. Lee, May 2, 2012, at 135-37.

be identified without reference to "populations." "Since *asbestos fibers are found isolated* as well as with each other or with other particles in varying arrangements, the fibrous particulates are characterized as asbestos structures: Fiber (F)…Bundle (B)…Cluster (C)…Matrix (M).[85]

### 5. Dr. Gordon Reasonably Accounted for the Presence of Other Minerals in the Samples He Tested.

Colgate has created a false obstacle in the form of "interferences." It asserts that Dr. Gordon did not even know what an interference was nor could he even name one. This might seem shocking as Dr. Gordon has been conducting electron microscopic analysis for forty-five years. When first asked about interferences, Dr. Gordon doesn't claim ignorance, but rather states, "Well, clearly, there are materials on these fibers that could potentially interfere, and that—that may, in fact, be what we're seeing and why we're seeing some differences as compared to…the fiber that you would expect if you looked at pure material mined."[86] When asked if there could be "interferences…a substance that appears similar to asbestos but is not asbestos," Dr. Gordon testified, "I don't think that's the case here."[87] In fact, Dr. Gordon has testified that he was not concerned about this idea of "interferences" as he had accounted for the presence of other minerals in the samples such as sodium, titanium, potassium and iron as being from the digested tissue and not from the fiber itself.[88]

Colgate failed to provide to the Court Dr. Gordon's testimony about what he did to account for "interferences," as they put it. Dr. Gordon has testified that he did multiple testing of the fibers he located as well as had other mineralogists review them as well (some of them were

---

[85] **Ex. 18**, Yamate Draft Protocol at p. 17-18 (emphasis added).

[86] **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 140.

[87] *Id.* at 141.

[88] *Id.* at 142.

his co-authors).[89] He further testified that he was able to discount any "interferences" to his identification of the fibers he counted in both Cashmere Bouquet and in pathology tissue by positive identification of the fiber using particle morphology, EDXA (Energy Dispersive Spectroscopy) and selected area defraction "**supportive of it being clearly not talc fiber…or chrysotile fiber, or anything else but a tremolite or anthophyllite fiber**."[90] Dr. Gordon has testified that he observed a great deal of talc in the samples he reviewed and was clearly able to distinguish it from asbestos.[91]

Dr. Gordon testified last year in the *Winkel* trial in Los Angeles County, regarding his analysis of her lymph node tissue.[92]  In fact, Colgate withdrew its request for a 402 hearing once foundation was laid as to his qualifications and methodologies.

| | |
|---|---|
| THE COURT: | Let me find out something. Because in thinking about 403 [sic] and the preliminary facts, he has a doctor's degree. He has a specialty in pathology.  And the issue the Court has is really not one of foundation but really one of relevancy. So what I'm hearing is that Mr. -- or, sorry, Dr. Gordon is going to testify as to the pathology slides taken from Mrs. Winkel.  He certainly has the background for that, and it's relevant. Is there something else I'm missing to do a 403 [sic] hearing, or to make it a valuable experience, Mr. Swedlow? |
| MR. SWEDLOW: | *We can just do it on cross in front of the jury.*  (Exhibit II, April 22, 2015 Reporter's Transcript, at p 1467-1468, italic added.) |

Dr. Gordon went on to testify about his digestion of Judith Winkel's lung tissue, extrapolated those findings of asbestos fibers into a per-gram figure based on the limit of

---

[89] **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 144.

[90] *Id.* at 201.

[91] *Id.* at 202.

[92] **Ex. 9**, Testimony of Dr. Ronald Gordon in *Winkel v. Colgate*, April 22, 2015, at 1467-68.

detection of his method and then compared them to background.[93] Dr. Gordon has now conducted the same analysis of Doris Jackson's lung and lymph node tissue, following the same methodology he has for almost five decades, and identified asbestos fibers as well as talc.[94]

## III.   Dr. Gordon's Specific Causation Opinions Are Reliable and Should Be Admitted.

Based on his extensive testing of Cashmere Bouquet, Dr. Gordon has concluded that, more likely than not, every single container of Cashmere Bouquet sold by Colgate contained some level of asbestos contamination.[95] In this case, he testified specifically that Ms. Jackson "should have had asbestos in every container [of Cashmere Bouquet] that she used to some degree" as a reasonable extrapolation of his research and testing.[96]

Dr. Gordon also reviews both lymph node tissue and lung tissue (when available) for the presence of asbestos fibers in order to determine:  (1) If the person had exposure to asbestos that can be identified, and (2) How that person's exposure compares to a control population of unexposed individuals. This analysis, specifically as it pertains to the presence of asbestos from talc in lung tissue, was published in the peer-reviewed literature along with Dr. Gordon's product testing.

