**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **BRIAN D. JACKSON,** | ) | |
| **Individually and as Personal Representative** | ) | |
| **of the Estate of Doris Jackson, Deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No: 1:15-cv-01066 (TFH)** |
| **v.** | ) | |
| | ) | |
| **COLGATE-PALMOLIVE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**DEFENDANT COLGATE-PALMOLIVE COMPANY'S REPLY MEMORANDUM IN
SUPPORT OF *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S
EXPERT DR. RONALD GORDON**

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

ARGUMENT ......................................................................................................................4

I.      Plaintiff Fails to Demonstrate That Dr. Gordon's Product Testing Opinions Are
Reliable ...................................................................................................................4

         A.      Plaintiff Fails to Demonstrate That Dr. Gordon Selected a Test Method
Capable of Reliably Identifying Asbestos in Talc ....................................5

         B.      Dr. Gordon Did Not Even Follow the Requirements of the Method That
He Incorrectly Selected for His Talc Analysis .......................................10

         C.      Plaintiff Fails to Demonstrate That Dr. Gordon Properly Documented His
Findings...................................................................................................12

         D.      Dr. Gordon Purported to Perform Statistical Extrapolations That He Is Not
Qualified to Perform and That His Results Do Not Support ..................14

II.     Dr. Gordon's Exposure and Specific Causation Opinions Based on His Tissue
Analysis Should Be Precluded..............................................................................16

         A.      Plaintiff Fails to Rebut the Key Facts Supporting Preclusion of Dr.
Gordon's Exposure and Specific Causation Opinions............................16

         B.      Dr. Gordon's Findings Do Not Satisfy the Helsinki Criteria.................18

         C.      Colgate's Expert's Finding of a Single Non-Asbestiform Tremolite
Particle in Ms. Jackson's Lymph Node Does Not Support Dr. Gordon's
Opinions..................................................................................................20

         D.      Dr. Gordon's Purported Finding of Three Undocumented "Asbestos
Bodies" in Ms. Jackson's Lymph Node Tissue Is Also Insufficient to
Attribute Ms. Jackson's Mesothelioma to Asbestos Exposure...............21

III.    Dr. Gordon's Recent False Testimony Is Relevant to the Reliability of His Expert
Opinions.................................................................................................................22

CONCLUSION.................................................................................................................22

# TABLE OF AUTHORITIES

## CASES

*Bernard v. Brookfield Props. Corp.,*
   Index No. 107211/08, 2013 WL 6985407 (N.Y. Sup. Ct. Nov. 26, 2013) ........................ 7

*Black v. Rhone-Poulenc, Inc.,*
   19 F. Supp. 2d 592 (S.D.W. Va. 1998) ............................................................. 13

*Cade v. Union Pac. R.R.,*
   No. CI 12-393 (Neb. Dist. Ct. Feb. 18, 2015) ............................................. 17, 18

*Claar v. Burlington N.R.R. Co.,*
   29 F.3d 499 (9th Cir. 1994) .............................................................................. 6

*Daubert v. Merrell Dow Pharm., Inc.,*
   509 U.S. 579 (1993) ......................................................................................... passim

*Gen. Elec. Co. v. Joiner,*
   522 U.S. 136 (1997) .................................................................................... 13, 16

*Lust By & Through Lust v. Merrell Dow Pharm., Inc.,*
   89 F.3d 594 (9th Cir. 1996) .......................................................................... 5, 6

*Meschino v. N Am. Drager, Inc.,*
   841 F.2d 429 (1st Cir. 1988) ........................................................................ 1, 5

*Morales v. Am. Honda Motor Co.,*
   151 F.3d 500 (6th Cir. 1998) ........................................................................ 14

*Smelser v. Norfolk S. Ry. Co.,*
   105 F.3d 299 (6th Cir. 1997) *abrogated on other grounds* ............................ 14

*United States v. Hebshie,*
   754 F. Supp. 2d 89 (D. Mass. 2010) ............................................................ 12

*Valentine v. Pioneer Chlor Alkali Co.,*
   921 F. Supp. 666 (D. Nev. 1996) .................................................................. 6

## STATUTES

Fed. R. Evid. 608 ................................................................................................ 22

Fed. R. Evid. 613 ................................................................................................ 22

## OTHER AUTHORITIES

2 McCormick on Evidence § 321 (7th ed. 2013) .............................................................................. 6

6 Wigmore on Evidence (Chadbourn Rev.), § 1692 ...................................................................... 6

J. Krause, *Misidenification of Asbestos in Talc* (1977) ............................................................. 1, 9

Jerome B. Krause, Letter to Ed., *Mineralogical Characterization of Cosmetic Talc
Products,* 2 J. of Toxicol. & Env'l Health 1223, 1223 (1977) ...................................... 1, 9

Robert Spirtas, *et al.*, *Malignant mesothelioma: attributable risk of asbestos exposure*, 51
Occup. Environ. Med. (1994) ........................................................................................... 18

Wylie, *Habit of Asbestiform Amphiboles* ...................................................................................... 8

## INTRODUCTION

Plaintiff announces that Dr. Gordon used "precisely the same techniques" that Drs. Rohl and Langer used forty years ago.  Opp. at 18.  That is all the more reason that Plaintiff cannot demonstrate that Dr. Gordon's method was reliable, as required to pass muster under *Daubert*. Indeed, the FDA and World Health Organization, among others, have specifically rejected Dr. Rohl's study as unreliable.[1]  The principle reason the FDA and others have rejected the "precise[] [] same" methods Dr. Gordon used here is because those methods fail to account for the well-known risks of mistakenly identifying asbestos in talc.  Dr. Gordon's gambit, claiming asbestos contamination in Cashmere Bouquet talcum powder by using a forty-year-old test method that the FDA and others have rejected as unreliable, is exactly the sort of ends-driven pseudo-science *Daubert* rejects.

