**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BRIAN D. JACKSON,**  )<br>**Individually, and as Personal Representative** )<br>**of the Estate of Doris Jackson, Deceased,**   )<br>                                                                          )<br>                **Plaintiff,**                        )<br>**v.**                                                                )<br>                                                                          )<br>**COLGATE-PALMOLIVE COMPANY,**   )<br>                                                                          )<br>                **Defendant.**                       )<br>_____  ) | Case No: 1:15-cv-01066 (TFH) |

**COLGATE-PALMOLIVE COMPANY'S REPLY IN SUPPORT OF ITS
MOTION *IN LIMINE* TO PRECLUDE ALL TESTIMONY AND
EVIDENCE REGARDING PURPORTED TESTING OF TALC BY
PLAINTIFF'S TESTING EXPERTS BECAUSE OF LACK OF
<u>AUTHENTICITY AND RELEVANCE OF TALC TESTED</u>**

Defendant Colgate-Palmolive Company ("Colgate"), by its undersigned counsel, respectfully submits this reply in support of its motion *in limine* to preclude all testimony and evidence regarding purported testing of talc by Plaintiff's testing experts because of lack of authenticity and relevance of talc tested.

## <u>INTRODUCTION</u>

In his Opposition brief, Plaintiff makes no attempt to document the chain of custody of any purported sample of Cashmere Bouquet talcum powder. Put another way, Plaintiff cannot tell this Court or a jury what happened to any purported sample between the time those samples left Colgate's manufacturing facility and decades later, when Plaintiff's lawyers took possession of them. Plaintiff has no foundation in law (other than a false equivalency) to support his argument that Colgate has somehow waived the ability to argue that these samples are not authentic.

At bottom, Plaintiff cannot explain or give any indication whether any of the containers has been tampered with, or tainted with asbestos particles from the ambient air, over the course of decades. Plaintiff asks the Court to excuse that failure because his case will be "irreparably harmed" if Colgate's Motion is granted. This is no reason to ignore the law's demand for authentic evidence, or Plaintiff's burden to establish a chain of custody for the materials he intends to rely on at trial. Colgate's Motion should be granted.

## ARGUMENT

### I. COLGATE HAS NOT WAIVED ITS ARGUMENTS OR ADMITTED TO THE AUTHENTICITY OF THESE SAMPLES

Plaintiff never denies in his Opposition that the chain of custody for the product containers is completely unknown for a period of decades. That is now undisputed. Plaintiff therefore resorts to asserting that Colgate is estopped from challenging the authenticity of the containers. Opp. at 4, 6-10. There is no proper basis for that claim.

*First*, Colgate's decision to produce product containers in its possession, as it was required to do to fulfill its discovery obligations, in no way amounts to an "admission" that those containers hold Cashmere Bouquet talcum powder in its original condition. "A party's duty to produce documents [or tangible things] . . . applies to responsive documents [or tangible things] in its 'possession, custody, or control.' They must be produced regardless of their authenticity, accuracy, or reliability, so the act of production does not say anything about authenticity, accuracy, or reliability. Those are matters for follow-up requests for admissions or other discovery tools." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 578-79 (7th Cir. 2015). *See also Clark v. County of Tulare*, 775 F. Supp. 2d 1075, 1102 (E.D. Cal. 2010) ("Documents [or tangible things] produced in discovery are not generally self-authenticating, and it is plaintiff's burden to establish the authentication of each document [or tangible thing] presented as

evidentiary support. . . . Merely producing a document [or tangible thing] in discovery does not 'authenticate it.'"); *Cramer v. NEC Corp. of Am.*, 496 Fed. Appx. 461, 463-464 (5th Cir. 2012) ("The discovery request was too broad to provide evidence of authenticity, the document itself bears no indication of authenticity, and Merryman's deposition testimony was noncommital. We therefore hold that the district court did not abuse its discretion in excluding the document."). Plaintiff never challenges Colgate's showing that these containers, far from having a verified chain of custody and confirmed authenticity, were collected from an array of sources, including garage sales and antique stores over a period of decades.  Colgate's "mere act of producing" these containers "does not amount to an admission of [] authenticity," and Colgate's compliance with its discovery obligations cannot be held against it in the manner that Plaintiff is proposing. *Castro,* 786 F.3d at 578.