### A.   Dr. Gordon's Methodology in Using His Control Group Has Been Subject to Peer Review and His Controls Are Internally Consistent.

Dr. Gordon testified at some length regarding his lab's background cases at trial in the *Winkel* case.[97] Dr. Gordon's control group has been screened for the purpose of providing an

---

[93] **Ex. 9**, Testimony of Dr. Ronald Gordon in *Winkel v. Colgate*, April 22, 2015, at 1530-32.

[94] **Ex. 2**, Report of Dr. Ronald Gordon dated June 13, 2016, at Specific Opinions Concerning the Fiber Burden Analysis of Doris Jackson's Lung Parenchyma and Lymph Nodes and Exhibit 4 thereto.

[95] **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 159:16-160:13, 202:7-15.

[96] **Ex. 15**, Deposition of Ronald Gordon, Ph.D., September 29, 2016, at 94:6-95:2, 205:5-11.

[97] **Ex. 9**, Testimony of Dr. Gordon in *Winkel v. Colgate*, April 22, 2015, p. 1550-54, 1571-72.

unexposed population with which to compare exposed individuals. Dr. Gordon testified that his colleague at Mt. Sinai, Dr. Dikman, was the screening pathologist who would obtain tissue for analysis from the patients.[98] Dr. Dikman worked with the treating physician and/or surgeon to ensure that tissue samples were only provided for individuals with no evidence of exposure to asbestos.[99] The clinicians at Mt. Sinai understood the need to take very careful histories and know exactly what questions to ask of the control group individuals.[100] While Dr. Gordon has found tremolite fibers among members of his control group, he has never found a tremolite fiber over five microns in his control group—either in the original group of 200 or the current group of 35 people.[101] In order to preserve patient confidentiality, Dr. Gordon is walled off from any personal information and is provided pre-screened tissue from non-exposed individuals. Like Dr. Gordon, Colgate's expert Dr. Roggli did not participate in the gathering of any history for his "unexposed" control group, which was done by medical students.[102]

Colgate relies on statements by its own expert Dr. Victor Roggli in support of its motion against Dr. Gordon as well as an order from a Nebraska trial court in *Cade v. Union Pac. R.R.*. That case was not a cosmetic talc case and therefore the court was not evaluating Dr. Gordon's use of lymph node tissue analysis in the context in which it was peer-reviewed and published. Furthermore, Dr. Gordon has already testified in a cosmetic talc, mesothelioma case in Los Angeles with regard to his fiber digestion and comparison to his lab's backgrounds. The *Cade*

---

[98] **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 119; **Ex. 9**, Testimony of Dr. Gordon in *Winkel v. Colgate*, April 22, 2015, at 1571-72I.

[99] **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 120.

[100] *Id.* at 123-24.

[101] **Ex. 15**, Deposition of Ronald Gordon, Ph.D., September 29, 2016, at 202:14-25. *See also id.* at 203:6-204:23 (noting that, as background levels of asbestos change over time, his control group needed to change as well).

[102] **Ex. 31**, Deposition of Dr. Roggli, April 16, 2009, at 101.

trial court cited the fact that Dr. Roggli's controls have "far higher levels of asbestos fibers in non-exposed individuals that did Dr. Gordon's group." There are two potential reasons for this: 1. Inter-lab variability (which is not only expected, but generally accepted) and 2. Dr. Roggli's controls were in fact exposed to asbestos.