Plaintiff's Opposition asks the Court to ignore the scientific flaws in Dr. Gordon's chosen method, and the concerns expressed by the FDA and others, and simply defer to the fact that Dr. Gordon and his two coauthors—all plaintiffs' experts retained in litigation against Colgate— published their findings in a peer-reviewed journal.  According to Plaintiff, that publication, by itself, demonstrates "acceptance" in the scientific community.  Common sense alone is enough the reject Plaintiff's circular reasoning—that an expert can avoid a *Daubert* challenge simply by publishing his litigation work—but the law rejects it as well.  *Meschino v. N Am. Drager, Inc.,* 841 F.2d 429, 434 (1st Cir. 1988) ("An article does not reach the dignity of a 'reliable authority' merely because some editor, even a most reputable one, sees fit to circulate it.").  It is not enough

---

[1]    Dkt. No. 48-3 (1986 Letter From FDA) at FDA00003601 (stating test results were of "questionable reliability" and citing to article, Dkt. No. 48-6 (J. Krause, *Misidenification of Asbestos in Talc* (1977)), which criticized Rohl and Langer findings); Dkt. No. 48-5 (IARC 93) at 303-304; Dkt. No. 48-7 (Jerome B. Krause, Letter to Ed., *Mineralogical Characterization of Cosmetic Talc Products,* 2 J. of Toxicol. & Env'l Health 1223, 1223 (1977)).

that Dr. Gordon published his analysis; Plaintiff must still show that the analysis was reliable. Plaintiff has not made, because he cannot make, that showing.

**Dr. Gordon's Product Testing**

Plaintiff's defense of Dr. Gordon's methods starts from the false premise that asbestos detection in talc is "simple." Opp. at 11. In fact, numerous scientists, including Plaintiff's other experts, have recognized that it is not. The reason that it is not, as Colgate detailed in its opening brief, is because talc contains various particles that can be mistaken for asbestos. Dr. Gordon has declined to apply the specialized test that the FDA has approved for guarding against those risks of misidentification, thus ensuring that he would label individual particles "asbestos," even if they are not. Plaintiff offers no answer—none at all—to this criticism of Dr. Gordon's testing.

Dr. Gordon has compounded the problems in his analysis with his admitted failure to maintain records as required. As a result, even according to Dr. Gordon, it would be impossible for other scientists to retrace and verify his work. Plaintiff does not contest Dr. Gordon's failure to properly record and document his work, but claims that this failure can be excused because Dr. Gordon personally verified his results by reproducing them in repeated tests. This *ipse dixit* "trust me" approach to expert analysis is the antithesis of reliable scientific inquiry, which requires documented findings specifically to permit verification by *independent* authorities.

Dr. Gordon's conclusions regarding the supposed asbestos concentrations in his samples also required him to perform a statistical analysis that he, by his own admission, is not qualified to perform ("statistics is not my thing"). Plaintiff claims there was no need for statistical analysis, and that Dr. Gordon was merely confirming the presence, not the amount, of asbestos in the product samples he tested. Opp. at 20-21. This is wrong on many levels. As an initial matter, Dr. Gordon *does* purport to quantify his results by extrapolating his findings of a single fiber to tens of thousands of fibers per gram—exactly the type of analysis that is not Dr.

Gordon's "thing."   Further, contrary to Plaintiff's assertion, it is impossible to confirm the presence of *any* asbestos in a sample based on a purported finding of a single fiber, which is what Dr. Gordon has claimed to do.   That is because, among other reasons, such *de minimis* findings can easily be the result of the fact that asbestos fibers are always present in the background air.   This is not Colgate's opinion; it is stated on the face of the method Dr. Gordon chose for his product testing, which provides that findings at the levels he has reported are equivalent to "blank" findings, *i.e.*, no asbestos at all.

**Dr. Gordon's Tissue Analysis**

Dr. Gordon's tissue analysis is similarly unscientific.   Most significantly, it is based on a "control group" for which Dr. Gordon provides no meaningful data.   Plaintiff's Opposition reinforces this fact.   Plaintiff spends pages critiquing various aspects of the control group of Dr. Victor Roggli, which Colgate had cited as an example of a generally accepted control group, in an effort to demonstrate that the members of that control group were poorly selected and thus should not be taken as a benchmark against which to compare Dr. Gordon's analysis.   But that type of critique—looking to the characteristics of Dr. Roggli's control group in order to determine whether it was validly selected—is impossible with respect to Dr. Gordon's control group because he has provided none of the same types of data that would permit such an analysis.   Once again, Dr. Gordon relies on a "trust me" approach, which is not science at all.

Further, Dr. Gordon claims to rely on the Helsinki criteria to attribute Ms. Jackson's mesothelioma to asbestos exposure, but those criteria require a finding of fibers in the *lung*, which Dr. Gordon undisputedly did not find.   Plaintiff now acknowledges that Dr. Gordon deviated from the Helsinki standards, insofar as he did not use a large enough sample of tissue for his analysis, but assures the Court that it is "entirely possible" that, had he performed a complete analysis, Dr. Gordon would have found a fiber in Ms. Jackson's lung tissue.   None of

this excuse-making satisfies *Daubert*.  It is Plaintiff's burden to show that Dr. Gordon adhered to accepted methods to perform a reliable analysis; it is not enough that it is "entirely possible" that, had he performed a complete analysis, his opinions would have been confirmed.

**Dr. Gordon's Credibility**

Dr. Gordon's repeated lies under oath regarding his past criminal conduct, which Plaintiff does not deny, is relevant to the reliability of his analysis in this case.  Dr. Gordon has failed to document his work at every turn, thus placing his credibility at issue to an extent one does not expect of a scientific expert.  Dr. Gordon's history of false testimony counsels strongly against excusing those failures.

For these reasons and the others discussed below, Colgate respectfully requests that the Court grant Colgate's Motion, or in the alternative, conduct a *Daubert* hearing to assess the reliability of Dr. Gordon's analysis.

## ARGUMENT

### I.   Plaintiff Fails to Demonstrate That Dr. Gordon's Product Testing Opinions Are Reliable

Colgate established in its Motion that Dr. Gordon failed to use the one generally accepted method for the testing he performed on purported samples of Cashmere Bouquet, and instead chose a method that fails to account for the substantial risks of misidentifying asbestos in talc.[2] Mot. at 23-26.  Colgate also demonstrated that, even with respect to the method Dr. Gordon chose, he failed to adhere to its requirements, and thus further heightened the risk of making misidentifications.  Mot. at 26-34.  As set forth below, Plaintiff has failed to refute either showing.