*Second*, contrary to Plaintiff's assertion, Colgate has not "admitted" the authenticity of what was in the historical containers because its experts published an article describing testing they performed on those samples.[1]  Opp. at 6-7.  The authors of this article, *Assessment of Health Risk from Historical use of Cosmetic Talcum Powder*, far from confirming the provenance of the talcum powder used in that study, made clear that those samples were "open and previously used" as of the time the authors obtained them, and that their "provenance . . . could not be confirmed with certainty."  Pl.'s Ex. 5, ECF No. 57-9 (Anderson, *Assessment of Health Risk from Historical Use of Cosmetic Talcum Powder*) at 4.  Even according to Plaintiff, the authors

---

[1]  Plaintiff claims that Colgate is "hypocritical," among other reasons, because it is planning to present its own testing as evidence, while seeking to exclude the testing by Plaintiff's experts. Opp. at 5. In fact, Colgate's view is that the samples, and all testing, should be precluded for all purposes, and that neither side should be permitted to present the results of their experts' testing on those samples. Mot. at 22 (requesting that this Court "preclude the product samples"). If the Court declines to preclude those samples, however, then Colgate would plan to present its own expert analysis in order to rebut the testimony of Plaintiffs' experts.

merely "accepted this assumption [of authenticity] for purposes of th[eir] analysis."  Opp. at 8.  The reason the authors accepted that assumption is because they were assigned, not to evaluate the authenticity of the samples, but to provide a scientific critique of the product testing performed by Plaintiff's proffered expert, Sean Fitzgerald, who relied on a "glove box" to approximate purported asbestos exposures resulting from the use of cosmetic talcum powder.[2]  In other words, Colgate's attorneys assigned Colgate's experts to develop an independent basis, separate from authenticity, to challenge Mr. Fitzgerald's product testing.  Thus, Colgate in no way abandoned or contradicted its long-held view that none of the "samples" of Cashmere Bouquet can be authenticated.  Rather, like any prepared litigant, Colgate pursued other substantive defenses that would permit it to challenge Plaintiff's expert testing in the event that testing was not excluded—as it has now been excluded by multiple courts—on authenticity grounds.  Plaintiff's rule would be that Colgate may only make one argument, and that it is estopped from making any arguments in the alternative.  Not only does this proposition have no support in the case law, it has no basis in common sense or good lawyering.

*Third*, Colgate has never "admitted" the authenticity of the decades-old samples in other litigation.  Rather, Colgate agreed only "not to challenge authenticity" in a separate New York proceeding, and it did so only at the trial judge's express request to avoid mooting a *Frye* hearing

---

[2] It is telling to note that Plaintiff makes much of the fact Colgate is paying for its own experts to conduct tests and have the results published when his own experts have done exactly the same thing.  The Gordon, et al. article was published in a journal called the "International Journal of Occupational and Environmental Health."  David S. Egilman, a repeat plaintiffs' expert in asbestos litigation, is the Editor-in-Chief of this Journal, and Arthur Frank, another well-known plaintiffs' expert, is on the editorial board.  *See* Taylor & Francis Online, *Editorial Board*, available at http://www.tandfonline.com/action/journalInformation?show=editorialBoard&journalCode=yjoh20.  The three co-authors—Dr. Gordon, Mr. Fitzgerald, and Dr. Millette—are all long-time plaintiffs' experts in asbestos litigation.  All five individuals have been disclosed as proffered experts by plaintiffs making asbestos-related allegations concerning Colgate's Cashmere Bouquet talcum powder.

that the judge had determined to hold—a hearing in which Colgate subsequently prevailed. Ex. 4[3] (MD Preclusion Order) at 19-20 & n.10; *In re New York City Asbestos Litig.* No. 107211/08, 2013 WL 6985407, *1-2, *4-7 (N.Y. Sup. Ct. Nov. 26, 2013). Even then, Colgate agreed not to challenge authenticity "without prejudice to either side." *Id.*