Dr. Roggli's own published book, now in its third edition explains why lab's controls vary between them. Since the first edition, published in 1992, Dr. Roggli has recognized this common feature. "The wide variety of preparative techniques and analytical methodologies that have been employed by various investigators makes it difficult to extrapolate results from one laboratory to another…interlaboratory comparison trials demonstrate some striking differences among laboratories, even when the same sample is analyzed."[103] Any number of factors can influence variability between labs such as laboratory procedure and microscopy techniques used.[104] It is no wonder that the laboratory results for Dr. Roggli and Dr. Gordon vary so widely as Dr. Roggli utilizes scanning electron microscopy (SEM)[105] for his tissue digestion studies while Dr. Gordon uses TEM.

The defendant, and the court in *Cade*, did compare Dr. Gordon's backgrounds with Dr. Roggli's even though Dr. Roggli himself stated, "Still, *one must use caution in comparing results between laboratories, bearing in mind any differences in the analytical procedures employed*."[106] The important consideration is the reliability and consistency of the lab analyzing the background controls.

---

[103] **Ex. 32**, Pathology of Asbestos-Associated Diseases, 1992, 1st Ed., Roggli, Greenberg, Pratt, eds., p. 306.

[104] Pathology, p. 306-7.

[105] Pathology, p. 306.

[106] Pathology, p. 306.

The Helsinki Consensus Report from 1997, revised again in 2014, sets forth various ways in which mesothelioma may be attributed to asbestos, including "a lung fibre count exceeding the background range *for the laboratory in question*." [107] In other words, comparing the background survey of one lab to another is useless, as each lab will have had different subsets of individuals that were studied.

Colgate sets up yet another false obstacle as to whether or not Dr. Gordon's control group "has never been published or peer-reviewed." The fact is that no scientist has published what Colgate claims is required of the Mt. Sinai control group. The most that any other scientists have done, including Dr. Roggli, is to refer to their control group in their papers.

Consider Dr. Gordon's peer-reviewed publication found in ENVIRONMENTAL HEALTH PERSPECTIVES, *Lung Disease in World Trade Center Responders Exposed to Dust and Smoke: Carbon Nanotubes Found in the Lungs of World Trade Center Patients and Dust Samples*, discussed earlier.  In this peer-reviewed publication, as in this very case, Dr. Gordon and the team at Mt. Sinai compared the lung tissue of an exposed population to unexposed control groups.  The study subjects of this work were first responders to the attacks on the World Trade Center on 9-11.  The researchers described "the histopathologic patterns associated with severe forms of respiratory impairment." [108] The technology and the methods Dr. Gordon used to compare the lungs of World Trade Center first responders to the background rates found in the

---

[107] **Ex. 33**, *Consensus Report: Asbestos, asbestosis, and cancer, the Helsinki criteria for diagnosis and attribution*, SCAND. J. WORK. ENVIRON. HEALTH 23(4):311-15 (1997); **Ex. 34**, *Consensus Report: Asbestos, asbestosis, and cancer, the Helsinki criteria for diagnosis and attribution 2014: recommendations*, SCAND. J. WORK. ENVIRON. HEALTH  (emphasis added).

[108] **Ex. 5**, Wu, 2010, at p. 499 (describing the methodology of comparison used to analyze subjects under study to established control groups); *see also* **Ex. 35**, Supplemental deposition of Dr. Ron Gordon, February 4, 2015, at 105.

general population have been subjected to the scrutiny of peer-review.[109]   The Mt. Sinai researchers reveal, among other safeguards, the following methodology used in their laboratory on control groups and study subjects and reported in their peer-reviewed publication:

  i.    Occupational history gathered;

  ii.    Biopsy collected;

  iii.    Tissue digestion;

  iv.    Electron Microscopy;

  v.    Positive and negative controls prepared;

  vi.    Comparison to construction worker controls;

  vii.    Comparison to the very controls used in this case ("reevaluated 20 lung tissue samples from either lung resections or autopsies used to study for research purposes").[110]

Dr. Gordon's methodology has been subject to peer review and his controls are internally consistent—comparison with other labs, specifically Dr. Roggli's, is not proper as they use different methodologies.

Dr. Roggli's controls were likely exposed to asbestos and would be expected to have higher levels of asbestos in their tissue. First, Dr. Roggli's control population came from the VA, who were likely in the armed services.[111] Second, despite the high propensity for service personnel (especially Navy) to have asbestos exposure, Roggli did not routinely record the branch of the service for the normal lung controls.[112] Third, Dr. Roggli admits that several of his control group had occupations that he associates with asbestos exposure:

---

[109] **Ex. 35**, Deposition of Dr. Ron Gordon, February 4, 2015, at 104-105.