---

[2]   Colgate has also moved separately to preclude Dr. Gordon's analysis of talc drawn from unauthenticated vintage containers of purported Cashmere Bouquet.  Dkt. No. 45.  If the Court grants that motion, Dr. Gordon's product testing opinions would be excluded on that basis alone.

**A.      Plaintiff Fails to Demonstrate That Dr. Gordon Selected a Test Method Capable of Reliably Identifying Asbestos in Talc**

Plaintiff ignores Colgate's principal argument in support of its Motion.  As Colgate explained, Dr. Gordon applied a definition of "asbestos"—amphibole or serpentine particles with substantially parallel sides and 3:1 aspect ratios—that scientists (including Dr. Gordon) widely recognize encompasses non-asbestos cleavage fragments, which permitted him to report "positive" findings based on particles that are not actually asbestos and not actually dangerous.  Mot. 23-26.  Plaintiff does not provide any scientific explanation as to how, in fact, Dr. Gordon ensured against this risk of misidentification and thus performed a reliable analysis.  Instead, Plaintiff asks the Court to simply accept that Dr. Gordon's approach was sound because he wrote about it in an article that was accepted for publication.  The Court should reject that invitation.

**1.      Dr. Gordon's "Peer-Reviewed" Article Does Not Relieve Plaintiff of His Burden of Demonstrating That Dr. Gordon Selected a Reliable Method for His Product Testing**

Plaintiff defends Dr. Gordon's methods largely on the basis that he wrote about those methods in an article published in a peer-reviewed journal.  Opp. 8-9.  But Plaintiff cannot rely on the mere fact of that publication to defeat a *Daubert* challenge; indeed, *Daubert* requires a showing that an expert used "reliable" methods, and publication is merely one factor among several that may (or may not) support that showing.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993); *see also Meschino v. N Am. Drager, Inc.,* 841 F.2d 429, 434 (1st Cir. 1988) ("An article does not reach the dignity of a 'reliable authority' merely because some editor, even a most reputable one, sees fit to circulate it."); *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 597-98 (9th Cir. 1996) (affirming exclusion of expert's opinion under *Daubert* where expert had published article containing opinions).  It is a "serious error" to "assume that because an article is accepted for publication . . . that the science it contains is

therefore valid," and *Daubert* therefore requires the court to "look behind the fact that [an expert] published the results of his research . . . and to examine for itself the method [the expert] employed in reaching his conclusion." *Valentine v. Pioneer Chlor Alkali Co.*, 921 F. Supp. 666, 675-76 (D. Nev. 1996) (citing *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 501 (9th Cir. 1994) (precluding expert's opinions under *Daubert* despite publication of opinions in peer-reviewed scientific journal).[3]

The article Plaintiff is relying on is a perfect example of the sort of publication that a Court should not simply defer to as valid. *See Lust By & Through Lust*, 89 F.3d at 597 (observing that it is "not unreasonable to presume" that an expert who published an article while "already a professional plaintiff's witness," was influenced "by a litigation-driven financial incentive"). Indeed, while Plaintiff inexplicably suggests that the article represents the "independent[]" analyses of its three authors, Opp. at 9, Dr. Gordon and his two coauthors actually report on the analyses they each performed as paid experts in the same litigation against Colgate. *See generally* Opp. Ex. 13 ("Article"). The Article itself states that the work was "paid for by attorneys for litigation purposes," where "[f]unding . . . was provided as part of litigation." *Id.* at 15.

Plaintiff's other testing expert (and Dr. Gordon's co-author), Mr. Sean Fitzgerald, has acknowledged what courts have held, which is that a paper does not become scientifically verified simply because it is published in a peer-reviewed journal. Reply Ex. 49 (Nov. 6, 2014 Fitzgerald Dep.) at 166:5-12. The process by which the Article was published provides

---

[3]    *See* 6 Wigmore on Evidence (Chadbourn Rev.), § 1692, at 6-7 (explaining that to be considered trustworthy the authors of a learned treatise should not have a "bias in favor of a lawsuit or of an individual" and that the authors should not have written with a "view to litigation or to the interests of a litigable affair"); 2 McCormick on Evidence § 321 (7th ed. 2013) (discussing that learned treatises are admissible hearsay because "authors of treatises have no bias in any particular case").

especially little assurance that the methods its describes are valid.  As already discussed, all three authors were already paid plaintiff-side experts against Colgate at the time they published their findings.  It is telling, moreover, that Dr. Gordon had the idea to publish after he was withdrawn as an expert in a litigation where the court had raised serious questions about his methods, and after one of his co-authors was precluded in the same case.[4]  Reply Ex. 49 (Nov. 6, 2014 Fitzgerald Dep.) at 67:10-68:11; *Bernard v. Brookfield Props. Corp.,* Index No. 107211/08, 2013 WL 6985407, at *1 n.2 (N.Y. Sup. Ct. Nov. 26, 2013) (stating Dr. Gordon withdrawn by plaintiffs in June 2013).  Moreover, there is no indication that the peer-review process was sufficient to address these concerns.  Mr. Fitzgerald conceded he was unaware of the identity of the peer reviewers or their qualifications.  Reply Ex. 49 (Nov. 6, 2014 Fitzgerald Dep.) at 168:6-21.  He further admitted that "most all of the comments [he received] were not necessarily methods related," and suggested no "substantive change[ ] . . . to the fundamental content of the science and the testing," but rather "were more overall grammar related."[5]  *Id.* at 188:11-23.

In sum, Plaintiff cannot meet his burden to demonstrate that Dr. Gordon used reliable methods in his product testing merely by invoking an article in which he, and two other plaintiffs' experts, reported the results from their litigation testing against Colgate.

---

[4]   The court also ordered a *Frye* hearing as to Dr. Gordon, Mot. Ex. 35 (July 24, 2012 *Bernard v. Brookfield Props. Co.,* Hr'g Tr.) at 64:4-65:11, but in June 2013 the plaintiffs withdrew him as an expert in the case before any hearing took place.  *Bernard v. Brookfield Props. Corp.,* Index No. 107211/08, 2013 WL 6985407, at *1 n.2 (N.Y. Sup. Ct. Nov. 26, 2013).