Thus, Colgate never stipulated that the samples were authentic. To the contrary, Colgate agreed, at the trial judge's request, not to challenge authenticity "notwithstanding claimed chain-of-custody concerns." Ex. 42 (Order, *Bernard v. Brookfield Properties Corp., et al..* No. 190070/11 (N.Y. Sup. Ct. Jan. 8, 2016)) at *2, n.3. And because Colgate's agreement was made "without prejudice" to renewal of its chain of custody arguments, Colgate had no obligation to seek relief from its "stipulation." There is no "knowing or voluntary" relinquishment of Colgate's right to challenge the authenticity of these samples in this case, or any other. *United States v. Olano*, 507 U.S. 725, 733 (1993) (defining waiver). Plaintiff's argument simply misstates what happened in that prior case, which was the conclusion reached by Judge Panos in his analysis of this very issue. Ex. 4 (MD Preclusion Order) at 19-20 ("[T]he Court finds that no prior stipulation exists.").

## II.   PLAINTIFF'S EXPERT OPINIONS CANNOT BE HELPFUL TO THE JURY IF THEY ARE BASED ON UNRELIABLE "EVIDENCE"

Plaintiff attempts to avoid his burden to demonstrate that the samples are authentic by arguing that they will not be offered as evidence, but merely as expert reliance material, and are therefore not subject to the ordinary rules of admissibility. Opp. at 26-30. Chain of custody is not irrelevant to expert testimony, however, for the fundamental reason that experts must have a "reliable" foundation for their testimony. Indeed, without an adequate chain of custody, physical

---

[3] To prevent repetition, Colgate references the exhibits as numbered in its initial Motion. Any additional exhibits are attached to this Reply and the numbering of those exhibits continues where the Motion ended.

samples are inherently unreliable and therefore improper reliance material for expert testimony under Federal Rule of Evidence 702. *See DL v. Dist. of Columbia*, 109 F. Supp. 3d 12, 30 (D.D.C. 2015) (noting that expert must apply "reliable methodology to the inadmissible materials, rather than simply 'transmit' the hearsay to the jury"); *Groobert v. Pres. & Dirs. Of Georgetown Coll.*, 219 F. Supp. 2d 1, 6 (D.D.C. 2002) (requiring expert's conclusion to be based on "good grounds"); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 324 (N.D. Ill. 2008) ("[N]otwithstanding the wide latitude accorded experts in choosing the sources on which to base opinions, those sources must be shown to be reliable.") (citing *Soden v. Freightliner Corp.*, 714 F.2d 498, 505 (5th Cir. 1983)); *see also Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726 (E.D. Wis. 2008) ("[I]f the data underlying the expert's opinion is so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded.").[4] An expert's opinion that unauthenticated talc samples contained asbestos is simply irrelevant to whether authentic Cashmere Bouquet, in its original condition, contained asbestos.

As discussed in its Motion, multiple courts in other jurisdictions have similarly reasoned that testing performed on unauthenticated talc samples is not relevant to whether genuine Cashmere Bouquet talcum powder contained asbestos, and thus have precluded the testing experts' testimony regarding the very same samples at issue here. *See, e.g.*, Ex. 3 (CA

---

[4] This same reasoning applies to Plaintiff's simplistic application of Federal Rule of Evidence 803(18). There, Plaintiff argues that because the testing results have been published, those results are therefore forever immune from any attack on their underlying findings. Opp. at 30. The fact that the test results have been published, however, has no bearing on whether the material that was tested in those articles was authentic Cashmere Bouquet in its original condition. And, indeed, there is no publication that has ever purported to make determination with respect to the samples at issue in this case. Moreover, as Colgate had demonstrated elsewhere, the testing described in those articles—even putting aside that there is no indication that the samples were authentic—was performed according to unreliable scientific standards that fail scrutiny under *Daubert*. *See generally* Colgate's Mot. Summ. J. (ECF No. 46); Colgate's *Daubert* Mot. to Exclude Testimony of Pl's Expert Sean Fitzgerald (ECF No. 48); Colgate's *Daubert* Mot. to Exclude Testimony of Pl.'s Expert Ronald Gordon (ECF No. 49).