[110] **Ex. 5**, Wu, 2010, at p. 500.

[111] **Ex. 31**, Deposition of Dr. Roggli, April 16, 2009, at 118.

[112] *Id.* at 119.

Q       They might go down as manual laborers, for instance.  True?

A       Yes, and manual laborers is one of the groups that we found increased amounts of asbestos in the lungs.  I don't think -- I don't think – we don't have any manual laborers in our control groups, do we?  We might have.

Q       You have three -- four.

A       Really?

Q       Four manual laborers, yes, in your controls.

A       So there's certainly potential for asbestos exposure in manual laborers.[113]

Dr. Roggli's supposedly *unexposed* normal lung controls also include a garage owner, someone who works in a spinning mill[114], three people without any occupational information whatsoever ("NA"), and two hospital workers who were not doctors or nurses. Thus, it is clear that *eleven out of twenty* Dr. Roggli's normal lung controls had high potential for elevated asbestos exposure.

In 2009, Dr. David Egilman, then the Editor-in-Chief of the International Journal of Occupational and Environmental Health and Brown University Associate Clinical Professor in the Department of Community Medicine[115], wrote an extensive, peer-reviewed, and published critique of the very work Defendants represented to this court was the generally accepted view in the scientific community. In "*Fiber Types, Asbestos Potency, and Environmental Causation: A*

---

[113] **Ex. 31**, Deposition of Dr. Roggli, April 16, 2009, at 142-43.

[114] **Ex. 36**, Loomis, Dement, *et al.*, *Lung Cancer Mortality and Fibre Exposures among North Carolina Asbestos Textile Workers*, J. Occ. Env. Med. 66(8): 535-542 (2009) (evaluation of asbestos textile yarn and woven goods workers).

[115] See **Ex. 37**, Egilman, *Fiber Types, Asbestos Potency, and Environmental Causation: A Peer Review of Published Work and Legal and Regulatory Scientific Testimony*, David, Int. J. Occup. And Env. Health, Vol. 15: pp. 202-228 (2009).

*Peer Review of Published Work and Legal and Regulatory Scientific Testimony*,"[116] Dr. Egilman

critiqued Roggli et al.'s 20 year old Modern Pathology paper.[117]  He revealed serous flaws in the

background controls used by Roggli and his colleagues. Dr. Egilman concluded Roggli's work is

"A case study of how bad science can contribute to bad public policy and erroneous courtroom

and regulatory testimony."[118]

"In essence, Roggli compares lung fiber counts between mesothelioma cases and a group

of 'controls' whose fiber levels he claims represents 'background' exposures."[119] Dr. Egilman

pointed out the following methodological errors that caused Roggli to "underestimate asbestos

contribution" and rendered his methodology "misleading":[120]

1.     At least 8 of the 20 controls used by Roggli "had occupations that are
       more usually associated with occupational asbestos exposure" and "three
       lacked any occupational history" at all;[121]

2.     Dr. Roggli's "background controls" included manual laborers, garage
       owners, spinning mill workers, and other trades that are affirmatively at
       high risk for asbestos-related disease according to the National Institute
       of Occupational Safety and Health.[122]

---

[116] **Ex. 37**, Egilman, *Fiber Types, Asbestos Potency, and Environmental Causation: A Peer Review of Published Work and Legal and Regulatory Scientific Testimony*, David, INT. J. OCCUP. AND ENV. HEALTH, VOL. 15: pp. 202-228, 202 (2009).

[117] *See* **Ex. 38**, Srebo, Roggli, et al., *Malignant Mesothelioma Associated with Low Pulmonary Tissue Asbestos Burdens: A Light and Scanning Electron Microscopic Analysis of 18 Cases*, MODERN PATHOLOGY 8(6): 614-621 (1995).

[118] *See* **Ex. 37**, Egilman, *Fiber Types, Asbestos Potency, and Environmental Causation: A Peer Review of Published Work and Legal and Regulatory Scientific Testimony*, David, INT. J. OCCUP. AND ENV. HEALTH, VOL. 15: pp. 202-228, 213 (2009).