[5]   Mr. Fitzgerald also joked that because his knowledge of the comments made on the Article came entirely from Dr. Gordon, he could not say whether the edits to the Article resulted from a peer reviewer or "someone in [Dr. Gordon's] family."  Reply Ex. 49 (Nov. 6, 2014 S. Fitzgerald Dep.) at 60:2-12.

**2.    Plaintiff Has No Response to Colgate's Showing That Dr. Gordon Used an "Asbestos" Definition That Encompasses Non-Asbestos Particles**

Rather than demonstrate that Dr. Gordon took appropriate steps to address the unique challenges of accurately identifying asbestos in talc, which Colgate detailed in its opening brief, Mot. at 7-13, Plaintiff pretends those challenges do not exist.  Plaintiff dismisses Colgate's concerns by insisting, without citation, that detecting asbestos in talc is a "simple task."  Opp. at 11.  It is not:  Plaintiff's own expert, Mr. Fitzgerald, has acknowledged that talc "is a difficult material to analyze for the presence of asbestos."  Reply Ex. 50 (June 6, 2016 A.M. *Alfaro* Trial Tr.) at 88:4-7.  Numerous independent scientists have reached the same conclusion, which has been reported throughout the published literature.  Mot. at 7, n.10 (citing statements from the International Agency for Cancer Research, ASTM International, independent scientists, plaintiff's experts, and Colgate's expert).

Dr. Gordon's primary mistake—like Plaintiff's mistake in her Opposition—was proceeding as if talc analysis is "simple," and thus failing to select an analytical method, like the USP Method, that has been specially designed to avoid the unique and well-known risks of misidentification.  Plaintiff never denies, for instance, that the broad asbestos definition Dr. Gordon used encompasses cleavage fragments, though they are not asbestos.  Mot. Ex. 18 (Wylie, *Habit of Asbestiform Amphiboles)* at 60 ("Since most habits of amphibole cleave into fragments that when longer than 5 µm are also elongated, a 3:1 aspect ratio is not specific for the asbestiform habit.").  In fact, Dr. Gordon himself admits that cleavage fragments can meet the broad criteria he applied.  Mot. Ex. 23 (Feb. 12, 2015 Gordon Dep.) at 212:2-14.  And Plaintiff's other expert, Mr. Fitzgerald, has acknowledged that individual particles of amphibole minerals found in talcum powder are far more likely to be cleavage fragments than asbestos.  Reply Ex. 51 (June 7, 2016 A.M. *Alfaro* Trial Tr.) at 29:25-28.  Yet rather than choose a standard that

would ensure that the individual particles he was labeling asbestos were in fact asbestos, and not cleavage fragments, Dr. Gordon chose a standard that would not differentiate between the two.

Plaintiff does not identify any scientific standard that Dr. Gordon applied, or any method he utilized, to ensure against this risk of misidentification.   Plaintiff instead defends Dr. Gordon's methods on grounds that they are "precisely the same" as the methods employed by Drs. Rohl and Langer in their 1976 article.  Opp. at 9.  That is a remarkable comparison for Plaintiff to make, since the Rohl/Langer study has been widely rejected as unreliable, and thus qualifies as the sort of testing *Daubert* is meant to reject.   Indeed, after Rohl/Langer reported asbestos in several unnamed cosmetic talcum powder products (one of which Plaintiff claims was Cashmere Bouquet) in 1976, a broad consensus emerged among leading scientists that those findings could not be credited.  The FDA said that its initial view that those results were of "questionable reliability proved well founded;"[6] the WHO rejected the findings outright, saying that "their methodology did not distinguish between asbestiform and non-asbestiform mineral fragments;"[7] and Jerome B. Krause, from the Colorado School of Mines, stated that the Rohl/Langer presented "impossible results and invalid conclusions."[8]  Even Drs. Rohl and Langer acknowledged, in the article itself, that their method—"precisely the same" method that Plaintiff claims Dr. Gordon used here, Opp. at 9—failed to distinguish asbestiform from non-

---

[6]    Dkt. No. 48-3 (1986 Letter From FDA) at FDA00003601 (stating test results were of "questionable reliability" and citing to article, Dkt. No. 48-6 (J. Krause, *Misidenification of Asbestos in Talc* (1977)), which criticized Rohl and Langer findings).

[7]   Dkt. No. 48-5 (IARC 93) at 303-304.

[8]   Dkt. No. 48-7 (Jerome B. Krause, Letter to Ed., *Mineralogical Characterization of Cosmetic Talc Products,* 2 J. of Toxicol. & Env'l Health 1223, 1223 (1977)).

asbestiform particles.[9]  Opp. Ex. 14 (Dkt. No. 58-15) at 277-78 (acknowledging that analysis did not "distinguish between possible differences" between asbestos and non-asbestos particles).

In sum, Plaintiff has no answer for Colgate's showing that Dr. Gordon used standards that fail to differentiate asbestos from non-asbestos particles, and in fact equates his testing with historical testing from the 1970s that has been widely rejected as unreliable on that exact basis.

### B.     Dr. Gordon Did Not Even Follow the Requirements of the Method That He Incorrectly Selected for His Talc Analysis

In addition to demonstrating in its opening brief that Dr. Gordon selected a method that was not suited to differentiating asbestos particles from cleavage fragments, Colgate showed that he failed to meet all of the requirements of that chosen method, thereby creating an added danger that he would misidentify certain minerals as asbestos-forming minerals when, in fact, they were not.  Mot. at 11, 15-18, 28-30.  Plaintiff does not dispute that Dr. Gordon selected the Yamate method, but failed to perform a Level III analysis.  Opp. at 12 ("Dr. Gordon utilized Level II").  As a result, Dr. Gordon avoided performing the form of analysis—"quantitative zone axis"— needed to avoid mistakenly identifying certain accessory minerals commonly found in talc as asbestos.  Mot. at 16-18, 28-30.  Dr. Gordon thus failed to follow his chosen method "faithfully," as *Daubert* requires.  *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1319 (9th Cir. 1995).