6

Preclusion Order) at 38:19-25 ("I don't think it is reasonable for him [Mr. Fitzgerald] to rely upon these containers where there is no testimony or evidence that would support a conclusion that they contained the same amount – type of Cashmere Bouquet that the plaintiff allegedly was exposed to in the '70s and in the 80s. It's just a gap in logic. You know, there isn't any science to support him."); Ex. 4 (MD Preclusion Order) at 28 (testing of same samples "excluded on grounds of relevance" in light of "Plaintiffs' inability to bear their burden to establish . . . the . . . samples' authenticity"); Ex. 5 (NJ Preclusion Order I) at 6 (excluding samples because plaintiff failed to show foundational requirement, i.e., "an uninterrupted chain of possession"); Ex. 6 (NJ Preclusion Order II) 227:18-25; 228:4-8 (excluding decades-old samples due to "break in the chain of custody," relying in part on "the definition of relevant evidence, as having a tendency . . . to prove . . . any fact of consequence to the determination of the action").

These prior holdings were correct, and the danger that the product samples here are not in the same condition as when they were manufactured and sold decades ago is very real. Plaintiff creates the straw man argument that the only concern described by Colgate is that there was a "conspiracy" to taint the samples, by numerous people in numerous locations, with asbestos. Opp. at 5. In fact, Colgate's primary concern is different, and follows directly from the testimony of Plaintiff's own experts. Mr. Fitzgerald has testified that "asbestos is everywhere." Ex. 43 (June 6, 2016 pm Trial Tr.) at 51:10-24. Indeed, there are asbestos particles in the ambient air, and there was plainly asbestos particles, of all types, in the asbestos-testing laboratories where certain of these samples were maintained, opened and unsealed, for years. In a case in which Plaintiff's experts are claiming massive levels of contamination in Cashmere Bouquet based on their findings of as few as one or two fibers in historic product samples, it is critical those samples are truly in their original condition, to permit confidence that any findings

7

of purported asbestos particles do not reflect contamination that could have occurred from the ambient air, or from any number of possible sources in a world in which "asbestos is everywhere," over a period of decades.[5]

In sum, testing performed on unauthenticated product samples, which have been unaccounted for over a period of decades, is simply irrelevant to whether genuine Cashmere Bouquet talcum powder actually contained asbestos at the time it was manufactured and sold to consumers. Fed. R. Evid. 401; *Sommerfield*, 254 F.R.D. at 324. Because Plaintiff has failed to show that the decades-old samples contained Cashmere Bouquet talcum powder in the same condition as when it was manufactured, the testing experts' opinions regarding those samples has no tendency to show that Cashmere Bouquet was asbestos-containing when Plaintiff used it.

### III. PLAINTIFF'S PURPORTED "INDICIA OF RELIABILITY" CANNOT AUTHENTICATE THE SAMPLES AS CASHMERE BOUQUET

Instead of pointing this Court to evidence that establishes any kind of a chain of custody for these containers, Plaintiff maintains that there are "reasonable indicia of trustworthiness and reliability" supporting the inference that the material in those containers was Cashmere Bouquet talcum powder. Opp. at 5. But, as shown below, none of those purported indicia provide any basis for admitting these samples (or provide foundation for their experts to give opinions about the asbestos content of Cashmere Bouquet talcum powder).

*First*, it is misdirection for Plaintiff to argue that the package labeling is indicative of authenticity. Opp. at 11-12. The actual *containers* themselves could possibly be authentic, but the issue is whether those decades-old, opened and unsealed containers actually contained

---

[5] In many instances, Dr. Gordon and Mr. Fitzgerald are claiming that there are tens of thousands or millions of fibers of asbestos in Cashmere Bouquet based on a test in which they purportedly reported a handful of asbestos fibers. *See* Colgate's *Daubert* Mot. re Gordon, ECF No. 49, Ex. 30 at 4-5, 16-17; Colgate's *Daubert* Mot. re Fitzgerald, ECF No. 48, Ex. 33 at 7.

authentic, unaltered Cashmere Bouquet talcum powder.  As explained above, Plaintiff fails to make that showing, particularly given (1) the decades-long gaps in the containers' chain of custody; (2) Mr. Fitzgerald's testimony that asbestos is "everywhere" in the environment, thus raising the reasonable possibility that any contamination occurred well after manufacture and resulted from exposure to the ambient air; and (3) the tendency of collectors to replace the contents of containers with other talcum powder.  *See supra* at 5-8.