[119] *See id*. at 215.

[120] *See id*.

[121] *See id*.

[122] *See id*. at 216.

3.      Roggli himself reported that manual laborers had occupational asbestos exposures nearly three times higher than shipyard workers,[123] they were nevertheless included among his "control" cases.

4.      Srebo, the first author and a medical student with no training in occupational medicine at the time she collected the data, did not interview the controls at all to determine their occupational history;[124]

5.      Furthermore, the controls in the Srebo / Roggli paper were selected even though the authors failed to access or record information from sources that almost always contain this information, such as complete medical records or interview family members to determine what jobs or environmental exposures the controls had;[125]

6.      Srebo, Roggli, et. al. also did not exclude potentially confounding "environmental" exposures when they labeled their controls as having "background exposure."[126]

These and other methodological errors detailed in his peer-reviewed published paper required Dr. Egilman to conclude that Dr. Roggli's controls are "indistinguishable from their mesothelioma cases,"[127] cases that had known occupational asbestos exposure and asbestos related disease. The inclusion of asbestos-exposed cases in a "background control" population necessarily inflates the calculated asbestos background rate.

**B.      The Helsinki Criteria Do Not Require Finding Asbestos Fibers in the Lungs.**

Colgate points out that no asbestos fibers were found in Ms. Jackson's lung tissue. As Colgate's expert Drew Van Orden explained, scientists like to have 0.2 to 0.3 grams of tissue to perform a fiber digestion study, but in this case, they had approximately a tenth to an eighth of

---

[123] **Ex. 37**, Egilman, *Fiber Types, Asbestos Potency, and Environmental Causation: A Peer Review of Published Work and Legal and Regulatory Scientific Testimony*, David, Int. J. Occup. And Env. Health, Vol. 15: pp. 202-228, 216 (2009).

[124] *See id.*

[125] *See id.*

[126] *See id.*

[127] *See id.*

that amount.[128] Mr. Van Orden testified that the samples were "[l]ess than what we'd like to work … with."[129] If more tissue had been available, it is entirely possible that Dr. Gordon (or Mr. Van Orden) would have found asbestos fibers in Ms. Jackson's lung tissue.[130] In addition, as Colgate's expert Dr. Allan Feingold testified, the lymph node in which Dr. Gordon found this tremolite fiber drains lymph fluids from the lung.[131] The only reasonably conclusion is that the asbestos fibers found by Dr. Gordon (and Mr. Van Orden[132]) were in the lung tissue before they were transferred to the lymph nodes. Dr. Feingold admitted that the presence of asbestos fibers in the lymph nodes "represents some exposure."[133] Thus, the fact that Dr. Gordon and Mr. Van Orden found what government agencies and Colgate's own pathologist define as asbestos fibers in Ms. Jackson's lymph nodes supports Dr. Gordon's conclusion that Ms. Jackson experienced significant asbestos exposure.[134]

Moreover, contrary to Colgate's suggestion, the Helsinki criteria do not require finding asbestos fibers in lung tissue, and the failure to find asbestos fibers in lung tissue cannot prove *lack* of exposure. According to the Helsinki Consensus Report:

> A lung fiber count exceeding the background range for the laboratory in question *or* the presence of radiographic or pathological evidence of asbestos-related tissue damage (e.g., asbestosis or pleural plaques) *or* histopathologic evidence of abnormal asbestos content (e.g., asbestos bodies in histologic sections of lung) should be sufficient to relate a case of pleural mesothelioma to asbestos exposure on a probability basis. ***In the absence of such markers, a history of significant***

---

[128] **Ex. 19**, Deposition of Drew Van Orden, September 22, 2016, at 14:7-15:3.

[129] *Id.* at 15:1-3.

[130] **Ex. 15**, Deposition of Ronald Gordon, Ph.D., September 29, 2016, at 84:23-85:1, 88:9-20, 103:12-14, 210:2-11.

[131] **Ex. 39**, Deposition of Allan Feingold, M.D., September 28, 2016, at 22:18-23-17; *see also* Deposition of Ronald Gordon, Ph.D., September 29, 2016, at 88:20-22.

[132] *See*, *infra*, Sec. II.C.