Plaintiff responds to Colgate's showing with a series of arguments that do nothing to excuse Dr. Gordon's decision to skip Level III analysis.  *First*, Plaintiff cites testimony from Colgate's expert, Drew Van Orden, in which he states that he used Yamate Level II for part of his analysis.  Opp. at 11.  What Plaintiff ignores is that Mr. Van Orden's report makes clear that

_____

[9]  Plaintiff also claims that Dr. Gordon was "not concerned" about interferences because "he had accounted for the presence of other minerals in the samples . . . ."  Opp. at 22.  But Plaintiff provides no citation to a scientific method or criteria that Dr. Gordon used to make this distinction and again asks Colgate to simply take Dr. Gordon's word for it.  *See id.*

he also performed "measurement and comparison of SAED patterns with zone axis diffraction patterns," which is exactly what Level III requires, exactly what the World Health Organization recommends,[10] and exactly what Dr. Gordon failed to do.  Opp. Ex. 19 (Van Orden Dep.) (*see* Ex. 3 to deposition).[11]

*Second*, Plaintiff misleadingly excerpts from the Yamate method to suggest that it does not actually require Level III analysis where the presence of asbestos is disputed in a legal proceeding.  Opp. at 12.  In fact, the Yamate method states explicitly, in multiple passages, that "[i]f a legal proceeding is anticipated, Level III analysis *will be required* . . . ."  Mot. Ex. 34 (Yamate Method) at 5 (emphasis added); *see also* Mot. at 16 n.34 (citing additional language from Yamate method).  That mandatory form of analysis is the analysis that Dr. Gordon indisputably elected not to perform.

*Third*, Plaintiff erects a straw man argument, Opp. at 13-17, suggesting that Colgate's criticism of Dr. Gordon was that he inspected too many grid openings in performing his analysis, which, in fact, was not among the criticisms Colgate advanced in its motion.  Plaintiff then defends Dr. Gordon's analysis of large numbers of grid openings on grounds that it permitted him to inspect the talc samples more closely and thus at a "much lower (better) level of detection."  Opp. 16.  But this is unresponsive to Colgate's actual criticism of Dr. Gordon's

---

[10]    Mot. Ex. 2 (IARC 93) at 286-87 (stating talc plates on edge and talc ribbons can give complex diffraction patterns that resemble amphiboles unless "carefully indexed").

[11]    Plaintiff also cites—and mischaracterizes—testimony from two scientists who are not even experts in this case, Andreas Saldivar and Richard Lee.  Opp. at 11-13.  Mr. Saldivar has testified that, in his own analyses, he has never used Level III testing.  But Mr. Saldivar was not testifying about analyses he had performed in a litigation context, Reply Ex. 52 (Aug. 6, 2015 Saldivar Dep.) at 20:13-21:7, which is the specific context, as discussed in text, in which Yamate requires Level III testing.  And Plaintiff cites Dr. Lee for the proposition that there are "a variety of published methodologies" that one could use for asbestos detection in talc, which of course says nothing about whether the specific methods Dr. Gordon selected are among those that are appropriate.  It also says nothing as to whether Dr. Gordon did "the science properly," which, as Dr. Lee made clear, is a minimum requirement for ensuring reliable results.  Opp. at 11.

work:   No matter how closely Dr. Gordon inspected the talc samples, his decision to label individual particles within those samples as "asbestos" is reliable only if he applied the scientific standards necessary to differentiate asbestos particles from non-asbestos particles.   But he failed to do so, both when he chose an overbroad definition of asbestos that encompassed cleavage fragments, and when he elected not to perform the quantitative zone-axis testing needed to distinguish non-asbestos-forming minerals from asbestos-forming minerals.   There is nothing in Plaintiff's Opposition that addresses, much less refutes, either of those critical errors.

### C.   Plaintiff Fails to Demonstrate That Dr. Gordon Properly Documented His Findings

Dr. Gordon admitted that he failed to follow the recordkeeping requirements of the Yamate method: "Do you see a paragraph that is entitled, Data Reduction? A. Yes. Q. Did you follow these data reduction protocols? A. No."   Mot. Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 166:19-23.   Plaintiff never addresses that admission, and, indeed, there is nothing to say that could excuse it.   The simple fact is that Dr. Gordon failed to record his results in a manner that, even according to him, would enable another scientist to verify his conclusions:

> Q:  . . . someone testing your hypothesis would have to find the grid opening and the fiber themselves; is that right?
>
> . . .
>
> A: If – if they could.
>
> Q: Could they?
>
> A: Chances are, no.

Mot. Ex. 15 (Mar. 20, 2015 Gordon Dep.) at 131:10-18.   This failure goes to the very heart of the scientific method.   *United States v. Hebshie*, 754 F. Supp. 2d 89, 125 (D. Mass. 2010) ("Documentation is necessary to test a hypothesis; in fact, reproducibility is the sine qua non of science."); *see also* Mot. at 31 (citing cases).   It is a large part of the reason that Justice Shulman

in New York granted Colgate's application for a hearing on Dr. Gordon's suitability as an expert for trial, Mot. Ex. 35 (July 24, 2012 Hr'g Tr.) at 64:20-24, and it is no doubt why the plaintiffs in that case withdrew Dr. Gordon rather than having him testify in defense of methods.

Plaintiff assures the Court that, despite Dr. Gordon's admitted record keeping failure, his results are "reproducible," since he himself reproduced them, as well as Plaintiff's other litigation experts. Opp. at 17. But this *ipse dixit* "trust us" approach is the exact opposite of the sort of verification, by *independent* scientists, that proper recordkeeping is meant to ensure. *See, e.g., Black v. Rhone-Poulenc, Inc.,* 19 F. Supp. 2d 592, 598-600 (S.D.W. Va. 1998) (precluding expert opinion in part due to failure to maintain records, which made "independent reconstruction [of results] exceedingly difficult if not impossible"); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (stating court need not accept expert opinion "that is connected to existing data only by the *ipse dixit* of the expert").