*Second*, Plaintiff attempts to bootstrap from his misreading of the historical testing on Cashmere Bouquet to claim that the expert testing confirms authenticity of the samples because those results demonstrate the presence of the same types of asbestos minerals as separately confirmed through other evidence.  Opp. at 13-14.  This suggestion that Cashmere Bouquet somehow had a "signature" for asbestos contamination is contradicted, first, by the repeated testimony of Plaintiff's experts that the mineral content of talcum powder, and Cashmere Bouquet, is not in fact consistent, but varies.  Mot. at 14.  The Maryland court correctly "express[ed] its concern regarding the inconsistency of the testing result," noting that "[i]n at least one test, Plaintiffs' experts identified the presence of differing asbestos minerals in the same sample."  Ex. 4 (MD Preclusion Order) at 19 & n.9.  Mr. Fitzgerald's results also varied across samples; he reported different types of asbestos fibers from one sample to the next. *Compare* Ex. 44 (Sean Fitzgerald Sept. 6, 2012 Report, "Analysis of Asbestos Releasability from Cashmere Bouquet Dusting Powder") ("Fitzgerald, Dusting Powder") at 42 *with* Ex. 45 (Sean Fitzgerald Sept. 6, 2012 Report, "Analysis of Asbestos Releasability from Cashmere Bouquet Body Powder") ("Fitzgerald, Body Powder Report") at 4.  And Mr. Fitzgerald's purported concentrations of fibers also differed dramatically: for one sample he claimed that 1.53 million fibers were released in his glove box, Ex. 45 (Fitzgerald, Body Powder Report) at 6, but another

had 53.6 million fibers released. Ex. 44 (Fitzgerald, Dusting Powder Report) at 7.  The samples thus did not have a "signature" level or type of contamination that could support authenticity, and there is nothing about the results of the product testing by Plaintiff's experts, which varied widely, that provides any assurance that the samples that were analyzed consistent of actual Cashmere Bouquet in its original condition.

*Third,* the historical evidence that purportedly demonstrates "signature" contamination in Cashmere Bouquet actually showed no contamination at all.  As discussed in its Motions *in Limine* to exclude Dr. Gordon and Mr. Fitzgerald and its Motion for Summary Judgment (and the respective replies in support of those Motions filed contemporaneously with this Reply), Colgate has debunked the notion that the historical testing referenced in Plaintiff's Opposition indicates that the source mines or historical testing indicates asbestos contamination.  *See generally* Colgate's Mot. Summ. J. (ECF No. 46); Colgate's *Daubert* Mot. to Exclude Testimony of Pl's Expert Sean Fitzgerald (ECF No. 48); Colgate's *Daubert* Mot. to Exclude Testimony of Pl.'s Expert Ronald Gordon (ECF No. 49).  Plaintiff cites testing by Drs. Rohl and Langer in 1976, which purportedly indicated nearly 20% asbestos contamination in a container of Cashmere Bouquet.  Opp. at 16.  As an initial matter, that finding does not remotely resemble the test results by Plaintiff's experts, which purports to show only trace contamination, and thus contradicts Plaintiff's claim that the results of their expert testing is so closely aligned with historical findings that it must relate to the same unaltered material.  *See supra* at 9.  But perhaps more importantly, that finding, which Plaintiff seeks to bootstrap as a basis to admit the faulty modern-day testing by his experts, has been roundly rejected by no lesser authorities than the FDA and World Health Organization.  Colgate's Mot. Summ. J. (ECF No. 46) at 13-14 (collecting citations from FDA and WHO criticizing Rohl's findings).