[133] **Ex. 39**, Deposition of Allan Feingold, M.D., September 28, 2016, at 10:9-11:13.

[134] **Ex. 15**, Deposition of Ronald Gordon, Ph.D., September 29, 2016, at 62:8-20.

***occupational, domestic, or environmental exposure to asbestos will suffice for attribution.***[135]

Thus, there is no violation of the Helsinki criteria in attributing mesothelioma to asbestos exposure in someone with a known history of significant domestic exposure to asbestos, which is exactly what Dr. Gordon did.[136] And as Plaintiff has demonstrated in his response to Colgate's motion for summary judgment, Doris Jackson was exposed to asbestos in Cashmere Bouquet talcum powder on a daily basis from the 1940s until approximately 1990. Dr. Gordon has published his own research that shows every single bottle of Cashmere Bouquet he has tested, including nearly two dozen produced by Colgate, contained asbestos fibers.[137]

### C. Tremolite Asbestos Fibers in Ms. Jackson's Lymph Nodes, Found by Both Dr. Gordon and Mr. Van Orden, Support the Attribution of Ms. Jackson's Mesothelioma to Her Exposure to Asbestos in Cashmere Bouquet.

Dr. Gordon's opinion that Ms. Jackson's mesothelioma was caused by her exposure to asbestos from Colgate's Cashmere Bouquet talcum powder was not based solely on his identification of a tremolite asbestos fiber and three asbestos bodies in her lymph node tissue. First of all, Dr. Gordon testified that he identified more than a single tremolite fiber, but because most of these fibers were less than five microns long, he did not count them in his analysis, although they were also indicative of asbestos exposure.[138] Moreover, Dr. Gordon has tested more than fifty containers of Cashmere Bouquet talcum powder—and found asbestos fibers in

---

[135] **Ex. 33**, *Consensus Report: Asbestos, asbestosis, and cancer, the Helsinki criteria for diagnosis and attribution*, SCAND. J. WORK. ENVIRON. HEALTH 23(4):311-15 (1997) (emphasis added); **Ex. 34**, *Consensus Report: Asbestos, asbestosis, and cancer, the Helsinki criteria for diagnosis and attribution 2014: recommendations*, SCAND. J. WORK. ENVIRON. HEALTH (quoting the 1997 Helsinki criteria).

[136] **Ex. 15**, Deposition of Ronald Gordon, Ph.D, September 29, 2016, at 57:4-12, 62:8-20, 89:1-11.

[137] *See* Plaintiff's Statement of Genuine Issues in Support of Plaintiff's Opposition to Colgate-Palmolive Company's Motion for Summary Judgment, incorporated by reference as if fully set out herein.

[138] **Ex. 15**, Deposition of Ronald Gordon, Ph.D., September 29, 2016, at 96:21-97:4.

every single one[139]—which allowed him to conclude that Ms. Jackson's daily use of Cashmere Bouquet constituted a "history of significant…domestic … exposure to asbestos,"[140] which according to the Helsinki criteria, is sufficient to attribute her mesothelioma to her asbestos exposure. The identification of an asbestos fiber and asbestos bodies in her lymph nodes corroborated her exposure to asbestos and supported his opinion about the cause her disease.

And in fact, Dr. Gordon is not the only expert to have identified a fiber in Ms. Jackson's lymph nodes that fits the EPA, OSHA, and AHERA definition of an asbestos fiber. Colgate's expert Drew Van Orden identified a "particle" that, according to its chemistry and crystal structure, is tremolite.[141] The particle was at least 14.5 microns long and 2 microns wide, meeting the EPA, OSHA, and AHERA definitions of an asbestos fiber.[142] In fact, Colgate's expert Dr. Feingold testified that the particle described by Mr. Van Orden was an asbestos fiber.[143]



While agreeing that the particle, pictured above, was chemically and structurally tremolite, was more than five microns long and jad a 7:1 aspect ratio, Mr. Van Orden insisted

---

[139] **Ex. 1**, Deposition of Dr. Gordon, March 20, 2015, at 159:16-160:13, 202:7-15; **Ex. 15**, Deposition of Ronald Gordon, Ph.D., September 29, 2016, at 205:15-206:8.