Without ever denying that Dr. Gordon failed to comply with the recordkeeping requirements of his chosen method, Plaintiff cites certain records that he did purportedly maintain, including various images from under his microscope. One need only review Dr. Gordon's images, which Plaintiff attached to their Opposition as Exhibit 16, to appreciate what a poor substitute they are for actual compliance with his full recordkeeping obligations. Below are four representative images from Opposition Exhibit 16 that purport to show the "photomicrographs" Plaintiff claims Dr. Gordon took during his analysis:



Opp. Ex. 16; *see also* images set forth at Sanchez Decl. at ¶ 39 for comparison).  Nothing useful can be gleaned from these images, yet these are the images that Plaintiff has presented, in support of meeting his burden under *Daubert*, as evidence that Dr. Gordon recorded his findings in a manner conducive to reproducibility and verification by independent scientists.

Plaintiff next attempts to suggest a false equivalence between recordkeeping by other experts in the case, and the recordkeeping by Dr. Gordon.  Opp. at 18-20.  There is no comparison.  Colgate's experts documented their analysis far more comprehensively than Dr. Gordon, including the results of each grid opening they analyzed,[12] which is something Colgate would easily demonstrate at any hearing on this motion.  In any event, Plaintiff's effort to point the finger elsewhere does not change the fact that Dr. Gordon, by his own admission, failed to document his findings in the manner he was required to under his chosen method, or in a manner that would permit another scientist to track his analysis.  Those are grounds for preclusion.  *See, e.g.*, *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 304 (6th Cir. 1997) *abrogated on other grounds by Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 514 (6th Cir. 1998) (testimony improperly admitted where expert had "failed to adequately document testing conditions and the rate of error so the test could be repeated and its results verified and critiqued").

> **D.     Dr. Gordon Purported to Perform Statistical Extrapolations That He Is Not Qualified to Perform and That His Results Do Not Support**

Dr. Gordon admitted that he repeatedly failed to find the minimum number of fibers in his test samples needed to constitute "statistically significant" findings of contamination, and that he is not qualified to make that determination in any event.  Mot. at 32-34.  As Dr. Gordon put it,

---

[12]   Opp. Ex. 19 (Van Orden Dep.) (Ex. 3 to deposition (July 27, 2016 report from RJ Lee Group, TEM Count Sheets)).

"statistics is not my thing."  Mot. Ex. 17 (Apr. 18, 2013 Gordon Dep.) at 131:3–14; *see also id.*

at 112:5-15 ("I don't do statistics.").  Plaintiff does not dispute this, but instead argues that

statistical analysis is unnecessary when an analyst is merely confirming that asbestos is present,

rather than attempting to quantify the levels at which it is present.  Opp. at 20-22.

*First*, Dr. Gordon does purport to quantify his results.  For example, in his March 4, 2014

report regarding sample FA13-15, Dr. Gordon reported finding one fiber each in four samples,

which he claimed equaled "a minimum of 11,040 anthophyllite and tremolite asbestos fibers . . .

per gram of talc."  Mot. Ex. 30, at 4-5.  Virtually all of Dr. Gordon's reports (with the exception

of the first two he prepared) also include quantifications in fibers per gram based on his

extrapolations from finding individual fibers.  *See generally* Mot. Ex. 30.  Thus, Dr. Gordon has

purported to quantify his results, which is not something he could have done, even as Plaintiff

acknowledges, without performing the sort of statistical analysis that he is not qualified to

perform.

*Second*, Plaintiff is also wrong that it is possible to reliably report the presence of

asbestos in a sample based on a finding of a statistically insignificant number of fibers.  Opp. at

20-22.  In fact, one reason scientists require a statistically significant number of fibers is because

below those levels there can be no assurance that what is being observed can reliably be called

asbestos at all.  Mot. at 32-33.  The Yamate method itself, which Dr. Gordon claims to have

followed, contains a section, Mot. Ex. 34 (Yamate method) at 68-73, which describes the number

of fibers necessary to distinguish a test result from a "blank" sample (*i.e.*, a sample containing no

asbestos).  *Id.* at 70.  Dr. Gordon mostly reported fewer than the five fiber minimum in the

samples he analyzed, thus reporting results that, according to the Yamate method he purported to

follow, were the equivalent of "blank" findings.[13]  Thus, in many instances, he reported asbestos based on statistically insignificant results that, according to Yamate itself, could not support his conclusion.  *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146-47 (1997) (affirming preclusion where expert's data did not support expert's opinion).

Dr. Gordon's opinions concerning both detection of asbestos and asbestos concentration per gram of talcum powder should be precluded for the additional reason that his dubious findings are statistically insignificant.

## II.    Dr. Gordon's Exposure and Specific Causation Opinions Based on His Tissue Analysis Should Be Precluded

### A.    Plaintiff Fails to Rebut the Key Facts Supporting Preclusion of Dr. Gordon's Exposure and Specific Causation Opinions

As Colgate demonstrated in its moving papers, Mot. at 34-42, Dr. Gordon's specific causation opinion, based on comparing the results of tissue analysis to his own control group, lacks a proper foundation.  Because he has manipulated his control group and failed to publish pertinent data relating to its membership, no scientifically reliable comparison can be made to determine whether Ms. Jackson's exposure to asbestos exceeded or fell within normal background range.  Plaintiff's Opposition, far from rebutting these points, actually underscores the need for close, gatekeeping scrutiny and exclusion under *Daubert*.

Plaintiff attempts to defend the adequacy of Dr. Gordon's control group in large part by criticizing at length the published control group of Dr. Victor Roggli, Opp. at 28-31, which, as Colgate demonstrated, Mot. at 36, indicates that normal "background" levels of exposure are far

---

[13]    *See, e.g.,* Mot. Ex. 30 at 120 (stating Dr. Gordon "documented 1 anthophyllite fiber in the 5 grids"); *id.* at 126 (same).

greater than the baseline levels in Dr. Gordon's analysis.[14]   Based on records concerning the persons included in Dr. Roggli's control group, Plaintiff argues that the control group is a population of people who were in jobs where they were likely exposed to asbestos.  Opp. at 28-31.  This critique is most interesting in that it highlights that no similar analysis is possible with respect to Dr. Gordon's control group since, unlike Dr. Roggli's control group, there is virtually no information about the people Dr. Gordon included—nothing beyond their age and gender is known.  Mot. at 36-37.  Whereas Plaintiff can exhaustively analyze and critique the individuals in Dr. Roggli's control group based on Dr. Roggli's records, Dr. Gordon provides no information about the occupations of the people in his control group, where they lived, or anything else that would permit Colgate to determine whether their lifetime exposures resemble Ms. Jackson's in any way.  *Id.*  This basic lack of information goes to the heart of the lack of reliability that is dispositive under *Daubert*; there is simply no basis to assume that Dr. Gordon has assembled an appropriate control, and no way for Colgate to test that control, since there is no information available that would demonstrate their adequacy.