*Fourth*, Plaintiff wrongly maintains that the samples "must be" authentic because Mr. Fitzgerald has published an article reporting on testing performed as litigation experts retained in actions against Colgate. Opp. at 19-20. Far from confirming that the samples are authentic Cashmere Bouquet, the Article does not even identify Cashmere Bouquet as the "specific brand of talc" tested. Pl.'s Ex. 7 (Gordon, Fitzgerald, Millette 2014) at 3. There is also nothing in the Article that describes any analysis that sought to address the decades-long gaps in chain of custody upon which multiple courts have relied to preclude Mr. Fitzgerald's testing opinions. *Id.* The authors made an assumption that the samples were authentic and that each container was filled with material from the same company, but have no evidence to support that proposition.

*Fifth*, Plaintiff once again argues *post hoc, ergo propter hoc* by arguing that based upon the faulty and unreliable testing of Ms. Jackson's lymph nodes, all samples of Cashmere Bouquet must be authentic. Opp. at 17. But to say that Ms. Jackson had asbestos in her system is not to say that Cashmere Bouquet was the source of that asbestos; Plaintiff's argument begs that question entirely. To the extent Dr. Gordon's analysis is at all relevant, it actually undercuts any finding of authenticity. *See* Colgate's Mot. *in Limine* re "Each and Every" Exposure Testimony (ECF No. 47) at 12-14 (describing how Plaintiff's experts have found no asbestos of any type in Ms. Jackson's body above background levels).[6] Despite spending pages in his opposition to point out instances in which anthophyllite was purportedly found in Cashmere Bouquet, Opp. at 13-16, Plaintiff fails to reconcile this allegation with the fact that Plaintiff's expert, Ronald Gordon, found zero anthophyllite fibers in Ms. Jackson's lung and lymph node tissue. Colgate's Mot. *in Limine* re "Each and Every" Exposure Testimony (ECF No. 47) at 9 (collecting

---

[6] As pointed out elsewhere, Colgate vigorously contends that the "tremolite" found in Ms. Jackson's lymph node is carcinogenic asbestiform tremolite. *See* Colgate's Opp. to Pl.'s Mot. to Exclude Colgate Witness Drew Van Orden's Conclusions that Tremolite Found in Doris Jackson's Tissue is "Non-Asbestos." ECF No. 56.

citations).  Yet, Plaintiff's own medical causation expert, Dr. Richard Kradin, admitted in this case that he would expect to find anthophyllite in Ms. Jackson's lung and lymph node tissue because it persists in tissue for decades.  *See* Colgate's Mot. *in Limine* re "Each and Every" Exposure Testimony (ECF No. 47) at 6, 38-39.  Plaintiff cannot explain this glaring inconsistency.

*Finally*, Plaintiff argues that chain of custody only applies after a person comes into possession of evidence.  Opp. at 30-31.  This makes sense in the criminal context, as nobody would care what happened to a knife used in a murder before the stabbing happened – all the Court (and justice) are concerned with is whether someone had tampered with the knife after it had been used to commit the murder.  Here, Plaintiff is essentially making the claim that the Cashmere Bouquet that Doris Jackson used was contaminated with asbestos at the time it left Colgate's manufacturing facility.  Therefore, the operative time period for which Plaintiff must account the custody for these samples extends from the moment of manufacture to the moment they arrived in the Plaintiff's experts' laboratory for testing several decades later.  As has been catalogued in Colgate's Motion and this Reply, there are yawning gaps in the account of what happened to any of these samples from their moment of manufacture to when they became involved in this litigation.  The samples cannot be authenticated and this Court should exclude all of them at the trial of this matter.

## **CONCLUSION**

For the foregoing reasons, and those set forth in Colgate's moving papers, Colgate respectfully requests that its motion be granted and that this Court should preclude all testimony and evidence regarding the talc tested.

Respectfully submitted,

*/s/ Matthew T. Wagman*
Michael A. Brown (D.C. Bar No. 434094)
Matthew T. Wagman (D.C. Bar No. 472684)
Matthew R. Schroll (D.C. Bar No. MD29424)
Jonathan J. Huber (D.C. Bar No. 1014590)
Miles & Stockbridge P.C.
100 Light Street
Baltimore, MD 21202-1487
(410) 727-6464 (T)
(410) 385-3700 (F)
mbrown@milesstockbridge.com
mschroll@milesstockbridge.com
mwagman@milesstockbridge.com
jhuber@milesstockbridge.com

*Attorneys for Colgate-Palmolive Company*