[140] **Ex. 15**, Deposition of Ronald Gordon, Ph.D,, September 29, 2016, at 57:4-12, 62:8-20, 89:1-11.

[141] **Ex. 19**, Deposition of Drew Van Orden, September 22, 2016, at 24:12-26:10.

[142] *Id.* at 22:19-24:6; **Ex. 39**, Deposition of Allan Feingold, M.D., September 28, 2016, at 47:14-50:12.

[143] **Ex. 39**, Deposition of Allan Feingold, M.D., September 28, 2016, at 50:18-51:13; *see also* **Ex. 15**, Deposition of Ronald Gordon, Ph.D., September 29, 2016, at 201:4-23.

that the fiber he found was a nonasbestos particle of tremolite because, in his opinion, the sides were too bumpy to be sufficiently parallel.[144] He did not know whether there was any difference in the biological reaction to an asbestos fiber with perfectly smooth parallel sides and the tremolite "particle" he had found, however, because that matter was "a medical issue and … outside [his] area of expertise."[145] In any event, he agreed that, whatever this particle was, it was present in the tissue at a concentration of 350,000 fibers per gram, based on the sensitivity of his testing protocol.[146]

### D. The Presence of Asbestos Bodies in Ms. Jackson's Lymph Nodes Provides Further Corroboration for Dr. Gordon's Conclusion that Ms. Jackson Experienced Significant Asbestos Exposure.

Dr. Gordon also noted the presence of asbestos bodies, which further supported his conclusion that Ms. Jackson had experienced significant asbestos exposure. Dr. Gordon testified that "the normal background population have little to no asbestos bodies unless they've been exposed to some other specific component."[147]  Dr. Gordon noted that ferruginous bodies can develop in people who work with hay or other particles known to induce such formations, and if the numbers of these bodies are above background, they are evidence of a history of exposure of some kind, and "could be attributed to asbestos."[148] Such attribution is appropriate here, where Ms. Jackson reported decades of daily use of a product Dr. Gordon has shown to be contaminated with asbestos and has no reported history of working with hay or other particles that are known to form ferruginous bodies.

---

[144] **Ex. 19**, Deposition of Drew Van Orden, September 22, 2016, at 24:11-27:14.

[145] *Id.* at 32:6-19.

[146] *Id.* at 13:4-21, 24:12-25:2; *see also* **Ex. 39**, Deposition of Allan Feingold, M.D., September 28, 2016, at 34:11-15.

[147] **Ex. 15**, Deposition of Ronald Gordon, Ph.D., September 29, 2016, at 71:21-24,

[148] *Id.* at 71:24-72:5.

**IV.    Numerous Courts Have Admitted Dr. Gordon's Methodology and Opinions, and None Have Permitted Defendants to Raise His Criminal History to Challenge His Credibility.**

Colgate makes repeated reference to the state court opinion of Judge *Shulman in Bernard v. Brookfield Props., Corp.*, 984 N.Y.S. 2d 633. There, the judge granted a 2013 *Frye* challenge to Dr. James Millette's testing of Cashmere Bouquet. The Judge's decision was primarily based on Dr. Millette's modification of a technique Dr. Millette himself had authored in 1990 for asbestos in water in order to examine bulk materials for the presence of asbestos (the decision has nothing to do with Dr. Gordon). See, *Bernard* at p. 5-6. The very same testing upon which the judge granted the challenge was accepted by peer-review ten months later. At the time of his decision, Judge Shulman lamented the lack of peer-review for the specific methodology employed by Dr. Millette—a concern that no longer exists. See, *Bernard* at p. 5. Interestingly, the Judge later confessed that his decision regarding Dr. Millette was influenced by his own personal interpretation of how the facts of the case should be manifested in litigation:

> I can't help but take judicial notice of certain realities in this litigation. And accepting your premise that millions of fibers in this sample and the nature in which this product was used historically, there is no real epidemiological or statistical correlation in terms of the kinds of cases out there in the universe…I thought there was more than 22 cases until I read the brief here on spoliation. I thought there was at least 50 to 100 cases throughout the United States. Now, again, maybe that statistic is not accurate here. But there is something to be said when you have a product that was being sold and used from, I don't know, the 1900s through when they ultimately turned over and sold it off in 1995. You would think that there would be thousands and thousands of cases, particularly with the latency period and the manner in which this product is used…*Keep in mind sir, it's part of the backdrop that led to what I determined yesterday*…Also I have to keep in mind the nature in which the product was used here. The way that theses three women all uniformly used it and the way that maybe the average person doesn't. That doesn't necessarily mean that they are *culpable*. I don't mean to suggest that at all, but it's part of the backdrop.[149]

---

[149] **Ex. 40**, Hearing Transcript, April 4, 2013, at 26-28.