This lack of documentation was just one factor that supported another court's preclusion of Dr. Gordon's exact same control group.  Mot. Ex. 36 (*Cade v. Union Pac. R.R.*, No. CI 12-393 (Neb. Dist. Ct. Feb. 18, 2015) at 3-7.  The court in *Cade* also precluded Dr. Gordon's analysis because it has never been peer reviewed and is not generally accepted.[15]   *Id.* at 5-7.  The *Cade* court also precluded Dr. Gordon's control group because he had manipulated the fiber levels in his control group by selectively removing individuals with higher exposures, and by failing to

---

[14] Dr. Roggli is a well-respected pathologist who has testified in asbestos litigation on behalf of both Plaintiffs and Defendants.  He was not retained by either party in this litigation, but his published works are relied upon by experts on both sides.

[15]   Plaintiff states that Dr. Gordon has testified about the results of his control group analysis at trial or referred to it in a single journal article, Opp. at 24-27, which is not relevant to whether his control group itself has been subject to peer review.

address this in their Opposition, Plaintiff implicitly admits that this is exactly what Dr. Gordon has done. Mot. at 36-37. By having lower levels of fibers in his control group, Dr. Gordon is more easily able to claim that even minimal levels of fibers in his patients "exceed" normal fiber levels, which allows Dr. Gordon to maintain his perfect record, in *every* case in which he has offered an opinion, of reporting that the patient's exposure was above background. *Id.*. The predictability of Dr. Gordon's findings itself raises a strong inference of bias, given that the published literature holds that only 23% of female mesothelioma cases can be attributed to asbestos exposure. Mot. Ex. 41 (Robert Spirtas, *et al.*, *Malignant mesothelioma: attributable risk of asbestos exposure*, 51 Occup. Environ. Med. 804, 804 (1994)).

In sum, the Opposition's focus on critiquing Dr. Roggli's control group only underscores the lack of information available to test the validity of Dr. Gordon's control. The Opposition otherwise fails rebut the key factors that led the *Cade* court to preclude Dr. Gordon's control group analysis, and Colgate respectfully requests that this Court do the same.

**B.    Dr. Gordon's Findings Do Not Satisfy the Helsinki Criteria**

Colgate established in its moving papers that Dr. Gordon's identification of a single fiber of tremolite in Ms. Jackson's lymph node tissue does not meet the Helsinki criteria's requirements for attributing Ms. Jackson's mesothelioma to asbestos exposure. Mot. at 38-39. Plaintiff's primary response is to concede that there was not enough lung tissue to perform an adequate (generally accepted) analysis, but if there was, "it is entirely possible" that Dr. Gordon would have found asbestos fibers in Ms. Jackson's lung tissue. Opp. at 32. Speculating about what Dr. Gordon might have found is not a proper basis for expert opinion. By conceding that that Dr. Gordon performed his analysis without the minimum amount of material necessary to support a reliable conclusion, Opp. at 31-32, Plaintiff is confirming part of the reason that his analysis fails *Daubert*.

Plaintiff also concedes that Dr. Gordon's purported finding of a single tremolite fiber in Ms. Jackson's lymph node tissue does not satisfy the three primary methods for attribution under the Helsinki criteria—none of which discusses analysis of lymph nodes.[16]  *See* Opp. at 31-33. Dr. Gordon himself admitted that "Helsinki, as written, does not support [his] conclusion that she was exposed to asbestos above background based upon [his] findings in lung tissue."  Mot. Ex. 33 (Sept. 29, 2016 Gordon Dep.) at 210:17-24.  This stunning admission warrants exclusion of his specific causation opinion or, at a minimum, further scrutiny of his bases for that opinion at a *Daubert* hearing.

Plaintiff resists this conclusion on grounds that Dr. Gordon satisfied Helsinki's alternative criteria, Opp. at 31-33, which states that "a history of significant occupational, domestic, or environmental exposure to asbestos will suffice for attribution."  Mot. Ex. 42 (Helsinki Criteria) at 313.  According to Plaintiff, Ms. Jackson's use of Cashmere Bouquet, which Dr. Gordon claims was contaminated with asbestos, establishes a history of "significant" exposure under Helsinki.[17]  Opp. at 33-34.

But Dr. Gordon's product testing, for reasons already discussed, is not a reliable basis for establishing Ms. Jackson used a contaminated product, and the available historical tests and literature regarding Cashmere Bouquet talcum powder and the relevant source mines show that cosmetic grade talc used in Cashmere Bouquet was asbestos free.  Mot. at 5-7.  Further, even if

---

[16]   Those criteria are "[1] A lung fiber count exceeding the background range for the laboratory in question *or* [2] the presence of radiographic or pathological evidence of asbestos-related tissue injury (eg, asbestosis or pleural plaques) *or* [3] histopathologic evidence of abnormal asbestos content (eg, asbestos bodies in histologic sections of lung) . . . ."  Mot. Ex. 42 (Helsinki Criteria) at 313.

[17]   Plaintiff speculates that the single fiber Dr. Gordon claimed to find in Ms. Jackson's lymph nodes may have come from her lung tissue.  Opp. at 31-32.  Not only is this argument speculative, but the Helsinki criteria states that the fiber must be found in the lung tissue, not the lymph node, regardless of where Plaintiff speculates the fiber may have been previously.  Mot. Ex. 42 at 313.