Judge Shulman stated on the record that his decision to grant a *Frye* challenge to Dr. Millette was against the "backdrop" that he would personally expect there to be more cases filed than the then-current twenty-two, and that the alleged exposures did not correlate with the number of legal cases.  This backdrop, of course, ignores that individuals with mesothelioma usually have no idea that the talcum product they used contained asbestos since the manufacturer never disclosed it.  Judge Shulman admitted that his expectation of "more cases" colored his evaluation of Dr. Millette's work. Nevertheless, Judge Shulman's decision was not with regard to any of Dr. Gordon's testing and was issued prior to peer review of Dr. Millette's testing.

Several courts around the country have accepted Dr. Gordon's methodology and results as reliable and admissible.  See, *e.g., id.*; *Buttitta v. Allied Signal, Inc.*, 2010 WL 1427273, *13-15 (N.J. Super. Ct. App. Div., April 5, 2010) (trial judge had "ample information from which he could determine that Gordon's methodology was scientifically sound"), cert. denied, 999 A.2d 462, 4 A.3d 1025 (2010); Hearing Tr., Feb. 8, 2010, *Torres v. Union Carbide Corp.*, No. 2009-40915, Dist. Ct. of Harris County, Texas, at 200-201 ("the methodology employed by Dr. Gordon does not appear to be out of the mainstream or scientifically invalid").[150]

In addition, any reference to Mr. Gordon's criminal history or alleged "lies" about his criminal history have no place in this case. Such evidence would be irrelevant, prejudicial, and inadmissible. Every court to have considered the issue has held that such evidence cannot be raised to challenge Dr. Gordon's credibility, and Plaintiff respectfully urges this Court to do the same for the reasons set forth in Plaintiff's motion to exclude such evidence, filed concurrently

---

[150] **Ex. 41,** *Torres v. Union Carbide Corp.*, No. 2009-40915, Dist. Ct. of Harris County, Texas.

with this response. *See* Plaintiff's Motion in Limine to Exclude Any Reference to Dr. Ronald Gordon's Criminal History and Related Matters.

## **CONCLUSION**

For the reason s stated above, Plaintiff respectfully urges the Court to allow Dr. Ronald Gordon to testify at trial concerning his challenged product testing and exposure opinions. Colgate's complaints are properly the basis of cross-examination, not a justification for exclusion. Dr. Gordon's opinions are reliable under the relevant *Daubert* standard, and Colgate's motion to preclude Dr. Gordon's testimony should be denied.

This 5th day of December, 2016.

Respectfully submitted,

**SIMON GREENSTONE
PANATIER BARTLETT**
*/s/Kevin W. Paul*
Kevin W. Paul *(pro hac vice)*
MSBA #43730
Attorney for Plaintiff
3232 McKinney Ave, Ste 610
Dallas, TX 75204
214-276-7680
kpaul@sgpblaw.com

**BROWN & GOULD, LLP**
*/s/ Daniel A. Brown*
Daniel A. Brown (Bar No. 444772)
Eileen M. O'Brien (Bar No. 483451)
7316 Wisconsin Avenue, Suite 200
Bethesda, MD  20814
Tel: 301-718-4548
dbrown@brownandgould.com
eobrien@brownandgould.com

**ATTORNEYS FOR THE PLAINTIFF**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 5, 2016 I electronically filed the foregoing true and correct copy of Plaintiff's Opposition to Defendant Colgate-Palmolive Company's *Daubert* Motion to Exclude Testimony of Plaintiff's Expert Dr. Ronald Gordon with the Clerk of Court using the CM/ECF System which will send notification of such filing to all counsel of record in the above-referenced matter.

*/s/ Kevin W. Paul*

Kevin W. Paul