Dr. Gordon's own product testing were reliable and representative of the talcum powder Ms. Jackson used, it still would not support his conclusion that Ms. Jackson had a history of *significant* asbestos exposures.  Dr. Gordon has not performed, and is not qualified to perform, an exposure assessment that would quantify the levels of purported asbestos exposure, if any, that Ms. Jackson may have experienced and determine whether those exposures were "significant."  The only evidence in the record that quantifies possible exposures is the FDA's analysis from 1986, which determined that, assuming a hypothetical worst-case asbestos contamination level of 0.1%, the potential exposure to a consumer from cosmetic talc would be *less than* the exposures an individual receives from the ambient air over a lifetime.  Mot. Ex. 3 (1986 FDA Letter) at FDA00003602; Mot. Ex. 29 (Gordon Report) at 7 (stating only above-background exposures increase risk).

In sum, Dr. Gordon's analysis does not satisfy the Helsinki criteria he claims to rely upon.  He did not identify asbestos in Plaintiff's lung tissue; his claim of significant exposure is not supported by any independent source; and his own testing, even if valid, would not support a finding of asbestos exposure above safe background levels.

### C.  Colgate's Expert's Finding of a Single Non-Asbestiform Tremolite Particle in Ms. Jackson's Lymph Node Does Not Support Dr. Gordon's Opinions

Plaintiff also relies upon the tissue analysis of Colgate's expert, Drew Van Orden, ostensibly to support Dr. Gordon's opinions.  Opp. at 33-35.  But Mr. Van Order identified a single *non-asbestiform* tremolite particle in Ms. Jackson's lymph node tissue.  Opp. Ex. 19 (Van Orden Dep.) at 27:10-14.  Plaintiff claims that this fiber is "asbestos," but is merely repeating Dr. Gordon's mistakes by identifying any amphibole fiber with a greater than 3:1 aspect ratio as asbestos.  In any event, even if the fiber Mr. Van Orden found in the lymph node was asbestos,

as discussed it would not support a finding of attribution under Helsinki.  Mot. Ex. 42 (Helsinki Criteria) at 313.

### D.   Dr. Gordon's Purported Finding of Three Undocumented "Asbestos Bodies" in Ms. Jackson's Lymph Node Tissue Is Also Insufficient to Attribute Ms. Jackson's Mesothelioma to Asbestos Exposure

As set forth in Colgate's Motion, Dr. Gordon's claimed identification of three, undocumented "asbestos bodies" in Ms. Jackson's lymph node tissue was unreliable for multiple reasons.  Mot. at 41-42.  *First,* Dr. Gordon provided no analytical backup of his purported findings—no images and no data.  *Id.  Second,* he failed to determine whether there was, in fact, asbestos at the core of these bodies, rather than some other mineral.  *Id.  Third,* his finding of three asbestos bodies was consistent with the background levels set forth in the original version of Dr. Gordon's control group.  *Id.*  Plaintiff's Opposition fails to rebut any of these points.

Instead, Plaintiff cites to Dr. Gordon's testimony that finding above-background levels of asbestos bodies generally indicates an exposure to asbestos.  Opp. at 35.  The problem is that the trier of fact is left with nothing to support Dr. Gordon's *ipse dixit* claim that he, in fact, found "above background levels of asbestos bodies" in Ms. Jackson's tissue.  As the proponent of the evidence, Plaintiff fails to carry his burden in multiple ways.

*First*, neither Plaintiff nor Dr. Gordon cites any authority for Dr. Gordon's claim that above-background levels of "asbestos bodies" suggests an asbestos exposure, and Dr. Gordon admits that "asbestos bodies" (more appropriately called ferruginous bodies) can form around non-asbestos particles.  Mot. at 41.  *Second*, Dr. Gordon's testimony does nothing to address his failure to provide evidence of the bodies he found.  *Third*, Plaintiff's argument is based on a false premise because the levels of asbestos bodies that Dr. Gordon claimed to find were *within the background level* of the original version of Dr. Gordon's control group (before he selectively removed individuals with higher counts of asbestos bodies).  Mot. at 42.  *Fourth*, Plaintiff cites

nothing in the Helsinki protocol stating that finding purported asbestos bodies in the *lymph node* tissue is sufficient to attribute the cause of pleural mesothelioma to asbestos, let alone talcum powder.  Opp. at 35.

### III.   Dr. Gordon's Recent False Testimony Is Relevant to the Reliability of His Expert Opinions

Plaintiff does not dispute that Dr. Gordon has lied about his criminal history in repeated sworn depositions, but claims only that his lies "have no place in this case."  *See* Opp. at 37-38. To the contrary, a witness's credibility always has a place.  Fed. R. Evid. 608 (permitting cross-examination on witness's prior conduct if relevant to character for truthfulness); Fed. R. Evid. 613 (permitting cross-examination regarding prior inconsistent statements).   Moreover, an expert's credibility, particularly one who has failed to document his findings as Dr. Gordon has, is key to assessing the reliability of his scientific analysis, which, in turn, is what *Daubert* requires.  *Daubert*, 509 U.S. at 589-90 (purpose of evidentiary rules is to establish reliability of expert analysis).

As detailed throughout this brief, Dr. Gordon has failed to perform his product testing and tissue testing pursuant to accepted standards, and has repeatedly failed to document his work in a manner that would permit independent scientists to verify his results.  Dr. Gordon's history as a testifying witness does not suggest a reason to excuse these failures.

### CONCLUSION

Because Dr. Gordon's proffered product and tissue testing opinions fail to follow generally accepted scientific methodology and principles, the Court should exclude them. Alternatively, Colgate respectfully requests that the Court conduct a *Daubert* evidentiary hearing.

Respectfully submitted,

**_/s/ Matthew T. Wagman_**
Michael A. Brown (D.C. Bar No. 434094)
Matthew T. Wagman (D.C. Bar No. 472684)
Matthew R. Schroll (D.C. Bar No. MD29424)
Jonathan J. Huber (D.C. Bar No. 1014590)
Miles & Stockbridge P.C.
100 Light Street
Baltimore, MD  21202-1487
(410) 727-6464 (T)
(410) 385-3700 (F)
mbrown@milesstockbridge.com
mwagman@milesstockbridge.com
mschroll@milesstockbridge.com
jhuber@milesstockbridge.com